UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIKHAIL GERSHZON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COLGATE-PALMOLIVE COMPANY,<br><br>Defendant. | Case No.  23-cv-04086-JCS<br><br>**ORDER RE MOTION FOR CLASS CERTIFICATION AND MOTIONS TO EXCLUDE**<br><br>███████████████ **REDACTED**<br><br>Re: Dkt. No. 68, 76, 77 |

## I.    INTRODUCTION

Plaintiffs Mikhail Gershzon, Kristin Della, and Jill Lienhard bring a false advertising case against Defendant Colgate-Palmolive Company ("Colgate"), alleging that Colgate's labeling of its toothpaste tubes as "recyclable" is misleading and amounts to "greenwashing." Currently before the Court is Plaintiffs' Motion for Class Certification ("Class Certification Motion") and Colgate's motions to exclude the testimony of two of Plaintiffs' experts, J. Michael Dennis, Ph.D., and Colin B. Weir.  A hearing on the motions was held on January 7, 2026 and the parties filed supplemental briefs following the hearing.  For the reasons stated below, the Class Certification Motion is GRANTED.  The Motion to Exclude Expert Testimony of J. Michael Dennis ("Dennis *Daubert* Motion") is DENIED.  The Motion to Exclude Expert Testimony of Colin B. Weir ("Weir *Daubert* Motion") is DENIED.[1]

## II.    BACKGROUND

### A.    Factual Background

Colgate manufactures, markets, and sells Colgate and Tom's of Maine brand toothpastes in

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

the United States, including California. First Amended Complaint ("FAC") ¶ 18.   In 2019, Colgate introduced a "recyclable tube" made primarily of High Density Polyethylene ("HDPE"), designed to be compatible with the existing #2 plastic bottle recycling stream.  Omnibus Declaration of Kate T. Spelman ("Spelman Decl."), Ex. L, dkt. no. 75-2 at ECF pp. 46-49; Declaration of Francisco J. Rolon in Support of Plaintiffs' Motion for Class Certification ("Rolon Decl."), Ex. K (Colgate Interrogatory Responses), dkt. no. 69-15 at ECF p. 5 ("Both the Standard Tube and the Insert Tube's specifications were designed to meet the Association of Plastic Recycler's (APR) most strict critical guidance for compatibility with the #2 HDPE pigmented bottle stream").

Colgate did not transition to the new tubes all at once. Declaration of Greg Corra in Support of Colgate-Palmolive Company's Opposition to Plaintiffs' Motion for Class Certification ("Corra Decl.") ¶ 7.   "Tom's toothpaste products began transitioning in late 2019, but Colgate Total toothpaste products did not begin transitioning until late 2021." *Id.*  ¶ 5. Thus, "both non-recyclable and recyclable versions of Colgate and Tom's toothpaste products were available concurrently on store shelves for years." *Id.* ¶ 7.   According to Colgate Senior Vice President Greg Corra, Colgate has used a "bleed in" transition process, introducing the new tubes without changing the universal price code ("UPC") of the products or raising the price.  *Id.*  ¶¶ 4, 7.  For the United States market, Colgate has transitioned approximately 200 toothpaste Stock Keeping Units ("SKUs") to recyclable toothpaste tubes since 2019, "with the goal of completing the transition by the end of 2025." *Id*. ¶ 7.

The development of the new tube was the culmination of an effort by Colgate to develop recyclable packaging for its products that began in 2014. Spelman Decl., Ex. I (Corra Dep.), dkt. no. 75-2 at ECF p. 9.  According to Colgate 30(b)(6) witness Christine Rein, "the intent of the [recyclable tube] initiative was to drive consumer behavior in adopting and starting to recycle tubes. It was not intended to drive sales or anything, pricing, or anything like that." Spelman Decl., Ex. J (Rein Dep.), dkt. no. 75-2 at ECF p. 26.  Documents produced by Colgate indicate that Colgate ███████████████████████████████████████████████████████ ███████" Rolon Decl., Ex. H, dkt. no. 69-13 at ECF p. 5 (slide 3), t███████████████████████████

2

███████████████████████████████████████████

*id.*, Ex. F, dkt. no. 69-11 at ECF p. 3 (slide 2), ████████████████

█████████████████████████████████████." *Id.*, Ex. I, dkt. no. 69-14 at ECF p. 8.

The new HDPE tube was invented by Jun Wang, Colgate's Director of Global Packaging Innovation, who is a materials scientist. Rolon Decl., Ex. J (Corra Dep.), dkt. no. 68-4 at ECF p. 3. Wang's invention was recognized by the Association of Plastic Recyclers ("APR"), a trade association for plastic reprocessors, on April 9, 2019. Spelman Decl., Ex. K (April 9, 2019 APR letter recognizing Colgate's new tube) ("Recognition Letter"), dkt. no. 75-2 at ECF pp. 29-30; Rolon Decl., Ex. L, dkt. no. 69-16 at ECF p. 8 (slide 5). APR's Recognition Letter states, in part:

> APR, the Association of Plastic Recyclers, is pleased to recognize Colgate-Palmolive Company's Samson tube consisting of pigmented low melt flow HDPE, 5% or less ethylene vinyl alcohol barrier layer and tie layer, direct printed decoration, and a PET insert, as meeting or exceeding the most strict APR HDPE Critical Guidance criteria and the APR HDPE Bottle-to-Bottle protocol. This APR recognition is based on the technical recyclability of the packaging tube innovation with HDPE bottles.
>
> . . .
>
> . . . While this Recognition speaks to the compatibility of your tubes with HDPE bottle recycling, it does not speak to collection of used tubes or include other tubes in the market that may conflict with the HDPE bottle recycling process. We encourage Colgate-Palmolive to be sure in its packaging information that the public does not misunderstand that this Recognition applies to look-alike tubes or to believe collection is happening when it is not.

Spelman Decl., Ex. K (Recognition Letter), dkt. no. 75-2 at ECF pp. 29-30.

As in the Recognition Letter, in other communications with Wang, ███████████

████████████████████████████████████. *See, e.g.,* Ralon, Ex. O, dkt. no. 69-19 at ECF pp. 3-4 (June 4, 2019 email regarding Colgate's planned announcement of APR recognition, ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

Wang acknowledged as much in a March 5, 2019 email to an APR representative in advance of

APR's recognition. Ralon, Ex. M, COL 64797, dkt. no. 69-17 at ECF p. 2 (March 5, 2019 email from Wang to APR representative).

In August of 2019, an APR representative responded ██████████████████████ ████████████ ████ █████████████ ██████████

██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
████████████████████

Rolon, Ex. P, dkt. no. 69-20 at ECF p. 2 (COL61239). Similarly, in March 2022, ████████ ███████████████████████████████████████████████████ Rolon Ex. S, dkt. no. 69-21 at ECF pp. 2-3 (COL312285-86). Wang understood APR's position at that time to be that while it

█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████

████ *Id.* at ECF p. 3 (COL312285).

In June of 2019, Colgate also applied to use Green Blue Institute's How2Recycle label. Rolon Decl., Ex. J (Corra Dep.), dkt. no. 68-4 at ECF p. 6 (dep. p. 44), 10 (dep. pp. 139-140).

████████████████████████████████████████████████████

██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
████████████████████████

Rolon Decl., Ex. U, dkt. no. 69-22 at ECF p. 3 (COL7654) (August 2, 2019 email from Green Blue

---

[2] The proposed labels depicted a chasing arrows symbol and stated "We've switched to a recyclable tube! Learn more at www.tomsofmaine.com." Rolon Decl., Ex. P, dkt. no. 69-20 at ECF p. 5 (COL61242).

Institute representative to Colgate's Anne Bedarf). In an internal email sent on August 14, 2019, Anne Bedarf stated, "███████████████████████████████████████████████████████████████." Rolon Decl., Ex. P, dkt. no. 69-20 at ECF p. 3 (COL61240).



Rolon, Ex. V, dkt. no. 69-23 at ECF p. 3 (COL4523).[3]

In the meantime, Colgate was engaging in efforts to accelerate the industry-wide transition to recyclable tubes. In particular, in late 2018 or early 2019 Colgate decided it would share the new tube technology with the industry as a whole so that all tubes would become "part of the circular economy" and "enter the stream." Spelman Decl., Ex. I (Corra Dep.), dkt. no. 75-2 at ECF p. 10 (dep. p. 35). According to Colgate, it also "███████████████████████████████████████████████████████████████████████████████" Opposition at 5 (citing Spelman Decl., Ex. P). A Colgate press release announcing the new tubes issued on November 20, 2019 stated, "Colgate has engaged with

_____

[3] Colgate's Greg Corra commented in an email to Bedarf addressing MoreRecycling's position that Colgate was ███████████████████████████████████████████ Rolon Decl., Ex. V, dkt. no. 69-23 at ECF p. 2 (COL4522).

United States District Court
Northern District of California

packaging and recycling stakeholders – including end consumers – to build awareness and acceptance of the 'ready-to-recycle' tube" and "Colgate engineers are already sharing the Company's plans at key packaging forums and other industry meetings."  Spelman Decl., Ex. S, dkt. no. 75-3 at ECF p. 98.

With the introduction of the new tubes, Colgate began using the claim "Recyclable Tube" and/or the chasing arrows symbol (the "Recyclability Claim") on its toothpaste products ("the Products"). Rolon Decl. ¶ 2 & Exs. A, B.  In 2022, Colgate began "updating its recyclable tube claims to advise consumers that 'their community may not yet accept tubes for recycling,' so they should 'check locally' for information."  Corra Decl., ¶ 9.  According to Corra, "[t]his language now appears on the vast majority of Colgate's recyclable tube cartons and tubes, with plans to complete the transition for all Products."  *Id.*

Colgate conducted an "audit of production data for ten Product SKUs from each of Colgate's and Tom's major subbrands, which includes five of the fifteen highest-selling SKUs during the class period . . . , [which] reflect[ed] that the sampled products were manufactured without any Claims for approximately 40% of the class period, and that Colgate's Max Fresh Mint Stripe toothpaste (the third highest selling SKU) was concurrently manufactured in both recyclable and non-recyclable tubes (and consequently with and without the Claims) from October 2021 until June 2022."  Opposition at 6-7 (citing Spelman Decl. ¶ 14 & Ex. U (the "Production Audit")).  According to Colgate, the Production Audit also revealed that "Tom's Rapid Relief toothpaste was manufactured with 'recyclable tube' iconography on the carton for nine months in 2020, after which the iconography was removed for close to three years even though the tube inside the carton was identified as recyclable."  *Id.*

The location, language, and imagery of the Recyclability Claim also varied across the Products during the class period.  Colgate describes these variations as follows:

> For example, Tom's product cartons never had a front-of-carton Claim; the Claim has always appeared on the back or side panel of the carton and its appearance has changed significantly over time. Compare [Spelman Decl.,] Exs. V–X; [Spelman Decl., Ex. Q (Boudrow Dep.)] at 67:23–68:10; id. at 74:16–75:12. Colgate also decided "for aesthetic purposes" not to include a front-of-carton Claim on any Colgate Optic White products. [Spelman Decl., Ex. J

United States District Court
Northern District of California

(Rein Dep.)] at 67:24-68:3. While the remaining Colgate recyclable tube products were initially manufactured with a front-of-pack "chasing arrows" symbol in the lower left-hand corner of the carton, Colgate began removing the front-of-pack claim from all Colgate products in 2022. [Spelman Decl.], Ex. J (Rein Dep.) at 90:14–91:8; compare [Spelman Decl.,] Ex. Y with Ex. Z. The Production Audit reflects that, during the time the Claims appeared on the ten representative SKUs, they were on the front of the product cartons approximately 43% of the time, while they appeared only on the back or side of the cartons the remaining 57% of the time. See Spelman Decl. ¶ 14; [Spelman Decl., Ex. U (Production Audit)]. The Production Audit also shows that, for the ten sampled SKUs, the "check locally" language has been present on cartons with Claims approximately 33% of the time the Claims appeared on the label and has been present immediately adjacent to the only Claim on the label approximately 30% of the time the Claims appeared. See id.; see also, e.g., [Spelman Decl.,] Ex. T.

Opposition at 7.[4]

The three named Plaintiffs, Mikhail Gershzon, Kristin Della, and Jill Lienhard, reside in California and allege that they purchased the Products because they believed Colgate's claims that they were recyclable and understood that this meant they would be able recycle the tubes through

---

[4] Plaintiffs do not disagree that the claims on Colgate's Products changed somewhat over time, summarizing the evolution of Colgate's claims during the class period as follows:

Colgate first began including the Recyclability Claim on its Tom's of Maine cartons in late 2019. *See* Rolon Decl., Ex. J at 30:5–9; *see, e.g.*, Rolon Decl., Ex. B-89. The packaging originally featured a chasing arrows symbol with the claim: "We've switched to a recyclable tube! Learn more at www.tomsofmaine.com." *See, e.g.*, Rolon Decl., Exs. B-87, B-89. Colgate subsequently modified the Recyclability Claim on the Tom's of Maine labels by removing the chasing arrows symbol and stating "THE FIRST OF ITS KIND RECYCLABLE TUBE." *See, e.g.*, Rolon Decl., Exs. B-87.B (1/25/21), B-89.C (11/30/20). In the next refresh, the labels maintained the "RECYCLABLE TUBE" claim in large font and added an ineffective qualifier in small font: "Your community may not yet accept tubes for recycling. Check locally." *See, e.g.*, Rolon Decl., Exs. B-87.C (10/10/22), B-89.D (10/10/22). That version of the Recyclability Claim remains on the most recent Tom's of Maine labels. *See, e.g.*, Rolon Decl., Ex. B-87.D (7/12/23).

Colgate rolled out the Recyclability Claim on the Colgate-branded products from 2020 through 2021. *See* Rolon Decl., Ex. J at 30:9–40:1; *see, e.g.,* Rolon Decl., Exs. A-B. The Recyclability Claim on the Colgate-branded products consists of the chasing arrows symbol around an image of a toothpaste tube, often with the phrase "Recyclable Tube." *See, e.g.*, Rolon Decl., Exs. A-52 (4/29/21), B-21 (4/27/21), B-60.B (2/11/22). In late 2022, Colgate began including a vague and insufficient "check locally" qualifier, in small font, on the side or back of some Colgate-branded Products: "Your community may not yet accept tubes for recycling. Check locally." *See, e.g.*, Rolon Decl., Exs. A-30.A (11/20/23), B-15.A (9/14/22).

Class Certification Motion at 7-8.

United States District Court
Northern District of California

their curbside recycling program. FAC ¶¶ 8-10, 57-59.  Gershzon states in his declaration that in August 2022, he purchased Colgate Total toothpaste but he does "not remember the specific sub-brand."  Declaration of Mikhail Gershzon in Support of Plaintiffs' Motion for Class Certification ("Gershzon Decl.") ¶ 2.  According to Gershzon, "[w]hen making that purchase, [he] saw the 'Recyclable Tube' claim and the chasing arrows symbol on the carton, and that affected [his] decision to buy that toothpaste." *Id.* ¶ 3.  He states further that had he "known the 'Recyclable Tube' claim and the chasing arrows symbol was false, [he] would have valued the product less and would have either paid less for it or bought a different product." *Id.* ¶ 4.

In his deposition, Gershzon testified that he had been using Colgate Total toothpaste since 2007 and continued to purchase that toothpaste until 2023 due to his "familiarity with the brand." Spelman Decl., Ex. AA (Gershzon Dep.), dkt. no. 75-4 at ECF p. 6 (dep. pp. 90-91).  He also testified that as to the Colgate Total with the Recyclability Claim, he purchased that toothpaste because it was his "favorite toothpaste" at the time "and because [he] [saw] a new mark, recyclable."  Declaration of Rajiv V. Thairani in Support of Plaintiffs' Motion for Class Certification and Opposition to Defendant's Motions to Exclude the Expert Testimony of Colin Weir and Dr. J. Michael Dennis ("Thairani Decl."), Ex. AF (Gershzon Dep.), dkt. no. 79-3 at ECF p. 7 (dep. p. 106). Gershzon testified at his deposition that he "[wouldn't] buy Colgate in the future anymore" because he "[doesn't] trust Colgate anymore."  Spelman Decl., Ex. AA (Gershzon Dep.), dkt. no. 75-4 at ECF p. 8 (dep. p. 114).  In a supplemental declaration, he clarified that he "still desire[s] to purchase Colgate toothpaste tubes that are genuinely recyclable and that are not mislabeled" but that even if Colgate's tubes "become recyclable," he is unable to determine on an "ongoing basis" whether Colgate's Recyclability Claim is true.   Supplemental Declaration of Mikhail Gershzon in Support of Plaintiffs' Motion for Class Certification ("Gershzon Supp. Decl.") ¶¶ 2-3.

Lienhard states in her declaration that in August 2022, she purchased Tom's of Maine Fluoride-Free Antiplaque and Whitening Toothpaste.  Declaration of Jill Lienhard in Support of Plaintiffs' Motion for Class Certification ("Lienhard Decl.") ¶ 2.  Like Gershzon, she states that when she purchased this Product, she "saw the 'Recyclable Tube' claim on the carton, and that

8

United States District Court
Northern District of California

affected [her] decision to buy that toothpaste." *Id.* ¶ 3. She further states that had she "known the 'Recyclable Tube' claim was false, [she] would have valued the product less and would have either paid less for it or bought a different product." *Id.* ¶ 4. In her deposition, Lienhard testified that when she buys toothpaste, she looks for toothpastes with charcoal and "natural toothpaste"; she further testified that whether a product is recyclable is "definitely one of the factors" in her purchasing decisions and that it is "important" to her. Spelman Decl., Ex. BB (Lienhard Dep.), 75-4 at ECF p. 13 (dep. p. 26); Thairani Decl., Ex. AG (Lienard Dep.), dkt. no. 79-4 at ECF p. 6 (dep. p. 58). She testified further that she does not plan on buying Tom's of Maine toothpaste in the future "unless they change their packaging" but that she would "certainly go back to it" if the tube were recyclable. Spelman Decl., Ex. BB (Lienhard Dep.), dkt. no. 75-4 at ECF p. 17 (dep. p. 122). Similarly, she states in a supplemental declaration that she "still desire[s] to purchase Tom's of Maine toothpaste tubes that are genuinely recyclable and that are not mislabeled." Supplemental Declaration of Jill Lienhard in Support of Plaintiffs' Motion for Class Certification ("Lienhard Supp. Decl.") ¶ 2.

Della states in her declaration that in October 2022, she purchased Colgate Total toothpaste but she did "not remember the specific sub-brand." Declaration of Kristin Della in Support of Plaintiffs' Motion for Class Certification ("Della Decl.") ¶ 2. She further states that when she "saw the 'Recyclable Tube' claim and the chasing arrows symbol on the carton, . . . that affected [her] decision to buy that toothpaste." *Id.* ¶ 3. She further states that "[h]ad [she] known the 'Recyclable Tube' claim and the chasing arrows symbol was false, [she] would have valued the product less and would have either paid less for it or bought a different product." *Id.* ¶ 4. At her deposition, Della was asked about her understanding of the following statement on some of the Products: "Your community may not yet accept tubes for recycling. Check locally." Spelman Decl., Ex. CC (Della Dep.), dkt. no. 75-4 at ECF p. 30 (dep. p. 61). Della testified that it meant "Colgate expects a consumer to check locally if it accepts recyclable tubes." *Id.* at ECF pp. 30-31 (dep. pp. 61-62). She agreed that the "statement tells consumers that their municipality might not yet accept tubes for recycling." *Id.* at ECF p. 31 (dep. p. 62).

Colgate offers evidence that it has been "conduct[ing] real-world testing to substantiate the

9

United States District Court
Northern District of California

'recyclable tube' claim, including material flow tests demonstrating sortability into the HDPE recycling stream." Corra Decl. ¶ 10. In particular, in his July 24, 2024 declaration, Corra states that "Colgate has been collecting data at Mt. Diablo, a high-capacity California MRF, for the last eight months in connection with a joint project aimed at measuring increases in tube recycling through improved consumer communication." *Id.* According to Corra, "[d]uring that time, Glacier equipment installed at Mt. Diablo has recorded the MRF's sortation of over 18,000 toothpaste tubes." *Id.* & Ex. F (Glacier data).

Corra also describes other "real-world testing" Colgate has conducted "to substantiate the 'recyclable tube' claim, including material flow tests demonstrating sortability into the HDPE recycling stream." *Id.* ¶ 11. This testing included a 2018 "sortation test at Penn Waste MRF in York, Pennsylvania, which showed that 86.76% of [Colgate's] 38mm toothpaste tubes and 81.05% of [Colgate's] 35mm toothpaste tubes sorted to the HDPE color stream." *Id.* & Ex. G (December 3, 2020 presentation entitled "Colgate Toothpaste Tube Testing/ Sorting Data Details", COL03333462). According to Corra, "Colgate also conducted size sortation tests in 2018 in accordance with APR's Size Sorting Potential methodology, which showed that 87.3% of our 38mm tubes, and 80% of our 35mm tubes, successfully passed over the 'average screen size' for glass screens used in U.S. MRFs." *Id.* ¶ 13 & Ex. G. "[T]wo types of tubes manufactured by Colgate" were also included in flow testing of HDPE tubes produced by a variety of manufacturers conducted by More Recyclying at Recycle BC's Container Recovery Facility in British Columbia. *Id.* ¶ 12.

### B.    The Green Guides

The Guides for the Use of Environmental Marketing Claims ("Green Guides") are published by the Federal Trade Commission and are codified at 16 C.F.R. § 260.1, *et seq.* Under the Green Guides, it is "deceptive to misrepresent, directly or by implication, that a product or package is recyclable." 16 C.F.R. § 260.12. Thus, "[a] product or package should not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item." *Id.* Furthermore, the Green Guides require that "[m]arketers . . . clearly and

United States District Court
Northern District of California

prominently qualify recyclable claims to the extent necessary to avoid deception about the availability of recycling programs and collection sites to consumers[,]" specifying that:

> (1) When recycling facilities are available to a substantial majority of consumers or communities where the item is sold, marketers can make unqualified recyclable claims. The term "substantial majority," as used in this context, means at least 60 percent.

> (2) When recycling facilities are available to less than a substantial majority of consumers or communities where the item is sold, marketers should qualify all recyclable claims. Marketers may always qualify recyclable claims by stating the percentage of consumers or communities that have access to facilities that recycle the item. Alternatively, marketers may use qualifications that vary in strength depending on facility availability. The lower the level of access to an appropriate facility is, the more strongly the marketer should emphasize the limited availability of recycling for the product. For example, if recycling facilities are available to slightly less than a substantial majority of consumers or communities where the item is sold, a marketer may qualify a recyclable claim by stating: "This product [package] may not be recyclable in your area," or "Recycling facilities for this product [package] may not exist in your area." If recycling facilities are available only to a few consumers, marketers should use stronger clarifications. For example, a marketer in this situation may qualify its recyclable claim by stating: "This product [package] is recyclable only in the few communities that have appropriate recycling facilities."

16 C.F.R. § 260.12(b)(1) & (2).  The Green Guides advise that "[i]f any component significantly limits the ability to recycle the item, any recyclable claim would be deceptive. An item that is made from recyclable material, but, because of its shape, size, or some other attribute, is not accepted in recycling programs, should not be marketed as recyclable."  16 C.F.R. § 260.12.

### C.    Expert Reports

#### 1.    Plaintiffs' Expert Reports in Support of Class Certification Motion

##### a.    Leonard Expert Report

Plaintiffs' expert Michelle Leonard is an environmental consultant who specializes in solid waste planning and facilities.  May 22, 2025 Declaration and Expert Report of Michelle Leonard ("Leonard Report") at 3.  She was retained to evaluate "the extent to which the Products are recyclable, and to analyze whether this issue can be proven based on common evidence as to all purchasers of the Products throughout California." *Id.* at 4. She concludes that: "(1) there are well-established and objective means for assessing whether the Products are recyclable; (2) the

11

recyclability of the Products can be determined based on common evidence across all purchasers; and (3) the Products are not recyclable." *Id.*

According to Ms. Leonard, in the solid waste industry, a product is considered recyclable if it meets the following requirements:

> First, consumers must have access to recycling facilities that accept the product for recycling. Second, recycling facilities must be capable of sorting the product into the correct material bale. Third, there must be end markets where parties purchase the bales and further process them into something else.

*Id.* at 5. Ms. Leonard states that these requirements are consistent with the Green Guides. *Id.*

As to the first requirement, Ms. Leonard opines, the 60% access requirement in 16 C.F.R. § 260.12(b)(1) provides a benchmark that allows recyclability to be evaluated on a classwide basis. *Id.* at 6. Likewise, she opines that "the question of whether a substantial majority of recycling programs in California accept these toothpaste tubes is an objective one. It does not depend on individual consumer behavior and can be answered class-wide, making it a common issue suitable for class certification." *Id.* at 9. Ms. Leonard also cites evidence suggesting that toothpaste tubes, including Colgate's Products, are not widely accepted by MRFs in California, at least in part because of the difficulty of removing residue from used tubes. *Id.* at 7-9. She also notes that "major solid waste companies, including Republic Services and Waste Management, have publicly stated that they do not accept the Products for recycling" and states that "[t]hese companies are among the largest in the industry and, to [her] knowledge, employ practices that are representative of industry norms[,]" indicating that "acceptance is, at best, limited and does not meet the substantial majority threshold." *Id.* ¶ 19.

As to the second requirement, Ms. Leonard opines that the Products are not sortable "primarily because the Products are visually and physically indistinguishable from conventional, non-recyclable toothpaste tubes made from multi-layer or flexible plastic laminates." *Id.* at 10. She further opines that sorting the recyclable tubes from the tubes that are not recyclable would require advanced technologies, such as the use of "invisible digital watermarks on packaging, and sorting facilities [with] technology to read the watermarks." *Id.* at 11. According to Ms. Leonard, "existing sorting facilities in California do not have this technology." *Id.* Consequently, MRFs are

United States District Court
Northern District of California

United States District Court<br>Northern District of California

not "capable of sorting the Products into the correct material bale(s) in order for them to be recovered, baled and shipped to a recycler for use in re-manufacturing into another item." *Id.* In other words, Leonard opines, while the Products are "technically" recyclable, they are not recyclable as a practical matter. *Id.* Further, based on internal Colgate documents, Ms. Leonard opines that Colgate knew that "widespread conversion" to the HDPE tubes was "essential to driving acceptance" of the Products by MRFs and that it sought to reach a "critical mass" of 75% recyclable tubes industry-wide to increase acceptance of the new tubes by the MRFs. *Id.*

With respect to the third requirement, Ms. Leonard opines that sufficient end markets do not exist to qualify the Products as "recyclable" because post-consumer curbside contamination makes the Products hard to recycle. *Id.* at 11-13. According to Ms. Leonard, the contamination problem is exacerbated by the fact that China, which used to accept "[m]illions of tons of plastic" for recycling, adopted a stricter policy in 2013 with respect to contamination, which has resulted in "bales of mixed plastics" that once would have been accepted for recycling largely being sent to landfills. *Id.*

Finally, Ms. Leonard opines that valid and reliable surveys can be designed to: 1) inquire of local communities as to whether they accept the Products for recycling; 2) assess MRF capabilities to sort the Products into the correct bale; and 3) assess the capabilities of MRF equipment to sort the Products. *Id.* at 14-15. Alternatively, Ms. Leonard opines, "real world materials flow testing can be conducted to determine the final destination of the Products in a typical MRF." *Id.* at 15.

### b. Dennis Expert Report

Plaintiffs' expert J. Michael Dennis is a survey expert who has "been involved in the design and conduct of hundreds of statistical surveys using the internet mode of data collection over the last 25 years[.]" May 22, 2025 Declaration and Expert Report of J. Michael Dennis ("Dennis Report"). Dr. Dennis was retained to evaluate: 1) whether the Recyclability Claims on the Products "led the reasonable consumer to perceive the Products' toothpaste tubes were accepted by local recycling programs and used to recycle the tubes into usable material[;]" 2) "the

United States District Court
Northern District of California

extent to which, if any, . . . the Challenged Representations[5] were material to the reasonable consumer's purchasing behavior with respect to the Products, resulting in consumers' preferring to purchase Products having the Challenged Representations[;]" and 3) "whether it would be feasible to devise a method for conducting a market research study that can be used to reliably measure whether and to what extent class members overpaid, if anything, for the Products because of the Challenged Representations." Dennis Report at 8-9.

Thus, Dr. Dennis has designed and conducted a consumer perception survey and a consumer materiality survey; he has also designed a price premium survey to be carried out if the class is certified that will allow him to obtain data that can be used by expert Colin Weir to determine classwide damages. *Id.* at 9. Dr. Dennis opines that all three surveys have or will produce reliable results that allow for classwide determination of:  1) whether the Challenged Representations "led the reasonable consumer into believing that the toothpaste tubes would be accepted by local recycling programs and recycled into usable material[;]" 2) whether the Challenged Representations "were material to the reasonable consumer in influencing purchasing preferences" for the Products; and 3) whether and the extent to which class members overpaid for the Products  as a result of the Challenged Representations on the packaging. *Id.* at 10-11.

The consumer perception and materiality surveys were conducted between January 31, 2025 and February 6, 2025, after Dr. Dennis had conducted "pre-tests" of the surveys with smaller samples. *Id.*  ¶¶ 87, 95.  For the perception survey, Dr. Dennis used a "between-subjects experimental design whereby study-eligible respondents were randomly assigned to one of two conditions – the test group or the control group." *Id.*  at 18.  "The two groups were administered the same consumer perception questions" but the product packaging visuals shown to the test group were from an actual Product, carrying Challenged Representations, whereas the control was shown the packaging of the same Product with the Challenged Representations removed. *Id.*  ¶ 57. In creating the survey, Dr. Dennis selected a Product that he believed was "representative of the litigated products in terms of its use of the [Recyclability Claim]" but states that he could

---

[5]Dr. Dennis uses the term "Challenged Representations" to refer to the claims "Recyclable Tube," "First of Its Kind Recyclable Tube," and/or the chasing arrows symbol. *Id.* ¶ 15.

conduct additional surveys using the same methodology for other Products to the extent deemed appropriate by the Court. *Id.* ¶ 62 & n. 17.

Dr. Dennis states that to ensure reliability of the perception survey results, he used the following "best practices," among others:

- [He] established a neutral, non-judgmental context to encourage honest answers from the respondents (e.g., "There are no right answers or wrong answers…We just want your honest opinions.").

- [He] used neutral and non-leading, even-handed, unbiased, and non-alarmist language.

- The survey appropriately asked respondents to answer the survey questions as if they were considering a purchase of toothpaste in a store where they typically buy toothpaste (including both brick-and-mortar and online stores).

- In order to measure consumers' perceptions of the actual product packaging, the survey appropriately instructs respondents to base their answers only on the product packaging shown to them in the survey.

- [He] provided balanced and complete survey response options.

- [He] emphasized the availability and acceptability of providing a "Don't know" response so that my respondents would not feel that a certain response is expected or demanded of them.

- [He] gave the respondents the opportunity to view the entire product (both the complete front and back panels) on multiple occasions in order to reduce the potential for recall error.

*Id.* ¶ 65. He further states that he "appropriately used the closed-ended survey question format" for the consumer perception survey questions, explaining that "[s]urvey research professionals prefer the use of closed-ended questions, not open-ended questions, because they are more appropriate for scientifically rigorous, quantitative survey research, while open-ended survey questions have more utility for qualitative research." *Id.* ¶ 6.

Dr. Dennis describes the consumer perception survey as follows:

69. In answering the consumer perception questions, both test and control group respondents were asked to consider the same section of the front panel of the product packaging. The section was demarcated by a green rectangular border. The only difference between the two rectangular areas is the presence or absence of the Challenged

15

United States District Court
Northern District of California

Representation "Recyclable Tube." Therefore, any differences in survey responses between the test and control groups are solely attributable to the presence or absence of the Challenged Representation. I expanded the green border to include all of the descriptors displayed at the bottom of the product packaging to prevent respondents from focusing only on the specific area where the Challenged Representation is shown. Respondents had the opportunity to zoom in and view the products more closely. . . .

70. After exposing respondents to the stimulus (first without the green border and then later with the green border), the survey administered three consumer perception questions. Each survey question had the same structure and question wording. Respondents were shown either the test stimulus or the control stimulus, and then asked about their opinion of whether the content inside the green border is communicating or not communicating a specific meaning. . . . The first question . . . served as a distractor question to prevent respondents from detecting my research agenda[6] . . .

71. Each of the three consumer perception survey questions have the same components, as listed below:

**Stimulus**: The product stimulus is on the screen and the respondents had the option to zoom in. By making the product stimulus available to the respondent while answering the question, I removed the potential for respondents to provide unreliable responses due to recall error (i.e., error caused by respondents' failure to accurately recall the details of the product packaging). Test group respondents are exposed to the test stimulus; control group respondents are exposed to the control stimulus.

**The Survey Question**: The survey question wording is fixed for all three consumer perception questions. The survey question instructs respondents to consider the product packaging as a whole while answering about the content inside the green border. The survey question emphasizes equally all three response options: "Does communicate," "Does not communicate," and "Don't know / not sure."

**The Tested Meaning**: The tested meaning is the portion of the measurement that changes from question to question. The "meaning" is a potential understanding that consumers might or might not have about the content inside the green border in the context of the product packaging a whole.

72. The second consumer perception question[7] . . . measures the

---

[6] The "distractor question" shows an image of the Product (either with or without the Recyclability Claim, depending on the group) and states below the image: "Considering the product packaging as a whole, does the content inside the **GREEN border** communicate or not communicate this **meaning** to you, or do you not have an opinion? **The toothpaste product promises to help dental health in several different ways.**" *Id.* ¶ 69. Under this statement, three options are offered to the survey participant: "Does communicate this meaning[,]" "Does not communicate this meaning[,]" and "Don't know/not sure." *Id.*

[7] Dennis refers to this question as the "acceptance question." *Id.* ¶ 73. This question states,

16

extent to which consumers perceive the product packaging to be communicating that the toothpaste tube will be "accepted for recycling" by the respondent's local recycling program.

. . .

74. The third consumer perception question[8] . . . is asked only of those respondents that selected "Does communicate this meaning" in the previous question. This third consumer question is appropriate only for those respondents that had already indicated that they perceived the product packaging to communicate that their local recycling program would accept the toothpaste tube for recycling . . .

*Id*. at 23-29. Dr. Dennis followed the perception questions with survey questions designed to eliminate any respondents who "did not base their answers on exposure to the product packaging" and to allow for "group[ing] of respondents for analysis, such as by urban/rural population density, how long the respondent has been purchasing toothpaste, frequency of toothpaste purchasing, and from which retail channels the respondent had purchased toothpaste in the past 12 months." *Id.* ¶ 76.

Dr. Dennis reports that "[w]hen shown the <u>test</u> product having the Challenged 'Recyclable Tube' Representation, 87.2% of the surveyed consumers perceived the product packaging to communicate that 'the toothpaste tube will be accepted for recycling by my local recycling program.'" *Id.* ¶ 95. Further, "[w]hen shown the <u>control</u> product omitting the Challenged Representation, 17.2% of the surveyed consumers perceived the product packaging to communicate that the same message (i.e., that 'the toothpaste tube will be accepted for recycling by my local recycling program')." *Id.* He found based on these responses that "the net deception rate is 70.0%, that is, respondents shown the test group product (with the Challenged

_____

"Considering the product packaging as a whole, does the content inside the GREEN border communicate or not communicate this meaning  to you, or do you not have an opinion? **Typically, the toothpaste tube will be <u>accepted for recycling </u>by my local recycling program when the used product is put in a recycling bin."**  *Id.* Under this statement, three options are offered to the survey participant: "Does communicate this meaning[,]" "Does not  communicate this meaning[,]" and "Don't know/not sure."  *Id.*

[8] Dennis refers to this question as the "usable material" perception question.  *Id.* ¶ 75.  This question states, "Considering the product packaging as a whole, does the content inside the GREEN border communicate or not communicate this meaning  to you, or do you not have an opinion? **After being accepted by my local recycling program, the toothpaste tube will typically be recycled into <u>usable material</u>."**  *Id.*  Under this statement, three options are offered to the survey participant: "Does communicate this meaning[,]" "Does not  communicate this meaning[,]" and "Don't know/not sure."  *Id.*

Representation) were 70.0 percentage points more likely than those shown the control group product to perceive that the 'the toothpaste tube will be accepted for recycling by my local recycling program.'" *Id.* ¶ 96.

In creating the materiality survey, Dr. Dennis used the "the referendum question format[,]" which "measures consumers' preference to purchase either the Products (i) without the Challenged Representations or (ii) with the Challenged Representations." *Id.* ¶¶ 77, 80. Dr. Dennis used the same product images he used for the perception study, designating the control group product images (those that did not contain the Challenged Representations) as "Toothpaste A" and the test group product images (those that contained the Challenged Representations) as "Toothpaste B." *Id.* ¶ 81. The survey instructed respondents to "assume that the two products [were] the same in every way except for the content inside the green rectangular border" and gave respondents "the opportunity to view the front and back panels for both Toothpaste A and Toothpaste B, as well as the content inside the green border[.]" *Id.* ¶ 82. The survey then posed a "referendum question, asking respondents which product they would purchase if these were the only available options." *Id.* ¶ 83. In particular, the referendum question stated: "If these products were your only options, would you prefer to  buy **TOOTHPASTE A** would you prefer to buy **TOOTHPASTE B**, or do you not have a preference? Please indicate which one you would prefer to purchase or else select "Don't know/not sure." *Id.* ¶ 85. The same survey questions used for the perception survey also followed the referendum question in the materiality survey. *Id.* ¶ 86. According to Dr. Dennis, the materiality survey results revealed that "[b]y a factor of more than four to one, consumers prefer to purchase the Products with the Challenged Representation over the Products without the Challenged Representation: 76.6% versus 18.0%, with only 5.4% not having a preference." *Id.* ¶ 104.

Finally, Dr. Dennis describes in his report the methodology he proposes for conducting a choice-based conjoint survey (also referred to as a "price premium survey") to calculate any overpayment attributable to Colgate's use of the Challenged Representations. *Id.* at 41-54. He explains that conjoint analysis is popular in the field of consumer market research and the most widely used type of conjoint is choice-based conjoint, which he describes as follows:

18

> Choice-based conjoint . . . asks the respondent to express their preferences by choosing from sets of alternative concepts (such as product profiles). In doing so, respondents are asked to make "trade-off" decisions that reveal their real preferences for preferred goods that they would potentially purchase in the real marketplace. As such, the respondent's experience in answering choice-based conjoint surveys is similar to what buyers actually do in the marketplace – that is, choosing a preferred product from a group of products.

*Id.* ¶¶ 112-113.

Dr. Dennis explains that the conjoint survey and analysis he has designed for this case will test Plaintiffs' theory that "the market value of the Products would have been lower if Defendant had not used the Challenged Representations in its marketing." *Id.* ¶ 110. According to Dr. Dennis, "[t]he overpayment (if any) attributable to the Challenged Representations can be determined through one or more choice-based conjoint surveys, which generate a set of thousands of data points that can be utilized by a market simulator that incorporates real-world demand and supply factors based on both the survey data and independent real world historical information regarding the marketplace of toothpaste products." *Id.* ¶ 111.

Dr. Dennis states that he will apply the following principles in designing the conjoint survey:

> I will carefully design the conjoint survey to ensure that they will deliver reliable information. In designing the survey questions, the hypothetical marketplace, and attributes to the respondents, I will use best practices that are customary in the survey research industry. I will use neutral, even-handed, unbiased, non-alarmist language. I will establish a neutral marketplace context for consumers to make their choices among the product options in my conjoint surveys. I will provide respondents a "no buy" option in case none of the product options are acceptable. I will provide no information that would enable respondents to identify the research objectives or the sponsor. Respondents, therefore, will be incapable of providing strategic responses or answers motivated to "please" the researcher.

*Id.* ¶ 127. Dr. Dennis also intends to conduct "at least 24 cognitive interviews for the conjoint survey as a final check on the draft price premium survey questionnaire" before administering the survey, consistent with best practices for survey questionnaire development. *Id.* ¶¶ 128-133.

Recognizing that "the Challenged Representations for the at-issue Tom's of Maine Products appear only on the *back* of the product packaging" whereas "the Challenged Representations for the at-issue Colgate Products appear on both the *front-of-the-product package*

19

*an*d on the *side/back* of the product packaging[,]" Dr. Dennis intends to "include product attributes in the conjoint survey that cover both the Colgate-specific and Toms-of-Maine-specific scenarios." *Id.* ¶¶ 136-137 (emphasis in original).  "The conjoint survey, therefore, will include separate attributes for the front-of-package label claims and an additional attribute for other label claims that appear on the side and back panels of the at-issue Products." *Id.* ¶ 137.  Dr. Dennis proposes the use of six "attributes" for the survey: brand, flavor, product benefits, ingredients list, label claims on the front of the packaging, other label claims on product package and price.  *Id.* ¶ 142 & Ex. 1 (table of attributes and levels for conjoint survey).  These "will function as the source of information that is used to create the choice tasks that will be displayed to respondents." *Id.* ¶ 143.

Finally, Dr. Dennis explains that he will conduct a "market simulation" using Sawtooth Software Lighthouse Studio, which will allow him to convert the raw data he obtains from the conjoint survey into "simulated market choices."  *Id.* ¶ 168.  Dr. Dennis states that this analysis differs from a "direct-questioning methodology that is typical in a marketing or public opinion survey[,]" explaining:

> In a conventional survey data set, survey answers such as "yes" and "no" are coded into "1" and "2," making possible a straightforward count of survey responses. No "modeling" of the data is required to draw inferences. In contrast, a conjoint study leads to a set of utilities or partworths that quantify the value respondents place on each level of each attribute (e.g., for each price level for the "Price" attribute). To draw inferences from the utility data, conjoint analysis leverages Bayesian statistics (technically, Hierarchical Bayesian modeling) to provide individual respondent-level models.

*Id.* ¶ 170. Dr. Dennis opines that his market simulations "will provide a statistically robust estimate of any overpayments that class members incurred." *Id.* ¶ 172.

Dr. Dennis states that in determining the appropriate methodology for his market simulation he has consulted with Plaintiffs' economics expert, Mr. Colin Weir, and based on that consultation "recognizes that the actual quantity of Defendant's Products supplied to the proposed class is fixed as a matter of history." *Id.* ¶ 173.  He continues, "[b]y using the actual prices paid by consumers, as well as the fixed quantity of Products supplied, my conjoint survey and my market simulations will incorporate both demand- and supply-side factors and will reliably

United States District Court
Northern District of California

United States District Court
Northern District of California

estimate the but-for market value of the Products." *Id.* Dr. Dennis further states that he will estimate overpayment statistics "specific to the location of the Challenged Representations[,]" that is, he will conduct separate calculations for "overpayment solely attributable to the Challenged Representations when the Challenged Representations are present (i) on both the front panel and side/back panel versus (ii) only on a side/back panel of the packaging." *Id.* ¶ 174. For either of the locations, he will also "provide overpayment statistics to evaluate any impact on the price premium attributable to the 'Check Locally' disclaimer used on some of the at-issue Products." *Id.* ¶ 175.

Dr. Dennis also describes "sensitivity and quality control tests" he intends to conduct "to assess the reliability of choice data collected from the respondents[,]" including examining Root Likelihood ("RLH") scores to identify respondents whose choices were random and evaluating the length of time respondents spent answering the survey questions to determine if some respondents' survey responses should be removed from the results to increase the reliability of the survey results. *Id.* ¶¶ 179-180. In addition, he will "identify any subgroups of respondents that potentially have statistically significant differences with respect to the overpayment statistics[,]" "for instance, whether the overpayment statistics are statistically the same for Colgate toothpaste purchasers versus non-Colgate toothpaste purchasers and frequent versus infrequent purchasers of toothpaste[.]" *Id.* ¶ 181.

### c. Weir Expert Report

Mr. Weir has a background in conjoint design analysis and was retained by Plaintiffs to work with Dr. Dennis to "help design (from an economic perspective), and to evaluate the economic suitability of a proposed conjoint survey (to be designed, implemented and analyzed by Dr. Dennis) to measure the overpayment for the Products solely attributable to the challenged Claims." May 22, 2025 Declaration of Colin B. Weir ("Weir Decl.") ¶¶ 1-3, 9. He was asked to "ascertain whether it would be possible to determine damages on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of damages suffered by the proposed class of consumers as a result of the allegedly false, deceptive, and/or misleading Claims." *Id.* ¶ 8.

United States District Court
Northern District of California

Mr. Weir states that he has reviewed Dr. Dennis's report and the methodology underlying Dr. Dennis's proposed conjoint survey, as well as "the documentary evidence relied upon by Dr. Dennis and incorporated into the survey design," and it is his opinion that Dr. Dennis's "proposed conjoint survey is properly designed to measure the price premia paid due solely to the presence of the [C]hallenged Claims on the Products." *Id.* ¶ 42. With respect to the quantity of sales to be used in calculating classwide damages, Mr. Weir opines that the number of units of the Products that were actually sold, which is "a fact," is the appropriate measure because a "but-for" determination of sales is not required for the false advertising claims asserted in this case. *Id.* ¶ 47. Mr. Weir further opines that "if one were to assume, arguendo, that Defendant would not have lowered its price in concert with demand (indicating that Defendant priced above the market clearing price), then the economic outcome would be that many or all of the purchases would not have taken place at all. As such, the price premium to be developed by Dr. Dennis will be an inherently conservative measure." *Id.* ¶ 48. Mr. Weir states that it would be "an economic perversion for a defendant engaged in a litigation (with an obvious conflict of interest) to simply state that it would never have adjusted its prices or would not have adjusted them enough so as to meet demand, and therefore damages should be set at zero or something less than actual economic damages." *Id.* ¶ 49.

Mr. Weir describes the sales information that he intends to use to calculate economic damages as follows:

> I have been provided with retail sales data for the Products from Nielsen. These data contain unit and dollar sales on a product-by-product (UPC) basis, along with pricing data for each Product sold in the United States and the State of California, from week-ending January 9, 2019 through July 6, 2024.35 It is also my understanding that Plaintiffs' counsel is in the processing of obtaining through-the-register, retail sales data from Circana. That data set typically contains unit and dollar sales on a product-by-product (UPC) basis, along with pricing data for each Product for the State of California. Additionally, Plaintiffs' counsel requested -and Defendant has provided -- specific information identifying when the challenged claim was phased in on particular Products. To date, Defendant has produced this information for ten selected Products. This production confirms that the necessary data exists and supports the feasibility of conducting a detailed, product-specific analysis. Using this information, I will be able to execute my model to calculate the total volume of each Product sold while the challenged Claims were in use.

22

Weir Decl. ¶ 63.

Mr. Weir intends to calculate price premium damages for the class by multiplying units sold for each of the four categories of the Products addressed by Dr. Dennis (based on placement on the packaging of the Challenged Claims and whether the Product includes a "check locally" disclaimer, as discussed above) by the price premium percentage for each category. *Id.* ¶¶ 66-69. According to Mr. Weir, "[v]ariations in purchase price do not prevent the calculation of class-wide damages" because "[s]uch variations in price are captured in the sales data used for analysis and price variations are an element of the conjoint survey." *Id.* ¶ 71. Likewise, he opines, "[h]ow any individual consumer uses the Products will not impact the market price or the price premia, which will have been paid and experienced by all consumers" and thus, calculation of damages will not "depend on individual behaviors or uses of the Products." *Id.* ¶ 74. Similarly, the individual reasons for purchasing the Products do not affect the damages calculation because "[e]ven if a consumer bought a unit of Product with the intention to immediately throw that Product in the trash and make no use of it at all[,]" "the consumer paid more for the Product than the consumer would have but for the Claim." *Id.* ¶ 76.

### 2. Colgate's Expert Reports

#### a. Kivetz Expert Report

Colgate retained Ran Kivetz, Ph.D., to evaluate the perception and materiality surveys conducted by Dr. Dennis and to conduct his own consumer materiality surveys to determine whether the challenged recyclability claims had "a common material effect on the putative class members' decisions to purchase, and willingness-to-pay (WTP) for, the disputed products." July 24, 2025 Expert Report of Ran Kivetz ("Kivetz Expert Report") ¶¶ 1-2.

Dr. Kivetz concluded that Dr. Dennis's perception survey was flawed because it did not replicate market conditions, instead manipulating the survey taker to focus excessively on the challenged recyclability claims, resulting in focalism bias. *Id*. ¶¶ 21-46. Dr. Kivetz identifies three problems with the survey in connection with this flaw:

> First, Dr. Dennis's initial directive that participants "base [their] answers on only the TOOTHPASTE product packaging that [is shown to them]" is unrealistic and leading, effectively prompting

United States District Court
Northern District of California

23

> participants to ignore (or suppress) any preexisting attitudes or opinions that they may hold about a given product, brand, or the general product category.
>
> . . .
>
> Second, contrary to the principle that a challenged claim must be evaluated in the context in which it is made, the Dennis "Perception" Survey repeatedly forced participants to focus on a set of packaging representations (including the challenged claims in the test group) that Dr. Dennis deemed relevant, on a package stimulus that literally highlighted the presence or absence of the challenged claims . . . by superimposing a green box that does not appear on any actual toothpaste packaging.
>
> . . .
>
> Third, in fact, both academic research and the various at-issue Colgate and Tom's packaging suggest that the proportion of consumers in the actual marketplace who would not have noticed or spontaneously formed interpretations of the challenged claims may be substantial

*Id.* ¶¶ 33, 34, 37. The result, Dr. Kivetz opines, is that the Dennis survey "artificially inflat[ed] the 'deception' estimates, which were essentially calculated out of a biased subset of participants who were forced to focus on the challenged claims, rather than on a sample representing the relevant consumers (including those who would not have noticed or interpreted the claim at all)." *Id.* ¶ 46.

Dr. Kivetz also faulted Dr. Dennis's perception survey for posing leading, close-ended questions, and deviating from the standard "funnel" format for perception studies (open-ended main questions followed by close-ended filter questions and then open-ended pointed questions). *Id. at* ¶¶ 47-91. Dr. Kivetz concluded:

> Overall, the Dennis 'Perception' Survey's closed-ended "perception" questions do not and cannot provide any reliable or valid measurement of consumers' true understandings (if any) of the challenged recyclability claims. Dr. Dennis's one-sided and leading questions effectively predetermined (or guaranteed) the surveys' "findings"; unsurprisingly, over 87% of "test" group participants acquiesced to the hypothesis that the content in the green rectangle (which included the challenged recyclability claims) means that the "toothpaste tube will be accepted for recycling by my local recycling program."

*Id.* ¶ 91.

Similarly, Dr. Kivetz found Dr. Dennis's materiality survey to be defective because it "forced participants to complete an artificial task that repeatedly highlighted the challenged

24

United States District Court
Northern District of California

recyclability claims." *Id.* at 56. In particular, Dr. Kivetz identified the following shortcomings:

> First, the Dennis "Materiality" Survey relied on a highly contrived and artificial choice task that (literally) highlighted, through Dr. Dennis's superimposed green rectangle, the presence versus absence of the challenged recyclability claims.
>
> . . .
>
> Second, the Dennis "Materiality" Survey's instructions further emphasized the challenged claims by repeatedly directing participants to choose based on the differences in the content inside the green rectangle.

*Id.* ¶¶ 104-105.

Dr. Kivetz also criticizes Dr. Dennis's use of a referendum question methodology for his materiality survey, opining that this approach is "akin to a 'within-subjects' (or 'within-group') research design" and suffers from the shortcomings of such a design. *Id.* ¶ 113. Dr. Kivetz explains that a within-subjects design is one in which "survey participants provide a response to a dependent variable or outcome measure (e.g., likelihood of purchasing a product or choice of a product) given a comparison between levels of an independent or tested variable (e.g., presence vs. absence of a packaging claim)." *Id.* "By contrast, in a 'between-subjects' design, different groups of participants respond to the dependent variable of interest given only one level of the independent variable." *Id.* According to Dr. Kivetz, "[a] major drawback of a within-subjects design such as that used by Dr. Dennis is that it reveals to participants the factor being investigated and the research hypothesis." *Id.* ¶ 114. Thus, Dr. Kivetz concludes, the "referendum question" Dr. Dennis used "[u]ndoubtedly . . . made it obvious to participants that the survey is assessing their preferences between a product with and a product without the challenged recyclability claims . . . [and] led participants to guess the 'expected' answer—to select the answer choice that is easiest to justify—as opposed to exhibiting the true impact (if any) that such claims would have on their purchase decisions." *Id.*

Furthermore, Dr. Kivetz opines, Dr. Dennis's referendum question "did not follow accepted standards for testing the materiality of challenged packaging claims in consumer purchase decisions" because it failed to take into account "research in consumer behavior and

25

social cognition demonstrate[ing] that people often do not have insights into the factors underlying their preferences, perceptions, decision making, and behavior." *Id.* ¶ 116. In fact, Dr. Kivetz opines, "[v]oluminous research in social cognition, marketing, and consumer behavior has shown that consumers routinely make incorrect predictions or projections about their responses to different variables, including to various factors in the marketplace." *Id.* Therefore, according to Dr. Kivetz, the appropriate approach would have been to use a "test-control" experimental design for the materiality survey, as Dr. Kivetz himself used in his own materiality surveys. *Id.* ¶ 119. Dr. Kivetz opines that "it is inexplicable that Dr. Dennis chose to use a " 'test-control' experimental design to assess consumer perceptions, yet opted not to use this same methodology to assess consumer preferences, both of which relate to causal questions in this litigation." *Id.* ¶ 120. He further opines that "[t]he failure to include any survey control whatsoever renders the results of the Dr. Dennis 'Materiality' Survey fundamentally uninterpretable, unreliable, and unscientific." *Id.* ¶ 125.

Finally, Dr. Kivetz opines that in both the perception survey and the materiality survey, the "don't know/not sure" response does not cure the defects in the two surveys because while such questions may "reduce some participant guessing, their presence does not remove the systematic 'noise' due to flaws inherent in the survey itself, such as leading questions, demand effects, focalism, and biased research designs." *Id.* ¶ 90; *see also id.* ¶ 126.

Dr. Kivetz's report goes on to describe the four surveys he conducted, using a test-control design, to determine whether the challenged claims were a "common, material factor in consumers' purchase decisions." *Id.* ¶¶ 127-184. Dr. Kivetz tested a Colgate product and a Tom's of Maine product and used California-only and nationwide consumer samples. *Id.* ¶ 129. He describes the results of these surveys as follows:

> The results of these four surveys, which followed well-established survey standards, unequivocally demonstrate that the challenged recyclability claims do not commonly affect consumers' purchase decisions or willingness to pay with respect to the at-issue products. More specifically: (i) the challenged recyclability claims do not materially increase consumers' likelihood of purchasing, or willingness to pay for, the challenged Colgate and Tom's of Maine toothpaste products; accordingly, these claims did not cause the putative class members to pay any alleged price premium; (ii)

United States District Court
Northern District of California

consumers purchase the challenged products for a variety of reasons unrelated to the challenged recyclability claims, with considerable variation (or differences) arising across consumers; and (iii) consumers consider a variety of factors (again unrelated to the challenged claims or recyclability) when deciding which toothpaste products to buy.

*Id.* ¶ 130. Further, Dr. Kivetz opines as follows in the summary of his survey results:

The results of my four materiality surveys demonstrate that **the challenged recyclability claims do <u>not</u> materially affect, let alone in a common way, consumers' purchase decisions or willingness to pay.** The lack of materiality of the challenged recyclability claims necessarily means that their associated price premium is **<u>zero</u>**, because a positive price premium cannot be attributed to claims that are immaterial to consumers.

o **Choice considerations**. Virtually no participants (i.e., only a single participant out of over 800 participants across two surveys) mentioned anything related to recyclability as a choice consideration in the category. Instead, participants identified myriad other factors, including product efficacy/features, price/value, taste/flavor, brand equity/familiarity, and more.

o **Purchase likelihood**. There was no statistically significant difference between test and control participants in the likelihood of purchasing the Colgate or the Tom's of Maine product after viewing the packaging. Thus, the challenged claims are neither a common nor material factor in consumers' purchase decisions.

o **Purchase reasons**. Participants' explanations also indicate that consumers purchase the at-issue products for a variety of reasons unrelated to the challenged claims, with considerable variation (differences) arising across consumers. Among those in the test group, extremely few participants—between 0% and 2.4%—mentioned anything related to recyclability, let alone recyclable tube, as a reason to purchase the at-issue products.

o **Willingness to pay (WTP).** Participants' average WTP for the product they examined was not statistically significantly higher in the test group compared to in the control group.

*Id.* at 11.

### b. Nix Expert Report

David Nix is a sustainability consultant with expertise in recycled resins and the recycling industry. July 24, 2025 Expert Report of David Nix ("Nix Expert Report") ¶ 1. Colgate retained him to provide his expert opinion "on the recyclability of Colgate toothpaste tube products in California, and to respond to the opinions of Plaintiffs' expert Michelle Leonard on this subject." *Id.* ¶ 6. In particular, Mr. Nix addresses Ms. Leonard's opinion that the Products "are not

recyclable at facilities available to Californians and more broadly to United States consumers and communities." *Id.* ¶ 7. He also responds to Plaintiffs' allegation that " 'MRFs in California and the United States reject the Products' due to the inability to distinguish the Colgate and Tom's tubes from nonrecyclable ones and that leftover toothpaste renders the tube unrecyclable." *Id.* (quoting FAC at 3: 5).

Nix opines that "Californians (and Americans more broadly) have access to programs in which the Products will be recycled if they are placed in a curbside recycling bin." *Id.* ¶ 9(a). In particular, he opines that 95% of residents in the State of California have access to recycling programs, with 38 MRFs across the state and "dozens of transfer stations that serve to consolidate recycle streams from smaller districts that don't have enough citizens for their own MRF." *Id.* ¶ 10. Further, HDPE recycling is "widely available" in the United States as it is one of the "three most common subcategories  [of plastic] that MRFs sort for." *Id.* ¶ 13. According to Mr. Nix, Colgate's HDPE tubes "meet the requirements for compatibility with other colored HDPE packaging, such as detergent and personal care bottles" and "[d]ue to the graphic design on the Products, they would be grouped with the HDPE color commodity stream managed by MRFs." *Id.*

Mr. Nix opines further that "[e]ven though specific types of containers may not be explicitly identified in [communications to consumers by municipal recycling programs], they may still be implicitly accepted by local MRFs. *Id.* ¶¶ 14-15. He explains:

> Municipal recycling programs often communicate to consumers about what material can be "accepted" by their local recycling program. It is widely known that "there may be misalignment between the types of items communicated for acceptance in collection programs and the types of items that are targeted for recycling in downstream elements of the recycling process (Sustainable Packaging Coalition, 2021). For example, there are far too many easily recyclable items made from HDPE to call each one out specifically.

*Id.* ¶ 14. Mr. Nix lists a number of "common items that are frequently made from HDPE that are not typically explicitly listed as accepted by MRFs for recycling" but which "will be sorted into the HDPE bale and recycled" "if they are placed in the recycling bin." *Id.* ¶ 15. This list includes ice cube trays, protein powder canisters, cutting boards and water coolers. *Id.*

28

United States District Court
Northern District of California

Mr. Nix criticizes Ms. Leonard for "inexplicably ignor[ing] the concept of implicit acceptance by focusing solely on explicit acceptance of the Products." *Id.* ¶ 16. According to Mr. Nix, "By doing so, she fails to consider the fact that, if a toothpaste tube is placed in a recycling bin, it will in fact be transported to the local MRF and sorted with the HDPE color stream if that MRF is capable of such sortation . . . ." *Id.*

He further opines that Ms. Leonard is incorrect with respect to her opinion that the Products are "not able to be sorted" by MRFs. *Id.* ¶ 17. He criticizes as unfounded opinions expressed by Ms. Leonard in her deposition (but not in her expert report) that toothpaste tubes might fall through the screens used in the early stage of sorting glass from plastic and that most sorting is done by hand. *Id.* ¶¶ 20-21. Rather, he opines, "most medium to large MRFs use optical sortation on their container line to sort PET, mixed-color HDPE and natural HDPE (at a minimum)." *Id.* ¶ 22. In particular, "[t]he vast majority of MRFs employ Near Infrared Spectroscopy (NIR) to identify the different types of plastic." *Id.* According to Mr. Nix, PET, HDPE and PP [plastics] all have separate absorption rates from each other and can be accurately identified by NIR spectroscopy." *Id.* Furthermore, "NIR sorters can detect materials in just 20 milliseconds (0.02 seconds), enabling a single unit to process between 3 and 5 tons per hour, depending on the conveyor's width, speed, and the type of material[,]" Mr. Nix opines. *Id.* ¶ 24. "Manual sorting is not practical due to the high volume of material[,]" according to Nix, and "occurs only for large parts that can't go through the system like laundry baskets and large totes or as a quality control removing dangerous items like fire extinguishers and propane tanks." *Id.* ¶ 27.

Mr. Nix notes that APR testing found that Colgate's HDPE tubes "are compatible with mixed-color HDPE recycling streams" and opines that "[t]here is no reason for an operator to intentionally remove HDPE Colgate tubes from a mixed-color HDPE sort, as they are recyclable and contribute to the facility's revenue." *Id.* ¶ 29. He states that "More Recycling testing has also shown that tubes larger than 2 ounces have on average a greater than an 81% chance of being ultimately placed into a mixed-color HDPE bale with 11% going into a mixed plastic bale that is also recycled." *Id.* ¶ 30.

29

With respect to reprocessing of Colgate's HDPE tubes once sorted, Mr. Nix opines that "[t]he physical properties of the Products align with the broader HDPE recycling stream, which is essential for efficient processing." *Id.* ¶ 32. He rejects Ms. Leonard's opinion that "contamination of materials that would otherwise be recyclable prevents them from being sold to reclaimers for recycling[,]" opining instead that "[t]oothpaste contamination is not a problem for reprocessors." *Id.* ¶ 36. He notes that while consumers are instructed to wash off food residue before recycling, many people do not do so and opines that "[r]eprocessors who purchase bales from MRFs have methods in place to handle this." *Id.* ¶ 36. According to Mr. Nix, "one of the primary methods is the use of water and friction to liberate contamination." *Id.* Because toothpaste is water soluble, Nix opines, it "aligns well with reprocessors' washing methods." *Id.* ¶ 37. He further opines that "there is no inherent attribute to the toothpaste tube over other packaging/products that would cause it to have more product left in the tube over other packaging that is regularly recycled (e.g., shampoo bottles)." *Id.*

Finally, Mr. Nix rejects Ms. Leonard's deposition testimony that the Products are not able to be "marketed," opining that "there is an active market for HDPE mixed-color bales that include tubes." *Id.* ¶¶ 38-44.

### c. Wilcox Expert Report

Ronald T. Wilcox is a professor of business administration and a marketing consultant whose focus is "branding, consumer behavior, surveys, statistical modeling of consumer choice, and the public policy implications of marketing." July 24, 2025 Expert Report of Ronald T. Wilcox, PhD ("Wilcox Expert Report") ¶¶ 1-2. Dr. Wilcox was retained to evaluate the price premium model of damages proposed by Plaintiffs' experts, Mr. Weir and Dr. Dennis. *Id.* ¶¶ 11-12. Dr. Wilcox opines that Dr. Dennis's conjoint survey and Mr. Weir's damages methodology are flawed in numerous respects.

First, Dr. Wilcox opines that Dr. Dennis and Mr. Weir "do not take into account real-world data that contradict Plaintiffs' assertion that there is a price premium associated with the Challenged Representations for all At-Issue Products." *Id.* ¶¶ 14, 18-32. According to Dr. Wilcox, his own analysis "of real-world data of two best-selling Colgate and Tom's of Maine

30

products . . . show[s] that prices for these At-Issue Products either did not increase with the introduction of Challenged Representations, or did not increase beyond any increase expected due to general trends in toothpaste category prices." *Id.* ¶ 18. Dr. Wilcox opines that this evidence "demonstrates that there is no class-wide impact because at least some (if not all) At-Issue Products had no price premium associated with the Challenged Representations." *Id.* Dr. Wilcox states that this conclusion is consistent with evidence from Colgate showing that "there was no price increase associated with the Challenged Representations." *Id.*

For his analysis, Dr. Wilcox used "Nielsen point-of-sale data on weekly sales of toothpaste products at the [UPC] level produced in this matter[,] . . . select[ing] two products for which Date of First Production for packaging that included the Challenged Representations is available: Colgate Total Whitening Stannous Fluoride, 4.8 Oz (1 pack) and Tom's of Maine Antiplaque and Whitening ('AP&W') Peppermint Fluoride Free, 5.5 Oz (1 pack)." *Id.* ¶ 20. According to Dr. Wilcox, the Dates of First Production for the two At-Issue Products he analyzed are October 28, 2021 for Colgate Total Whitening Stannous Fluoride, 4.8 Oz and February 10, 2020 for Tom's of Maine AP&W Peppermint Fluoride Free, 5.5 Oz. *Id.* at 9 fn. 21.

Dr. Wilcox plotted average weekly prices for the two products between August 3, 2019 and December 31, 2022 and while he found that there was a general increase in toothpaste prices, (including for the two products he studied), he did not find any significant increases in the prices of the two products beyond the general increase in response to Colgate's introduction of the Challenged representations. *Id*. ¶¶ 21-24. Instead, he found as to the price of the Colgate Total Whitening product that there was a "pronounced jump in February 2021, *prior* to the introduction of the Challenged Representations," *id*. ¶ 22 (emphasis added), and that the only significant increase in price as to the Tom's product during the period he studied occurred in March-April 2022, two years *after* the date when the Challenged Representations were introduced. *Id*. ¶ 23. He did not observe any price increase in the two products, beyond the general increase in toothpaste prices, that correlated with the introduction of the Challenged Representations in terms of timing. *Id*. ¶ 24. Dr. Wilcox opines that this evidence contradicts the opinions of Dr. Dennis and Mr. Weir that Colgate charged a premium for the Products due to the Challenged

United States District Court
Northern District of California

31

United States District Court
Northern District of California

Representations.  *Id.*

Dr. Wilcox also conducted statistical tests on the average prices of the two At-Issue Products in Nielsen Retail Scanner Data" to confirm these conclusions.  *Id.* ¶¶ 25-28.  In particular, based on evidence from Colgate that "it would have taken two to eight months for packaging containing the Challenged Representations to reach stores[,]" Dr. Wilcox compared average prices of the two Products six months before the Date of First Production to average prices six to 12 months after the Date of First Production.  *Id.*  ¶ 25. He found for the Colgate Total product that "while average prices are higher six to 12 months after the Date of First Production compared to six months before, . . . the increase in prices is actually lower than, but not statistically significantly different from, the increase in average prices of the overall toothpaste category (excluding Colgate and Tom's of Maine products)."  *Id.* ¶ 26. As to the Tom's of Maine product, Dr. Wilcox found that there was no statistically significant increase in price six to 12 months after the Date of First Production and that instead, there was a "statistically significant decrease compared to the average price of the toothpaste category (excluding Colgate and Tom's of Maine products) over that period." *Id.*  ¶ 27.  Dr. Wilcox reached the same conclusion when he ran the statistical test for a slightly longer period, comparing average price eight months before the First Production Date to the average price 14 months after that date.  *Id.*  ¶ 28.

Using Nielsen Retail Scanner Data, Dr. Wilcox also "examine[d] whether there [was] evidence of Colgate and Tom's of Maine experiencing an increase in market share after the introduction of the Challenged Representations."  *Id.*  ¶ 31-32.  He concluded that "shares of Colgate and Tom's of Maine brands [were] relatively flat throughout the period from August 2019 to December 2022, during which the Challenged Representations for many of the At-Issue Products were introduced."  *Id.*

Next, Dr. Wilcox opines that Dr. Dennis's conjoint survey and Mr. Weir's damages methodology cannot be used to estimate market prices or price premia because conjoint analysis can model only the demand side of the market, contrary to the opinions of Dr. Dennis and Mr. Weir that their methodology will also take into account supply-side factors.  *Id.*  ¶¶ 33-40. According to Dr. Wilcox, a conjoint survey can only be used to evaluate the demand side, namely,

32

willingness to pay ("WTP"). *Id.* ¶ 33.  He explains:

> [C]onjoint analysis can—at best—provide insight into consumers' WTP for a product or product attribute but cannot be used on its own to estimate market prices or market price premia. Market prices are jointly determined by both demand (i.e., prices that consumers are willing to pay) and supply (i.e., prices that producers are willing to accept), so in order to estimate a market price in the but-for world, one needs to estimate both supply and demand in the but-for world. Conjoint analysis, however, attempts to model only the demand side of the market and does not account for supply side factors, so it cannot be used to calculate market prices.

*Id.* Thus, he opines, "the 'price premia' that Dr. Dennis proposes are in fact more correctly interpreted as estimates of consumers' WTP for the Challenged Representations, not a reflection of the market price." *Id.* ¶ 34. Furthermore, he opines, because WTP tends to "overstate the actual market price of a feature[,]" (because "any consumer with a WTP greater than the price of a product will purchase the product"), "any methodology based on aggregating WTP across consumers will overstate the market price premium if no supply-side factors are taken into account." *Id.* ¶ 36.

Dr. Wilcox rejects the opinions of Dr. Dennis and Mr. Weir that their methodology will take into account supply-side factors by using the actual prices paid by consumers and the fixed quantity of Products supplied. *Id.* ¶ 37. As to Dr. Dennis's use of actual prices in his conjoint survey, Wilcox opines:

> Simply incorporating a range of real-world prices into the price attribute of a conjoint survey does not account for how the supply-side factor affects the but-for price. The "actual prices" that Dr. Dennis claims to have incorporated into his conjoint survey reflect only demand and supply considerations in the actual world (i.e., the world in which the Challenged Representations appear on the product packaging) and do not account for any supply-side factors in the but-for world.

*Id.* ¶ 38.  As to the fixed quantity supplied, Dr. Wilcox opines:

> While it is true that a fixed number of products were sold in the actual world, what matters for the calculation of but-for prices is the quantity of products that would be sold in the but-for world, which is not "fixed as a matter of history."42 It is a basic economic principle that equilibrium price and equilibrium quantity are determined simultaneously by the intersection of supply and demand. It follows that if the equilibrium price in the but-for world is different from the

33

United States District Court
Northern District of California

> price in the actual world, then the equilibrium quantity sold in the but-for world may also differ from equilibrium quantity in the actual world. Specifically, if demand is lower in the but-for world then companies may also lower the quantity they supply to the market. The combination of changes in demand and changes in supply together define the new equilibrium price, which may be higher or lower than the equilibrium price predicted while holding supply fixed. However, Dr. Dennis makes no attempt to account for this basic economic principle, and in arriving at his estimate for the but-for price, Dr. Dennis merely assumes without basis that the quantity stays fixed in the but-for world.

*Id.* ¶ 39.

Dr. Wilcox further asserts that Dr. Dennis's conjoint study will lead to unreliable results because it fails to take into account market realities. *Id.* ¶¶ 41-47. In particular, he opines that Dr. Dennis fails to take into account the fact that habitual purchasers of a brand "may make repeat purchases with little (if any) attention paid to the wording of claims or images on product packaging such as the Challenged Representations." *Id.* ¶ 42. Dr. Wilcox opines, "[t]o the extent that Dr. Dennis's proposed conjoint survey forces individuals to make active, conscious decisions about each purchase choice—with specific attention to each attribute, including the Challenged Representations—his results are likely to overstate respondents' relative WTP for the Challenged Representations because respondents will focus on the Challenged Representations more in the survey setting than they would in a realistic marketplace setting." *Id.* ¶ 43.

In addition, Dr. Wilcox opines that a reliable conjoint survey must test all the important attributes of a product to avoid the problem of focalism, that is, inflating the importance of the attributes that *are* tested. *Id.* ¶ 45. Dr. Wilcox asserts that Dr. Dennis's conjoint survey does not include all the important attributes, failing to include "packaging attributes such as color, imagery, and different sizes of claims." *Id.* ¶ 46. According to Dr. Wilcox, "[b]y arbitrarily selecting some packaging attributes over others and focusing respondents' attention on those attributes, Dr. Dennis is likely to artificially increase consumers' WTP for the Challenged Representations relative to what they would be willing to pay in the real world." *Id.*

Dr. Wilcox opines Dr. Dennis's proposed attributes are also defective, and therefore will lead to flawed results, in four other respects:

> First, Dr. Dennis's survey design presents claims from the front of the

package (in his "Front-of-Package Label Claims" attribute) and claims from the sides and back of the package (combined in his "Other Label Claims on Product Package") in the same manner, even though such attributes would not be equivalently visible during a consumer purchase decision.

. . .

Second, Dr. Dennis's naming of the attribute with claims from the back and sides of the product packaging ("Other Label Claims on Product Package") may be misleading, as it does not specify where the claims would appear on the product package.

. . .

Third, Dr. Dennis presents all attributes and claims in the same plain text format, including the Challenged Representations [whereas] [i]n reality, the claims listed on a product package vary in size, color, and placement[.]

. . .

Lastly, Dr. Dennis's proposed survey design does not accurately mirror the set of information that consumers would see when looking at the product packaging in a retail environment. For example, Dr. Dennis's survey requires respondents to hover over an asterisk in order to view the "Check Locally" disclaimer associated with certain Challenged Representations.

*Id.* ¶¶ 49-55.

Dr. Wilcox also faults Dr. Dennis's conjoint survey on the basis that it fails to identify any distractor attributes, which are necessary to "conceal from respondents which attributes are the attributes of interest to the researcher" and avoid bias. *Id.* ¶ 56. According to Dr. Wilcox:

[Dr. Dennis] states that "any claims other than the challenged claims" can act as distractor claims. However, the attributes describing the Challenged Representations are the only attributes or levels presented that are described to respondents as relating to the product packaging rather than the product. This could signal to respondents that the researcher is interested specifically in the Challenged Representations, or more generally in the product packaging rather than the product, rendering their responses to the survey unreliable. It is not clear which, if any, suitable distractor attributes exist (i.e., attributes that will serve to conceal the purpose of the survey but will not themselves give rise to survey bias). Absent a concrete proposal for the distractor attributes, Dr. Dennis has no basis to conclude that his conjoint survey proposal will provide reliable results.

*Id.* ¶ 57.

Finally, Dr. Wilcox opines that Mr. Weir's proposed calculation of classwide damages is "deeply flawed and unreliable for several reasons." *Id.* ¶ 58. First, Dr. Wilcox asserts that Mr.

35

United States District Court
Northern District of California

Weir's model is flawed because it incorporates Dr. Dennis's conjoint analysis, which is defective for the reasons discussed above. *Id.* ¶ 59. Next, Dr. Wilcox challenges Mr. Weir's methodology of calculating classwide damages using the four "price premia" calculated by Dr. Dennis in conjunction with Colgate's data to "calculate the dollar value of units sold . . . associated with each of the four 'Recyclable Tube' claim formats." *Id.* ¶¶ 60-61. Dr. Wilcox contends this approach is unreliable because: 1) Mr. Weir "appears to ignore that any price premium would likely vary, both across At-Issue Products and over time for the same product[;]" 2) "Mr. Weir ignores that the price premium, if any, would likely differ across different types of outlets and different retailers[;]" 3) "Mr. Weir does not have a reliable methodology to calculate the total sales associated with each Challenged Representation[;]" 4) "Mr. Weir does not explain how he plans to apply Dr. Dennis's calculated price premium to the At-Issue Products while accounting for variations in the Challenged Representations over time[.]" *Id.* ¶¶ 60-68. Dr. Wilcox concludes that Dr. Dennis and Mr. Weir "disregard such considerations, and do not demonstrate that individual inquiry is not necessary for assessing the economic damages suffered by a member of the Putative Class." *Id.* ¶ 68.

### 3. Plaintiffs' Reply Expert Reposts

#### a. Dennis Reply Report

In his Reply expert report, dkt. no. 79-13 ("Dennis Reply Decl."), Dr. Dennis responds to five of <u>Dr.</u> Kivetz's criticisms of his opening report and one of Dr. Wilcox's criticisms.

First, Dr. Dennis rejects Dr. Kivetz's opinion that he "violated marketplace conditions by inappropriately highlighting the challenged recyclable claims." Dennis Reply Decl. ¶¶ 12-18. According to Dr. Dennis, this assertion is misleading because he only "asked respondents to consider a *section* of the product packaging that included mostly non-challenged label claims"; he did not highlight the recyclability claims themselves. *Id.* ¶ 13. Dr. Dennis further opines that Dr. Kivetz's criticism fails to take into account that the use of randomly selected test and control groups "effectively isolated any impact of the Challenged Representations on the perceptions of respondents." *Id.*

Dr. Dennis further opines that by using the green border for both the test and the control

United States District Court
Northern District of California

group, his "survey brought an equal level of so-called 'focus' to the section of the packaging having the Challenged Representations and the control group packaging that did not show the challenged claims." *Id.* ¶ 15.  He explains that because he was "ultimately measuring the difference in survey perceptions between the two sample groups, and because any potential bias is equally present in both the test and control groups, there is no merit to the criticism that [he has] biased the results in favor of respondents focusing on the Challenged Representations." *Id.* Dr. Dennis further opines that use of the green border had the benefit of allowing him to "state with certainty that the difference in perceptions between [his] test and control group respondents [was] solely attributable to differences in the content within the green border of the product packaging." *Id.* ¶ 17. Finally, Dr. Dennis opines that his perception survey approximated a "real-world marketplace context" because respondents were shown both the front and back panels of the Product and could also enlarge the images.  *Id.* ¶ 18.

Second, Dr. Dennis rejects Dr. Kivetz's criticism of his use of close-ended questions and his opinion that Dr. Dennis's questions were leading and "inappropriately focused respondents only on the Plaintiffs' hypotheses." *Id.* ¶ 19.  Dr. Dennis opines that "[o]pen-ended questions have a tendency to produce under-estimates of phenomena and can suffer from bias resulting from the subjectivity required to code the verbatim responses (to make possible quantitative analyses)." *Id.*  ¶ 20. He further asserts that "nearly all professional survey research experts . . . recognize that closed-ended questions are more appropriate for scientifically rigorous, quantitative survey research, while open-ended survey questions have more utility for qualitative research." *Id.*  ¶ 21. Dr. Dennis opines that "the open-ended survey data from the Kivetz Materiality Surveys . . . cannot be relied on to support any assessment of the role of the Challenged Representations in causing consumers to purchase the at-issue Products." *Id.* ¶ 24.

As to Dr. Kivetz's assertion that Dr. Dennis's perception survey uses leading questions, Dr. Dennis contends he took "proactive measures" to assure that his survey would not be "leading biasing, or focusing on Plaintiffs' allegations." *Id.*  ¶ 31.  These measures included randomly assigning respondents to test and control stimuli and attempting to measure "noisy" responses ("that is, respondents who perceived the product packaging to be communicating a message about

the recyclability of the toothpaste tubes even though the displayed product images do not include the Challenged Representations"), which he did not include in determining the deception rate. *Id.* ¶ 32. In addition, Dr. Dennis included a "Don't know / not sure" answer in his survey and "raised respondent's awareness" that that response was "a legitimate response" by referencing it in the survey instructions and in the phrasing of the survey questions. *Id.* ¶ 33.

Third, Dr. Dennis rejects Dr. Kivetz's opinion that his materiality survey "relied on a fundamentally leading, biased, and artificial methodology that guaranteed the 'findings' and does not test for materiality." *Id.* ¶¶ 35-48. Dr. Dennis opines that "[t]he choice exercise in [his] survey could not be simpler, more direct, or unbiasing as it is based on the referendum framework that our democracy trusts to collect unbiased votes in elections." *Id.* ¶ 39. "Like ballots in our elections," Dr. Dennis opines, "[his] referendum survey is an unbiased way to find out what people prefer between alternatives." *Id.* Furthermore, Dr. Dennis asserts, "[t]he referendum section of [his] survey is based on the well-established stated preference survey methodology, in which the use of referendum questions is central." *Id.* ¶ 44. He cites, in particular, "The Report of the NOAA Panel on Contingent Valuation (January 11, 1993)," which he contends "fully vetted" the referendum question format and found that it had "many advantages for measuring respondents' valuations of non-market goods compared to open-ended questions and other formats." *Id.*

Fourth, Dr. Dennis addresses and rejects various miscellaneous criticisms of his perception survey by Dr. Kivetz, including his assertion that Dr. Dennis should have used a filter question preceding the substantive survey questions (Dr. Dennis says that "filter questions can cause more harm than good to the quality of a survey"); that his survey suffered from "acquiescence bias" (Dr. Dennis says the problem of "yea-saying" occurs mainly in interviewer administered surveys, whereas the perception survey was self-administered); and his criticism that Dr. Dennis's survey "amounts to a 'trivial matching task' that used 'leading' and 'unclear' questions" (Dr. Dennis says this criticism is not supported by any data and that he used "generally accepted survey practices."). *Id.* ¶¶ 49-56.

Next, Dr. Dennis responds to Dr. Kivetz's materiality surveys and his conclusion that the

Challenged Representations were not material. *Id.* ¶¶ 57-79. Dr. Dennis focuses in particular on what he contends were "failures specific to his implementation of the test control framework." *Id* ¶ 63. He opines:

> The problem for Dr. Kivetz is that there is no evidence to indicate that *his control group respondents answering his purchase likelihood questions relied on anything besides the presentation of brand* on the product stimuli in answering the purchase likelihood question. There is no evidence that control group respondents even noticed that the control group images, branded with the familiar Colgate and Tom's of Maine branding elements, had been manipulated to remove the Challenged Representations. Furthermore, there is no reason why control group respondents should have suspected that the product packaging had been manipulated.

*Id.* ¶ 63 (emphasis in original). As a result, Dr. Dennis opines, "[t]here is no evidence to indicate that his control group respondents answering his purchase likelihood and willing-to-pay questions relied on anything besides the presentation of brand on the product stimuli." *Id.* ¶ 68. Dr. Dennis further opines that "[t]his is the primary explanation why the test and control group results for the Kivetz Surveys are nearly identical[.]" *Id.* ¶ 75.

Finally, Dr. Dennis addresses Dr. Wilcox's criticisms of his conjoint survey methodology and rejects Dr. Wilcox's opinion that it cannot be used to determine price premia paid by consumers because of the Challenged Claims. *Id.* ¶¶ 80-84. As to Dr. Wilcox's assertion that Dr. Dennis has failed to take into account supply-side factors, Dr. Dennis states that numerous courts have rejected the same challenge to other similar conjoint surveys Dr. Dennis has designed, including in *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592 (N.D. Cal. 2018); *de Lacour v. Colgate-Palmolive Co.*, 2021 WL 1590208 (S.D.N.Y. Apr. 23, 2021); *McMorrow v. Mondelez*, Case No. 3:17-cv-2327-BAS-JLB. (S.D. Cal); *Cadena v. American Honda Motor Corp.*, Case No. 2:18-cv-04007-MWF-MAA; and *Allen v. Conagra*, 2019 U.S. Dist. LEXIS 122807. *Id.* ¶¶ 81-82. According to Dr. Dennis, these courts found that he sufficiently accounted for supply-side factors by using actual historic market prices and actual quantities of the product that were sold during the relevant period, just as he proposes here. *Id.* Dr. Dennis also lists steps he will take to ensure reliable results, which are also described in his initial report. *Id.* ¶ 83. He contends his "approach for conducting a price premium survey – a choice-based conjoint survey or

39

United States District Court
Northern District of California

simply 'conjoint survey' – is typical of, and generally accepted by, experts in the field of consumer market research." *Id.* ¶ 84.

b. Weir Reply Report

In his Reply expert report, dkt. no. 80-6 ("Weir Reply Decl."), Mr. Weir addresses Dr. Wilcox's criticisms of his proposed calculation of classwide damages using data obtained from Dr. Dennis's conjoint survey. Weir Reply Decl. ¶ 9.

As an initial matter, Mr. Weir observes that Dr. Wilcox "does not suggest that conjoint analysis is an invalid method." *Id.* ¶ 12. According to Mr. Weir, "[c]onjoint analysis is a time-tested, peer-reviewed, well-accepted, and widely used method" and it "has a long history of use in litigation to determine economic damages, as well as in academia and in industry." *Id.* According to Mr. Weir, Dr. Wilcox's criticisms of the methodology Dr. Dennis and Mr. Weir have proposed go only to the "*implementation* of conjoint methodology" and "are speculative at best, because [Dr.] Wilcox has not conducted any empirical work or testing as it relates to the proposed conjoint." *Id.* ¶ 17 (emphasis added). Mr. Weir further contends Dr. Wilcox fails to acknowledge that "there are objective, statistical measures that can be used to evaluate the statistical significance of" the results of conjoint analysis. *Id.* ¶ 19.

Citing Dr. Wilcox's deposition testimony, Mr. Weir contends Dr. Wilcox concedes the basic premises that underlie Plaintiffs' proposed use of conjoint to determine the amount of damages. *Id.* ¶¶ 20-24. In particular. Mr. Weir contends Dr. Wilcox concedes that: 1) "a product's attributes, including label claims, can impact the market price of that product[,]" *id.* ¶ 20 (citing Thairani Decl., Ex. AJ[9] (Wilcox Dep.) at 20); 2) "that consumers are economically better off not paying a price premium for products[,]" *id.* ¶ 21 (citing Thairani Decl., Ex. AJ (Wilcox Dep.) at 8); 3) "that product differentiation is often used by companies to attract more customers, sell more products and as a result, increase profits[,]" *id.* ¶ 22 (citing Thairani Decl., Ex. AJ (Wilcox Dep.) at 58-59); 4) "that the recycling Claims at issue in this case are differentiating factors and that Colgate could use the Claims to differentiate its Products from other brand products without the

---

[9] Although the Thairani Declaration states that the Wilcox deposition excerpts are attached as Exhibit AK, they are, in fact, attached as Exhibit AJ.

recycling Claims[,]" *id.* ¶ 23 (citing Thairani Decl., Ex. AJ (Wilcox Dep.) at 61); and 5) "that the damages framework that [Mr. Weir has] set forth[,]" namely, "[t]he notion that you should take the difference between the equilibrium 'but for' world price and the real world price and then multiply it by the quantity of products sold in order to get an aggregate damages number[,]" "is the correct framework for this case." *Id.* ¶ 24 (citing Thairani Decl., Ex. AJ (Wilcox Dep.) at 9-10).

Next, Mr. Weir rejects Dr. Wilcox's opinion that the model Dr. Dennis and Mr. Weir propose fails to take into account supply side factors, opining that he and Dr. Dennis appropriately factor in the supply side "through the price range used in the survey that reflects the actual market prices that prevailed during the Class Period and the fact that the quantity used (or assumed) in the damages calculations reflects the actual quantity of products supplied during the Class Period (the number of units sold being fixed as a matter of history)." *Id.* ¶ 25. Mr. Weir also opines that Dr. Wilcox's proposed alternative approach – "that Dr. Dennis and [Mr. Weir] should model a but-for world in which more than the harmful conduct can vary, including the very sales of the Products" – would be improper. *Id.* ¶¶ 25-34. Mr. Weir opines that using "what the class actually purchased" is the only "sensible measure of the quantity supplied to the class[,]" *id.* ¶ 34, and that "[t]hese real-world transactions occurred at prices that *already* reflect the supply-side factors then extant in the marketplace, *id.* ¶ 30. Therefore, according to Mr. Weir, Dr. Dennis's use of "these historical data in setting the prices to be used in his proposed conjoint survey" appropriately factors in supply-side factors. *Id.*

Likewise, according to Mr. Weir, use of the actual sales (rather than varying the quantity of sales, as Wilcox proposes) allows Dr. Dennis and Mr. Weir to compare "apples-to-apples" rather than "apples-to-oranges," as Mr. Weir illustrates in a chart comparing the two approaches. *Id.* at 13 Fig. 1.  Mr. Weir opines that "when it comes to a but-for analysis, the economic instructions [in the Reference Manual on Scientific Evidence] are quite clear: the but-for world is the same as the real world in **every respect but one**: defendant's allegedly wrongful conduct." *Id.* ¶¶ 35-36 (emphasis in original).  According to Mr. Weir, Dr. Wilcox's proposed approach to conjoint would violate this rule as he would vary "potentially myriad factors in the but-for world[,]"

41

United States District Court
Northern District of California

including the features on the Products, the claims on the packaging and the number of units sold. *Id.* ¶¶ 39-44. According to Mr. Weir, "this clearly improper but-for construction . . . will not isolate the impact of Defendant's harmful conduct." *Id.* ¶ 44. He offers the example of "[a] but-for market price that is measured . . . as a result of the removal of the Claims AND a massive increase in advertising spending[,]" which he contends "would be unable to identify the economic effect due solely to Defendant's conduct of using the Claims." *Id.*

Mr. Weir also challenges Dr. Wilcox's criticisms aimed at Plaintiffs' modeling of supply-side factors, and in particular, Dr. Dennis's use of actual historical sales in his model, on the basis that Dr. Wilcox has "not conducted any empirical analysis of the supply side that would be relevant to this case" and "has not calculated the supply curve in this case." *Id.* ¶ 46. Nor has Dr. Wilcox "performed any empirical work to determine whether Colgate would have actually lowered supply, and if so, at what price they would make such a change[,]" Mr. Weir contends. *Id.* ¶ 47. Indeed, Mr. Weir contends, Dr. Wilcox admitted in his deposition that the quantities do not appear to change in the but-for world. *Id.* (citing Thairani Decl., Ex. AJ (Wilcox Dep.) at 101-102). In sum, Mr. Weir opines that "[u]sing a range of historic real-world prices and fixed quantity of supply in the Dr. Dennis survey 'bakes in' the impact of myriad supply factors as they existed throughout the class period." *Id.* ¶ 52. Furthermore, Mr. Weir contends, because the use or non-use of the Challenged Claims does not affect the cost of producing the Products, "the underlying supply conditions would not change based upon the challenged conduct" and therefore "it is reasonable to use the same supply factors in both the real and but-for worlds -- as Dennis and [Weir] have done in this case." *Id.* ¶¶ 60-64.

Mr. Weir also asserts that Dr. Wilcox is wrong with respect to his assertion that Mr. Weir and Dr. Dennis's model can only determine willingness to pay and not actual price premia. *Id.* ¶¶ 65-78. In fact, Mr. Weir contends, "[w]hen a conjoint survey contains information about market prices, or proxies . . . , the survey can calculate a marketplace outcome . . . rather than 'Willingness to Pay.'" *Id.* Mr. Weir asserts, "[t]he Dennis conjoint analysis is designed to determine a marketplace premia attributable to the use of the Claims and not 'Willingness to Pay[]' [as it] includes market-based price points and alternative product selections to simulate a

42

marketplace outcome, including an outside, no-buy option." *Id.* ¶ 72. According to Mr. Weir, "[i]n the aggregate, this simulation results in the calculation of marketplace price premium measurements." *Id.* ¶ 73.

Mr. Weir further contends "willingness to pay" can be "used in different ways to mean different things" in economics, and that the concept of "willingness to pay of the marginal consumer" is equivalent to the market price. *Id.* ¶ 75. Thus, according to Mr. Weir, at least one court has rejected the argument Dr. Wilcox makes here, finding that willingness to pay can be used to calculate a market price premium. *Id.* ¶ 76 (citing *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 333-336 (D.N.H. 2017)).

Mr. Weir rejects Dr. Wilcox's opinion that Dr. Dennis's proposed conjoint survey suffers from focalism bias, asserting that Dr. Wilcox "himself has not conducted any empirical analysis to determine whether this accusation is true." *Id.* ¶ 79. According to Mr. Weir, Dr. Wilcox's "speculation is wrong." *Id.* Mr. Weir states, in particular, that in Dr. Dennis's survey, "the Claims are not . . . highlighted or called out" but instead "are presented in the same manner as all other label statements" and are "included amongst a randomized list of product label statements[.]" Those product statements, he asserts, "are included in part because they have been identified as purchase drivers of the products, and in part because they serve as distracters, precisely to eliminate the risk of the Claims garnering undue attention." *Id.* ¶ 81.

Mr. Weir also rejects Dr. Wilcox's criticism of Mr. Weir's use of a single price premium to calculate classwide damages. *Id.* ¶ 82. While Dr. Wilcox's criticism is based on the fact that prices of the Products varied from one to another and over time, Mr. Weir opines that this does not "prevent the calculation of class-wide damages or require individual inquiry" because "such variations in price are captured in the range of prices used for analysis and analyzed by the conjoint model." *Id.* ¶ 83. He explains, "to the extent that any class member experienced a variation in price, the premium amount expressed as a percentage of the purchase price would raise or lower the premium amount in relation to the actual transaction price paid (i.e., the dollar premium paid would go up for those that paid higher prices and down for those that paid less). Such variations in purchase price are reflected and captured in the analysis of the actual

43

underlying transaction data used in the second portion of my damages analyses (the analysis of actual purchase prices)." *Id.* ¶ 86.

Next, Mr. Weir contends Dr. Wilcox is incorrect in asserting that "class-wide damages cannot be calculated due to a lack of commonality among the purchase motivations of consumers." *Id.* ¶¶ 89-95. According to Mr. Weir, Dr. Wilcox's assertion that "it would be difficult to ascertain the precise price paid (and quantity purchased) for each individual class member" is a "red herring, because what any one individual paid or purchased has no direct impact on the determination of class-wide damages." *Id.* ¶ 96. This is because "class-wide damages under a price premium model can be calculated from the bottom up as the sum of individual damages (as defendants often assert), or can be calculated from the top down, without individual inquiry, by finding the percentage price premium for the Claim and then multiplying the price premium by the dollars sold (as discussed in detail above)" and Mr. Weir and Dr. Dennis use the latter approach. *Id.*

Mr. Weir also opines that Dr. Wilcox's reliance on a "comparison of prices before-and-after the Claims were removed from the Product packaging as evidence that there is no premium associated with the challenged Claim" is flawed. *Id.* ¶¶ 98-106. According to Mr. Weir, "before-and-after analyses are notoriously poor at determining whether, in isolation, any one feature or attribute of a product has an impact on a product's price, because there are too many variables that would confound the ability of a simple side-by-side comparison of price to 'hold everything else constant.'" *Id.* ¶ 99. Mr. Weir further opines that there are many factors Dr. Wilcox failed to consider or control for in his before-and-after analysis, including label changes, exogenous shocks such as COVID-19 and supply-chain issues, entry and exit of competitors, and major world events such as famine or wars. *Id.* ¶¶ 100-101. Mr. Weir contends Dr. Wilcox's use of an "average price index" for the marketplace does not provide a sufficient control because: 1) "use of an average will obfuscate changes in price that are specific to individual products[;]" and 2) "it relies on the assumption that all effects in the toothpaste market impact each and every toothpaste product in identical fashion, an assumption that Wilcox concedes is simply not true." *Id.* ¶ 103. Mr. Weir concludes that it is "virtually impossible to isolate the impact of the challenged Claim

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

using the before-and-after methodology." *Id.* ¶ 104.

Finally, Mr. Weir rejects Dr. Wilcox's assertions that he has "not provided a method for measuring sales of the Products" and that Mr. Weir has "not provided a method by which to ascertain whether class members purchased the class Products with the Claim." *Id.* ¶¶ 107-115. Mr. Weir reiterates that he has "been provided with retail sales of the Products in California from Nielsen," that he has "been advised that Counsel for Plaintiffs has requested similar retail sales data from Circana[,]" and that "[e]ither of the Nielsen or Circana data allow for the analysis of dollar and unit sales of the Products, by UPC, and by time period." *Id.* ¶ 108. He states further that "Plaintiffs' Counsel requested -- and Defendant has provided -- specific information identifying when the challenged Claims went into production" as to ten selected Products, indicating that "the necessary data exists and supports the feasibility of conducting a detailed, product-specific analysis." *Id.* ¶¶ 108-109.

Mr. Weir offers the following explanation of the "goal post" approach that Wilcox criticizes:

> While the actual sales may have begun at dates slightly earlier or later than the label introduction, there is no reason, a priori, to believe that with labels cycling in the market, that lag of sales of one label would be materially different at either end of the label change. In other words, this lag would result in a shift of the begin and end dates of both ends of the lifespan of the label. Sales estimates based on these goal posts would then be subjected to a sensitivity analysis to ensure that the goal posts have not been estimated in a way that is anti-conservative to Defendant. As noted at my deposition, my prior research -- including specific studies of sales of Colgate toothpastes with changing labels -- has indicated that the goal post approach is not sensitive to such adjustments, but I would nonetheless conduct such a sensitivity analysis in the instant litigation. In the event that the sensitivity analysis suggests that the estimates are anti-conservative, adjustments to the stream of commerce timing can be made to ensure that the final estimates are conservative.

*Id.* ¶ 111.

Mr. Weir further observes that his estimates, "based upon Nielsen or Circana data, would add an additional level of conservatism, given that both syndicated data providers, while relatively comprehensive, are known to understate total sales of the products that they track, given that the smallest of retailers (e.g., a corner bodega) are not tracked." *Id.* ¶ 112. In addition, he opines, "to

the extent that there are products that have undergone multiple label configurations (e.g., shifting from a front-of-pack claim to a back-of-pack claim), and assuming that the results of the Dr. Dennis conjoint analyses reveal that one label configuration generates a lower price premium than another, the lower of the two premiums can be applied to any time period where there might be uncertainty as to which configuration was in the stream of commerce." *Id.* ¶ 113.

Lastly, Mr. Weir opines that Dr. Wilcox is "disingenuous" in raising "the specter . . . that due to the distribution of products, and the time it takes for a new package design (with or without the Claim) to arrive on retailer shelves, it will not be possible to correctly analyze the retail sales data." *Id.* ¶ 115. Mr. Weir points out that Dr. Wilcox "himself conducts an analysis of Nielsen retail sales data that supposedly delineates the periods before the Claim is introduced, while the Claim is in use, and after its eventual replacement, including a lag period just as [Mr. Weir has] suggested." *Id.*

### D.    The First Amended Complaint

In the First Amended Complaint ("FAC"), Plaintiffs allege that Colgate's conduct violates California public policy, California law, and the Green Guides, which are incorporated into California law, California Business & Professions Code § 17580.5. FAC ¶¶ 44-53. Plaintiffs assert the following claims: 1) violation of the Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*; 2) false advertising under California's False Advertising Law ("FAL"), California Business and Professions Code § 17500, *et seq.*; 3) fraud, deceit and/or misrepresentation; 4) negligent misrepresentation; and 5) unfair, unlawful and deceptive trade practices under California's Unfair Competition Law ("UCL"), Business and Professions Code, § 17200, *et seq.*.

Plaintiff's UCL claim asserts that Colgate engaged in unfair practices, FAC ¶ 110, unlawful practices, ¶ 111, and fraudulent practices, *id.* ¶ 112. The unlawful practices claim is based on the allegation that Colgate's labelling of the Products violates: 1) the Federal Trade Commission Green Guides regulations, including 16 C.F.R. §§ 260.1,[10] 260.2, 260.3, 260.12(a),

---

[10] Although the FAC cites "16 C.F.R. § 2601.1" the Court understands that this is a clerical error and that Plaintiffs intended to cite § 260.1.

United States District Court
Northern District of California

and 260.12(b); and 2) the Environmental Marketing Claims Act, including Cal. Bus. & Prof. Code § 17580(a). *Id.* ¶ 111.

Plaintiffs seek injunctive relief and damages as to the claims where damages are available.

### E.　Class Certification Contentions

#### 1. Motion

In the Class Certification Motion, Plaintiffs ask the Court to certify the following class under Rule 23 of the Federal Rules of Civil Procedure:

> All persons who purchased, in the State of California, a Colgate or Tom's of Maine brand of toothpaste labeled with a "Recyclable Tube" claim and/or a chasing arrows symbol between August 29, 2019, and the date of notice of pendency.

Notice of Motion at ii. They argue that this class definition satisfies all of the requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy) as well as both Rule 23(b)(2) ("the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole") and Rule 23(b)(3) ("questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."). *See generally,* Class Certification Motion.

According to Plaintiffs, this case presents a "textbook example for class certification because (1) all Class members were exposed to Colgate's recyclability claim and (2) the key liability questions—whether that recyclability claim violated the law and/or was likely to mislead the 'reasonable consumer'—will be determined by objective evidence common to the Class." *Id.* at 1-2. Plaintiffs further assert that damages are susceptible to common proof using the conjoint price premium model proposed by Dr. Dennis and Mr. Weir. *Id.* at 2.

Plaintiffs contend the numerosity requirement of Rule 23(a) is met because ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 11 (citing Rolon Decl., Ex. AD at COL00000004). The commonality requirement is met, Plaintiffs contend, because "there is classwide evidence that all of the Products included a Recyclability Claim during the class period,

47

and the Class is limited to such Products." *Id.* (citing Rolon Decl., Exs. A, B). According to Plaintiffs, "[t]he Recyclability Claim is substantially similar on each label; any immaterial variations in the Recyclability Claim that Defendant may identify cannot defeat certification." *Id.* at 11-12 (citing *Prescott v. Reckitt Benckiser LLC*, No. 20-cv-02101-BLF, 2022 U.S. Dist. LEXIS 135329, at *14 (N.D. Cal. July 14, 2022); *In re First All. Mortg. Co.*, 471 F.3d 977, 992 (9th Cir. 2006)).

Furthermore, Plaintiffs assert, " 'because deception and materiality under the FAL, CLRA, and UCL are objective questions, they are ideal for class certification because they will not require the court to investigate class members' individual interaction with the [challenged] product[s].' " *Id.* at 12 (quoting *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018) (internal quotations and citations omitted); and citing *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 564, 565, 575 (N.D. Cal. 2020); *Woodard v. Labrada*, No. EDCV 16-189 JGB, 2021 U.S. Dist. LEXIS 189649, at *88; and *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 377 (N.D. Cal. 2010)). Thus, the Court will be able to resolve Plaintiffs' claims on a classwide basis using objective standards, Plaintiffs contend. *Id.* (citing *Smith v. Keurig Green Mt., Inc.*, 2020 U.S. Dist. LEXIS, at *13–22 (N.D. Cal. Sept. 21, 2020)). In particular, Plaintiffs assert, "whether Colgate's Recyclability Claim complied with the Green Guides and California law is a common issue, regardless of any individual Class member's particular beliefs, knowledge, actions, or circumstances (including whether they personally relied on the Recyclability Claim or were able to recycle the Product)." *Id.* (citing *Smith v. Keurig*, 2020 U.S. Dist. LEXIS, at *13–14 for the proposition that "no individualized reliance inquiry is required for a UCL claim" and quoting *Smith v. Keurig,* 2020 U.S. Dist. LEXIS, at *21 ("Whether an individual class member's recycling facility happened to accept the Products is irrelevant.")).

To support commonality, Plaintiffs also point to the results of Dr. Dennis's perception survey finding that "reasonable consumers understand the Recyclability Claim to mean local recycling programs accept the product for recycling," and of his materiality survey, finding that the Recyclability Claim was material to the reasonable consumer. *Id.* at 12-13 (citing Dennis Report ¶¶ 92-105). Plaintiffs argue further that they will be able to establish, through common

48

evidence, "that a substantial majority of California consumers did not, and still do not, have access to recycling programs and facilities that will accept the Products, sort the Products, and convert the Products into reusable end-market material." *Id.* at 13 (citing Leonard Report ¶¶ 15–38). Another common question, according to Plaintiffs, is "[w]hether Colgate complied with California law requiring it to 'maintain in written form in its records . . . information and documentation supporting the validity' of the Recyclability Claim" pursuant to Cal. Bus. & Prof. Code § 17580. *Id.* Finally, Plaintiffs contend "the methodology for calculating the price premium on the Products as a result of the Recyclability Claim is common to the Class[,]" pointing to the Weir Declaration. *Id.*

Plaintiffs argue that the claims of the named Plaintiffs also meet the typicality requirement because "[t]hey, like all class members: purchased Products with a Recyclability Claim . . . and paid a price premium as a result of the misrepresentation." *Id.* at 13-14 (citing Gershzon Decl., ¶¶ 2, 4; Della Decl., ¶¶ 2, 4; Lienhard Report. ¶¶ 2,4; Dennis Report, ¶ 168–182; Weir Decl., ¶¶ 42–43). According to Plaintiffs, "[i]t does not matter that Plaintiffs did not purchase each Product included in the proposed Class because the relevant underlying facts and the theories of liability with respect to each Product are all the same." *Id.* at 14 (citing *Swartz v. Dave's Killer Bread, Inc.*, 2024 U.S. Dist. LEXIS 198028, at *20–21 (N.D. Cal. Sept. 20, 2024); *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-2724-LHK, 2014 U.S. Dist. LEXIS 71575, at *56 (N.D. Cal. May 23, 2014); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 502–03 (S.D. Cal. 2013); *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, at 539–40 (N.D. Cal. 2012)).

Next, Plaintiffs contend the class representatives and class counsel will "fairly and adequately protect the interests of the class" under Rule 23(a)(4). *Id.* at 14-15. In particular, they contend the named plaintiffs have no conflicts with other class members and that their counsel are experienced class action litigators with the resources to prosecute the case vigorously on behalf of the class. *Id.*

Plaintiffs contend they also meet the predominance requirement of Rule 23(b)(3). *Id.* at 15-23. First, they assert that "Colgate's liability under the unlawfulness prong of the UCL is a predominating common question because the Recyclability Claim either satisfies the required

49

legal threshold [under the Green Guides and California law] or it does not, and that determination will apply to all Class Members." *Id.* at 16 (citing *Smith v. Keurig*, 2020 U.S. Dist. LEXIS 172826, at *21–22).

Second, to the extent that deceptiveness is not decided as a matter of law, it will be evaluated under the reasonable consumer standard, which also is amenable to common proof, Plaintiffs argue. *Id.* at 17-18. Further, according to Plaintiffs, "[b]ecause deception is the key element for Plaintiffs' UCL and FAL claims, the objective deception inquiry necessarily establishes predominance." *Id.* at 17 (citing *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 407 (N.D. Cal. 2021)). Plaintiffs assert, Colgate's "check locally" disclaimer on some packages does not defeat predominance because that disclaimer is insufficient as a matter of law under the Green Guides. *Id.* Plaintiffs also contend the disclaimer is insufficient because "under the reasonable consumer standard, consumers are not required to research or review information beyond the label before purchasing a product." *Id.* (citing dkt. no. 45, Feb. 6, 2024 Order Denying Motion to Dismiss First Amended Class Action Complaint at 39). Predominance is established as to deceptiveness, Plaintiffs argue, because "class members were uniformly exposed to the affirmative (but false) Recyclability Claim on the Products' labels." *Id.* at 17-18 (citing *Walker v. Life Ins.of the Sw.*, 953 F.3d 624, 631 (9th Cir. 2020); *Salas v. Toyota Motor Sales, United States, Inc.*, 2019 U.S. Dist. LEXIS 77847 at *25–26 (C.D. Cal. Mar. 27, 2019)).

Third, Plaintiffs "seek restitution under the UCL, as well as damages under the CLRA and for fraud, presenting further predominant common questions." *Id.* at 18. According to Plaintiffs, under *Comcast v. Behrend,* they are required to show at the class certification stage "that damages are 'capable of measurement' across the class and that their damages model 'is consistent with [their] liability case.'" *Id.* (quoting *Comcast*, 569 U.S. 27 (2013)). They are not, however, required to "actually execute their model at the class certification stage." *Id.* (citing *Lytle v. Nutramax Labs., Inc.*, No. 22-55744, 2024 U.S. App. LEXIS 9722, at *18 (9th Cir. Apr. 22, 2024)). They assert they have met this requirement by offering the expert reports of Dr. Dennis and Mr. Weir setting forth a methodology that can be used to reliably determine classwide damages consistent with the theory of their claims. *Id.* at 18-19.

50

United States District Court
Northern District of California

In particular, Plaintiffs contend the conjoint analysis methodology proposed by Dr. Dennis and Mr. Weir "has been used for over 50 years by academic researchers, industry marketing departments, and government agencies to determine the price premium attributable to particular product attributes, such as label claims." *Id.* at 19.  Furthermore, they assert, "[n]umerous courts have . . . approved of conjoint analysis as a methodology to determine the price attributable to specific product features such as a label claim." *Id.*  (citing *Smith v. Keurig*, 2020 U.S. Dist. LEXIS 172826, at \*28–29; *Bailey v. Rite Aid Corp.*, No. 4:18-cv-06926 YGR, 2021 U.S. Dist. LEXIS 81654, at \*50 (N.D. Cal. Apr. 28, 2021);  *Hadley*, 324 F. Supp. 3d at 1103; *Post Foods*, 334 F.R.D. at 575; *In re Lenovo Adware Litig.*, No. 15-MD-02624-RMW, 2016 WL 6277245, at \*21 (N.D. Cal. Oct. 27, 2016); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 944 (C.D. Cal. 2015), aff'd sub nom. *Briseno*, 844 F.3d 1121, and aff'd sub nom. *Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017)).  Plaintiffs assert the methodology proposed by their experts is reliable because it factors in the "real-world marketplace for similar products, and [their analysis] will be based on actual, historical prices that occurred in the marketplace based on Circana (f/k/a IRI) data." *Id.* at 19-20 (citations omitted).

Fourth, Plaintiffs argue that common questions predominate with respect to materiality of the Recyclability Claims because, under California law, " '[q]uestions of materiality and reliance are determined based upon the reasonable consumer standard, not the subjective understandings of individual plaintiffs.' " *Id.* at 20 (quoting *Kumar v. Salov N. Am. Corp.*, 2016 U.S. Dist. LEXIS 92374, at \*21 (N.D. Cal. July 15, 2016); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011); *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 (1971)).  Thus, they argue, materiality can be established based on Dr. Dennis's materiality survey.  *Id.* at 20-21. Plaintiffs argue that the Court should reject any argument advanced by Colgate that "certain purchases should be excluded from the Class because the deceptive Recyclability Claim appeared only on the side or back label of certain Products and not on the front of the package." *Id.* at 21.  According to Plaintiffs, "when 'there is evidence that the representation was consistently made on a product's label, the only question is whether it was objectively material to a reasonable consumer.' " *Id.* at 21-22 (quoting *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 564-65 (N.D. Cal. 2020); and citing *Falcone*

*v. Nestle USA, Inc.*, No. 3:19-cv-723-L-DEB, 2024 U.S. Dist. LEXIS 214648, at \*27-29 (S.D. Cal. Sep. 25, 2024); *Prescott v. Reckitt Benckiser LLC*, 2022 U.S. Dist. LEXIS 135329, at \*16 (N.D. Cal. July 29, 2022); *Banks v. R.C. Bigelow, Inc.*, No. 20-cv-06208 DDP (RAOx), 2023 U.S. Dist. LEXIS 135167, at \*16 (C.D. Cal. July 31, 2023)).

Fifth, Plaintiffs contend common questions predominate regarding the availability of punitive damages under the CLRA as that question turns on whether Plaintiffs can establish that Colgate acted with "oppression, fraud or malice[,]" which depends on Colgate's conduct rather than facts unique to any class member. *Id.* at 22-23.

Next, Plaintiffs contend a class action is superior to individual actions under Rule 23(b)(3) "because the amounts charged per purchase were low relative to the costs of litigation[;] Judicial resources would . . . be conserved by concentrating the action in a single suit[;] [and]. . .the adjudication of class claims would not be significantly more burdensome than if the matter were prosecuted individually." *Id.* at 23.

Finally, Plaintiffs argue that Rule 23(b)(2) provides a separate basis for certifying the class. *Id.* at 23-24. Plaintiffs point out that that rule permits certification where the Rule 23(a) prerequisites are satisfied and a defendant "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole"; thus it does not require Plaintiffs to establish predominance or present a damages model. *Id.* Here, they contend, the UCL "provides Plaintiffs and the Class with a statutory right to enjoin Colgate's deceptive and unlawful conduct" and "Colgate continues to market the Products with an objectively unlawful and deceptive label, in the same manner to the entire Class." *Id.* Therefore, Plaintiffs assert, the class can be certified under Rule 23(b)(2) for the purposes of pursuing injunctive relief. *Id.* at 24.

### 2. Opposition to Class Certification Motion

In its Opposition brief, Colgate does not dispute that Plaintiffs' proposed class meets Rule 23(a)'s numerosity and commonality requirements. It argues, however, that Rule 23(b)(3)'s predominance requirement is not met because of the individualized issues that will arise with respect to proving materiality and classwide exposure to the Recyclability Claims. Dkt. no. 75

52

(Class Cert. Opposition) at 7-14.

As to materiality, Colgate points to the survey results of its own expert, Dr. Kivetz, that it contends "unequivocally demonstrate that the Claims do not materially affect, let alone in a common way, consumers' decisions to purchase the Products." *Id.* at 9.  Colgate also contends Plaintiffs Lienhard and Gershzon admitted in their depositions that their reasons for purchasing the Products had nothing to do with the recyclability claims on the packaging. *Id.* (citing Spelman Decl., Ex. AA ("Gershzon Dep.") at 85:3–86:14, 90:2–7; Ex. BB ("Lienhard Dep.") at 26:10–24). Colgate argues that Dr. Dennis's materiality survey does not help Plaintiffs because that survey does not satisfy *Daubert*, as is argued in Colgate's separate motion. *Id.* at 10.  Because there is no evidence of materiality, Colgate contends, "any presumption of reliance that may otherwise arise in this case" is negated. *Id.* (citing *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, 2016 WL 5920345, at *8 (C.D. Cal. June 23, 2016)).

Colgate argues further that the predominance requirement is not met because Plaintiffs cannot demonstrate classwide exposure to the recyclability claims. *Id.* at 11 (citing *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 595-96 (9th Cir. 2012); *Castro Valley Union 76, Inc. v. Vapor Sys. Techs.*, Inc., 2012 WL 5199458, at *10 (N.D. Cal. Oct. 22, 2012)).  They point to evidence that a significant percentage of the Products carried no recyclability claims on their packaging during the class period due to the phased transition, and argue that because of the "bleed-in approach" whereby the UPCs stayed the same even when the packaging changed, it is impossible to determine which version of the Product a consumer purchased. *Id.* at 12. This "lack of uniform exposure dooms class certification" according to Colgate. *Id.* (citing *In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d 679, 705 (9th Cir. 2018)).

Colgate contends Plaintiffs cannot "sidestep" this problem by defining the class "to include only those Products labeled with a Recyclability Claim" as this approach would undermine the Ninth Circuit's holdings in *Mazza*  and *Hyundai*, allowing plaintiffs to "evade a lack of uniform exposure by gerrymandering the class to encompass only those individuals who purchased Products with Claims despite the significant variations in the Claims across the Products and the class period." *Id.*  at 12.  According to Colgate, district courts in the Ninth Circuit have rejected

United States District Court
Northern District of California

United States District Court
Northern District of California

that approach. *Id.* (citing *Bruton v. Gerber Prods. Co.*, No. 12-CV-02412-LHK, 2018 WL 1009257, at \*1 (N.D. Cal. Feb. 13, 2018); *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 228-229 (N.D. Cal. 2015)). Colgate notes that "two of the three named Plaintiffs cannot recall which specific Colgate toothpaste product they purchased, despite having purchased the product for many years." *Id.* at 13 (citing Spelman Decl., Ex. AA (Gershzon Dep.) at 96:6–97:1; Spelman Decl. Ex. CC (Della Dep.) at 57:12–16).

Furthermore, Colgate contends, Plaintiffs' class definition "cannot address the fact that many of the Claims appeared only on the side or back panels of the Product cartons[,]" which Colgate asserts was the case for 57% of the Products addressed in the Production Audit. *Id.* (citing Spelman Decl., Ex. U). According to Colgate, "[t]he Ninth Circuit has recognized that consumers may not see such representations before purchase because they 'won't have the time or interest to read . . . the back of the box.'" *Id.* (quoting *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1018 (9th Cir. 2020); and citing *Zakaria v. Gerber Prods. Co.*, 2016 WL 6662723, at \*8 (C.D. Cal. Mar. 23, 2016)). Colgate contends courts have refused to certify classes on this basis, refusing to infer classwide exposure. *Id.* (citing *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1099–1100 (N.D. Cal. 2018); *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 444 (N.D. Cal. 2014)).

Next, Colgate argues that the proposed class is "fatally overbroad" because many putative class members "*could not* have been deceived." *Id.* at 14 (emphasis in original). First, Colgate asserts, "even assuming the recyclable tubes do not meet the Green Guides standard (which Colgate disputes), Plaintiffs' alleged interpretation of the Claims is still *true* for any consumer whose local recycling facility does 'typically' sort recyclable tubes into HDPE bales and sells those bales to reprocessors, and thus those consumers cannot be injured in the way Plaintiffs allege." *Id.* at 15. According to Colgate, the evidence here is that there are significant numbers of such class members "given that the typical MRF in California, such as Mt. Diablo, can properly sort the Products into HDPE bales that are sold to reprocessors willing and able to recycle the Products into usable material." *Id.*; *see also* Corra Decl. ¶ 10 & Ex. G. Furthermore, Colgate asserts, Plaintiffs' expert, Michelle Leonard, "has little first-hand knowledge of, and a self-

professed lack of expertise in, many of the basic facets of the plastics recycling process." Opposition at 15.  In addition, Colgate asserts, in her expert report Ms. Leonard's "sole focus (and limited knowledge) relates to 'explicit' acceptance of tubes by MRFs and municipal collection programs." *Id.*  According to Colgate, "[t]his ignores the established concept of 'implicit' acceptance, which reflects that tubes can be and regularly are recycled within the #2 HDPE stream—which is widely accessible in California—even if tubes are not specifically identified in consumer-facing communication." *Id.* (citing Nix Report ¶¶ 15–16 & Ex. M at 7, 27).

The second reason some class members could not have been deceived by the Recyclability Claims, according to Colgate, is that many of the Products carried a "check locally" disclaimer. *Id.* at 16.  According to Colgate, "Plaintiffs offer no evidence regarding consumers' interpretation of the Claims with the "check locally" language, or the disclosures on Colgate's and Tom's websites, and it defies common sense that a reasonable consumer would interpret such language to convey acceptance by their local recycling program." *Id.* (citing *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 295 (S.D.N.Y. 2022), aff'd sub nom. *Bustamante v. KIND, LLC*, 100 F.4th 419 (2d Cir. 2024)). It points to Della's deposition testimony that she understood the "check locally" disclaimer to mean that the Product might not be accepted for recycling.  *Id.* (citing Spelman Decl., Ex. CC (Della Dep.) at 61).  It also cites the Production Audit, which it says indicated that "the 'check locally' language appeared immediately adjacent to the only Claim on the carton approximately 30% of the time the Claims were on the sampled products." *Id.* (citing Spelman Decl. ¶ 14, Ex. U).

Colgate rejects Plaintiffs' argument that "their UCL 'unlawful' claim does not depend on 'any individual Class member's particular beliefs, knowledge, actions, or circumstances.'" *Id.* (quoting Motion at 12).  It contends this argument is based on the assumption that "a technical violation of the Green Guides . . . results in a cognizable injury to every single person who purchased a product labeled as a 'recyclable tube'" but that this is not the law.  *Id.*  In particular, Colgate cites *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) for the rule that "a 'bare procedural violation' of a statute or regulation 'divorced from any concrete harm' resulting from that alleged violation, cannot 'satisfy the injury-in-fact requirement of Article III.' " *Id.* at 16-17.  Therefore,

Colgate concludes, "an 'alleged violation of labeling laws alone' cannot establish a legally cognizable injury 'separate from any alleged fraud or deception.'" *Id.* (quoting *Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1145 (N.D. Cal. 2013)).

Colgate contends California law supports a similar conclusion.  In particular, according to Colgate, "[r]estitution is 'the only monetary remedy available in a private action brought under the unfair competition law,' including the UCL's 'unlawful' prong." *Id.* (quoting *Clark v. Superior Court*, 50 Cal. 4th 605, 611 (2010)). Further. Colgate argues, "[a]though the UCL 'authorize[s] restitution for money or property which may have been acquired by means of a fraudulent business practice or deceptive advertisement,' it does 'not authorize restitution for money or property definitively not acquired through such means.'" *Id.* (quoting *Downey v. Pub. Storage, Inc.*, 44 Cal. App. 5th 1103, 1121 (2020) (internal quotations and citation omitted)). Therefore, Colgate argues, a regulatory violation is actionable under the UCL "only if it results in consumer reliance on the allegedly deceptive claim." *Id.* (citing *Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1143–44 (2020)).

Colgate asserts that these principles are illustrated in *Howard v. Hain Celestial Grp., Inc.*, in which the court denied class certification as to UCL fraud and unlawful claims "based on the presence of nutrient content statements on certain foods allegedly marketed to children under age two, which allegedly violated FDA regulations incorporated into California's Sherman Law." *Id.* (citing *Howard,* 2024 WL 718180, at *1 (N.D. Cal. Feb. 22, 2024), appeal filed, No. 25-1919 (9th Cir. Mar. 24, 2025)).  According to Colgate, the court in that case "denied certification of a class of *all* product purchasers because the class included people 'who bought the products for children two and up' and thus who, 'under the plaintiffs' own theory, could not have been defrauded.' " *Id.* at 18 (quoting *Howard*, 2024 WL 718180, at *1).  The *Howard* court further held that this conclusion applied not only to the UCL fraud claims but also to the UCL unlawful claims, according to Colgate, because those claims "were 'based on the contention that Hain Celestial's products are misbranded,' and the 'whole point of a misbranding law is to prevent people from being misled.' " *Id.* (quoting *Howard,* 2024 WL 718180, at *1).

Colgate rejects Plaintiffs' assertion that all consumers were harmed, even if they were not

56

United States District Court
Northern District of California

deceived by its Recyclability Claims, because they suffered an economic injury, namely, the payment of a price premium. *Id.* It argues that for those purchasers in the putative class whose local recycling facilities actually recycled the Products there could be no "price premium" because they got exactly what they paid for. *Id.* (citing *Estrada v. Johnson & Johnson*, 2015 WL 1440466, at *4 (E.D. Cal. Mar. 27, 2015)). Thus, Colgate contends, the class is overbroad to the extent that it includes these consumers. *Id.*

Next, Colgate argues that Plaintiffs' damages model does not satisfy the requirements of *Comcast Corp. v. Behrend*. *Id.* at 18-24 (citing *Comcast*, 569 U.S. 27, 33, 35 (2013)). According to Colgate, under *Comcast* Plaintiffs' damages model must be capable of accurately measuring only those damages attributable to their theory of liability. *Id*. Thus, it contends, Plaintiffs must offer a damages model that "isolate[s] the premium due *only* to the allegedly misleading marketing statement." *Id.* (quoting *In re Scotts EZ Seed Litig.,* 304 F.R.D. 397, 413 (S.D.N.Y. 2015) (emphasis added by Colgate)).

According to Colgate, Plaintiffs attempt to meet this requirement by calculating the price premium paid for the products, that is, "the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices." *Id*. (quoting *In re NJOY, Inc. Consumer Class Action Litig*., 120 F. Supp. 3d 1050, 1122 (C.D. Cal. 2015)). Colgate argues that Plaintiffs have not demonstrated that their damages model offers a reliable method for calculating price premia (if any) because it ignores real-word data showing that there was no price increase associated with use of the Recyclable Claims, as set forth by Dr. Wilcox in his expert report. *Id.* at 19-20 (citing Wilcox Report ¶¶ 18-32). According to Colgate, Dr. Wilcox's opinion is also consistent with Dr. Kivetz's "determination that the Claims have no impact on consumer behavior or willingness to pay." *Id.* at 20 (citing Kivetz Report ¶¶ 127–80). Colgate argues that "[c]ourts have found similar market data sufficient to show a lack of price premium damages." *Id.* (citing *Moore v. GNC, Holdings, Inc.*, 2014 WL 12634919, at *5 (S.D. Fla. Mar. 18, 2014); *Colpitts v. Growers*, 2023 WL 2752161, at *4–5 (S.D.N.Y. Mar. 31, 2023); *Housey v. Procter & Gamble Co.*, 2022 WL 874731, at *8 (S.D.N.Y. Mar. 24, 2022)).

Colgate also points to *Briseno v. Henderson,* 998 F.3d 1014, 1029 (9th Cir. 2021), in which "the Ninth Circuit rejected Mr. Weir's 'conclusion that the [100% Natural] label [at issue] led to a price premium' where the company 'dropped the "100% Natural" label years ago, so he could have studied whether that led to the removal of the price premium.' " *Id.* Similarly, Colgate cites *Klein v. Meta Platforms, Inc.*, an antitrust case. *Id.* at 21. In that case, according to Colgate, "Judge Donato . . . held in excluding expert testimony and denying certification in an antitrust case, the 'undisputed record about the real world, and the lack of any meaningful contrary evidence, is a big red flag for [plaintiffs' expert's] theory' of damages." *Id.* (quoting 2025 WL 295361, at \*5 (N.D. Cal. Jan. 24, 2025)). Colgate asserts that "[b]ecause the only evidence in the record reflects the absence of a price premium, there is no 'evidence of loss to raise an inference of classwide harm' and thus certification is unwarranted." *Id.* (quoting *In re Tobacco Cases II,* 240 Cal. App. 4th 779, 799 (2015)).

Colgate argues further that Plaintiffs' proposed damages model is unreliable for the additional reason that it "cannot effectively isolate the alleged price premium statistics attributable to the Claims as they appear on the front versus back/side panel of the carton, and/or the presence or absence of the 'check locally' language,'" as explained by Dr. Wilcox in his expert report. *Id.* at 21-22. In particular, it argues, "Dr. Dennis's survey design would present claims from the front of the carton (in his 'Front of-Package Label Claims' attribute) and from the side and back of the carton (in his 'Other Label Claims on Product Package' attribute) in the same manner. *Id.* (citing Dennis Report at 58; Wilcox Report ¶ 49). Furthermore, Colgate contends, "by including the Claims in both the 'Front-of-Package Label Claims' attribute and the 'Other Label Claims on Product Package' attribute, Dr. Dennis's conjoint design will expose respondents to hypothetical toothpaste products with two concurrently visible 'recyclable tubes' claims, supposedly representing cartons with both front label and back/side label claims." *Id.* at 22 (citing Spelman Decl., Ex. DD (Dennis Dep.) at 213-14; Wilcox Report ¶¶ 48, 55). Colgate also asserts that Dr. Dennis's conjoint survey is not an accurate reflection of what consumers experience in the real world because "Dennis attempts to capture the price premium for the Claims with the 'check locally' language by requiring respondents to hover over an asterisk to reveal the language." *Id.*

United States District Court
Northern District of California

(citing Dennis Report ¶ 144 n. 48, ¶ 145).  In reality, according to Colgate, "the 'check locally' language appears immediately adjacent to the back-label 'recyclable tube' language in the real world such that a consumer would need to take no further action (besides viewing the back label claim) to see it." *Id.*

Colgate also faults Plaintiffs' damages model on the basis that Mr. Weir has "presented no reliable method to . . . aggregate [the] sales attributable to the different versions of the recyclable tube cartons." *Id.* at 22-23. First, it contends, "because the recyclable tubes and subsequent label updates were 'bleed ins,' there were significant time periods in which a single SKU was available with and without the Claims, and there is no way to identify the relevant sales during these time periods." *Id.* (citing Corra Decl. ¶¶ 6–7; Wilcox Report at ¶¶ 64-67). "Second, the Production Audit reflects that, in addition to the 'bleed in' time periods, there were significant periods during which different versions of product labels were produced simultaneously." *Id.* (citing Spelman Decl., Ex. U). According to Colgate, although "Mr. Weir testified that he would set 'goal posts' that would allow him to estimate the sales at issue, he provided no details about this supposed approach, which lacks the requisite specificity to satisfy Plaintiffs' burden under Rule 23." *Id.* (citing Spelman Dec., Ex. EE (Weir Dep.) at 58-60; Wilcox Report ¶¶ 64–67). Colgate contends courts have found that class certification is inappropriate where, as here, damages models could not "identify at-issue sales necessary to measure aggregate sales." *Id.* (citing *Jensen v. Natrol, LLC*, 2020 WL 416420, at *1 (N.D. Cal. Jan. 27, 2020)).

Next, Colgate argues that the named Plaintiffs are not adequate class representatives because there are unique defenses as to those individuals that threaten to become the focus of the litigation, namely, that their testimony "belies their alleged reliance on the Claims." *Id.* at 24 (citing *Joseph v. Costco Wholesale Corp*., 2015 WL 12745803, at *6 (C.D. Cal. Aug. 27, 2015)). In particular, it points to deposition testimony by the named Plaintiffs that it contends "establishes that they were loyal Colgate and Tom's purchasers well before the Claims were introduced, and their purchasing habits did not change as a result of the Claims." *Id.* (citing Spelman Decl., Ex. AA (Gershzon Dep.) at 90; *id.*, Ex. BB (Lienhard Dep.) at 110; *id.*, Ex. CC (Della Dep.) at 45, 50.

Finally, Colgate argues that the Court should deny Plaintiffs' alternative request to certify

an injunctive relief class under Rule 23(b)(2) because certification of an injunctive relief class is only appropriate "where the primary relief sought is declaratory or injunctive," and here, the focus of the lawsuit is the monetary relief Plaintiffs seek, namely, the price premium class members allegedly paid as a result of Colgate's Claims.  *Id.* (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001)).

### 3. Reply in Support of Class Certification Motion and Expert Reply Declarations

In their Reply brief, Plaintiffs contend Colgate primarily contests the facts, arguing that its "recyclability claims were immaterial, that some consumers may have been able to recycle the Products, that no premium exists, and that Plaintiffs did not rely on the claims."  Dkt. no. 80-3 (Class Cert. Reply) at 1.  According to Plaintiffs, these are all "merits questions answerable with common evidence" and thus, support class certification.  *Id.*

As to Colgate's assertion that Plaintiffs cannot establish materiality on a classwide basis, Plaintiffs argue that "the very fact that Dr. Kivetz has offered evidence of materiality through his surveys is a concession that these issues are susceptible to classwide proof."  *Id.*  at 4.  They also challenge Dr. Kivetz's methodology on numerous grounds, asserting that his " 'materiality surveys' were designed to fail."  *Id.*  at 3. In particular, Plaintiffs argue that "[r]ather than isolating the effect of the challenged claims, the surveys simply measured pre-existing brand loyalty by showing respondents familiar Colgate and Tom's of Maine packaging—with or without the recyclability representations digitally removed—without disclosing the alteration or asking respondents to choose among competing products."  *Id.* (citing Sept. 16, 2025 Reply Expert Report of J. Michael Dennis, PhD ("Dennis Reply Decl.") ¶¶ 57-79).

As to Colgate's assertion that the class definition is "gerrymandered," Plaintiffs assert that "defining the class by reference to consumers who purchased Products bearing a specific, challenged claim is an 'accepted and uncontroversial' approach that ensures all class members were exposed to the recyclability representations."  *Id.* at 2 (citing *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1097 (N.D. Cal. 2018)). According to Plaintiffs, "when a claim appears on the package of each item sold, class-wide exposure may be inferred." *Id.*  at 5 (citing *Astiana v.*

United States District Court
Northern District of California

60

United States District Court
Northern District of California

*Kashi Co.*, 291 F.R.D. 493, 500 (S.D. Cal. 2013); *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 410 (E.D.N.Y. 2021)). Plaintiffs reject Colgate's reliance on *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012), arguing that that case is distinguishable because the plaintiffs in *Mazza*, who were purchasers of Hondas, had received "varying information through some limited television advertising and individualized dealer statements" and thus had not been "uniformly exposed" to the claims that were alleged to have been deceptive. *Id.* In contrast, Plaintiffs contend, in this case "there is no dispute that exposure was uniform because every purchaser received a product bearing the recyclability representation." *Id.*

Plaintiffs reject Colgate's assertion that there are "significant variations in the claims," arguing that even after Colgate added the "check locally" language, "[a]ll of these variations communicated the same consistent falsehood and used the same language—i.e., 'Recyclable Tube.'" *Id.* at 7. According to Plaintiffs, these minor variations are not sufficient to defeat class certification. *Id.* (citing *In re First Alliance Mortg. Co.*, 471 F.3d 977, 992 (9th Cir. 2006)). Similarly, Plaintiffs assert, "Colgate's contention that claims on back or side panels cannot support classwide exposure" also fails because "[t]he Ninth Circuit has made clear that the decisive question is whether consumers were exposed to the misleading information—not the size or placement of the claim." *Id.* at 2, 7-8. Thus, Plaintiffs contend, this argument is a "reliance argument in disguise" and fails because individualized proof of reliance is not required for their UCL and FAL claims and under the CLRA, reliance is presumed when a claim is material. *Id.* at 2. Plaintiffs also point to the testimony of Colgate's 30(b)(6) witness, Christine Rein, "that it initially placed the recyclability claim on the front label of its Products to 'announce' the message and, once it had 'adequately communicated that news' to consumers, moved the claim to the back panel." *Id.* at 2 (quoting Thairani Decl., Ex. AI (Rein Dep.) at 90). Plaintiffs contend "[t]he Court should take Colgate at its word that it succeeded in communicating the recyclability message to consumers and reject its effort to recast this issue as one requiring individualized reliance inquiries." *Id.*

Plaintiffs also contend Colgate's assertion that identification of class members will involve a "memory" test is inconsistent with Ninth Circuit law, which provides that "administrative

61

feasibility is not a prerequisite to certification." *Id.* at 8 (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017)).

Plaintiffs argue that Colgate's overbreadth argument – that the class includes purchasers who were not misled because their tubes were actually recycled – also falls short because this issue depends on whether "recycling facilities are available to a substantial majority [defined as, at least 60%] of consumers or communities where the item is sold." *Id.* at 8 (quoting 16 C.F.R. § 260.12(b)(1)). That question, in turn, can be addressed on a classwide basis with common evidence. *Id.*

Furthermore, Plaintiffs assert, Colgate's argument that some class members were not injured because their tubes were recycled is based on a misunderstanding of Plaintiffs' theory of the case: "Plaintiffs' theory of damages is that all class members were injured at the point of sale when they paid a price premium for a product that, under the Green Guides and California law, was objectively mislabeled as recyclable." *Id.* at 9 (citing *Pulaski v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015); *Swartz v. Coca-Cola Co.*, No. 21-cv-04643-JD, at *4 (N.D. Cal. July 27, 2023)). Plaintiffs argue that "[t]hat injury exists regardless of whether a de minimis number of tubes may have been recycled at some facilities." *Id.* Furthermore, according to Plaintiffs, "[c]ourts have rejected the idea that isolated outcomes defeat predominance or standing." *Id.* (citing *Smith*, 2020 U.S. Dist. LEXIS 172826, at *21).

Plaintiffs reject Colgate's argument that class members who can establish only a "bare procedural violation" lack standing under *Spokeo*. *Id.* at 10. According to Plaintiffs, they will show that all class members paid a price premium and therefore, that all class members were injured. *Id.* (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011)). Plaintiffs further assert that *Howard v. Hain Celestial Grp., Inc.*, 2024 U.S. Dist. LEXIS 179147, at *7-8, cited by Colgate in support of its assertion that a regulatory violation is actionable under the UCL "only if it results in consumer reliance on the allegedly deceptive claim[,]" Opposition at 17, "incorrectly determined that a UCL unlawfulness claim requires a showing of reliance." *Id.* (citing *King v. Nat'l Gen. Ins. Co.*, No. 15-cv-00313-DMR, 2025 U.S. Dist. LEXIS 85677, at *74-75 (N.D. Cal. May 5, 2025)).

Plaintiffs argue that Colgate's challenges to the damages model proposed by their experts go to the weight of the evidence and that these disputes should be decided by the jury. *Id.* They also reject those challenges, arguing that their damages model meets the requirements of *Comcast* for the reasons set forth in their Opposition to Colgate's *Daubert* motions, discussed below. *Id.* at 11-13.

Plaintiffs reject Colgate's argument that the named plaintiffs are not typical of the class members or adequate representatives because they did not rely on Colgate's Recyclability Claims when they purchased the Products. *Id.* at 13-14. They contend Colgate has mischaracterized the evidence, which supports the opposite conclusion. *Id.* Similarly, Plaintiffs assert that the named Plaintiffs' testimony is sufficient to establish standing to seek injunctive relief as they have testified that they *would* purchase the Products if the Recyclability Claims were true, which this Court found at the pleading stage was sufficient to establish standing under *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018). *Id.* at 2, 14-15 (citing dkt. no. 45 (Feb. 6, 2024 Order Denying Motion To Dismiss First Amended Class Action Complaint) at 45).

### 4. Supplemental Briefs

At the motion hearing, the Court asked the parties to provide supplemental briefing addressing the possibility of certifying multiple classes or subclasses.

In their opening supplemental brief, Plaintiffs reiterate their position that "certification of a single class is appropriate because all Products conveyed the same core representation—that the toothpaste was packaged in [a] 'Recyclable Tube'—and because deception, materiality, and restitution/damages may be established through common evidence as to that claim." Dkt. no. 97 (Plaintiffs' Supplemental Brief Re Subclasses) at 1, 8-9. However, they "agree that subclasses would be useful for case management[.]" *Id.* at 1. To that end, they propose the following subclasses that correspond to the four proposed price-premium calculations used by their experts:

> **Subclass 1**: All Class Members who purchased Products with a "Recyclable Tube" claim or chasing arrows with an asterisk on the front panel of the outer package, and without "check locally" stated on the outer package.
>
> **Subclass 2**: All Class Members who purchased Products with a "Recyclable Tube" claim on the back and/or side panel of the outer

United States District Court
Northern District of California

United States District Court
Northern District of California

package, with no such claim appearing on the front panel, and without "check locally" stated on the outer package.

**Subclass 3**: All Class Members who purchased Products with a "Recyclable Tube" claim on the back and/or side panel of the outer package, with no such claim appearing on the front panel, and with "check locally" stated on the outer package.

**Subclass 4**: All Class Members who purchased Products with a "Recyclable Tube" claim or chasing arrows with an asterisk on the front panel of the outer package and with "check locally" stated on the outer package.

*Id.* at 1, 9-10.

In addition, Plaintiffs propose "refinements" to the class definition in response to comments by the Court at the motion hearing, *id.* at 1, offering the following revised class definition:

**Class**: All persons who purchased, in the State of California, a Colgate or Tom's of Maine brand toothpaste products with the language "Recyclable Tube" on the outer package ("Products") between August 29, 2019, and the date of notice of pendency, except the Excluded Products.

The Excluded Products are defined as MaxFresh 6 oz. (UPC No. 35000764522); MaxFresh 6.3 oz. (UPC No. 35000996671); and Tom's of Maine Sensitive Rapid Relief Toothpaste Fresh Mint Fluoride (UPC No. 77326835623).

*Id.* at 7. According to Plaintiffs, with this revised definition they make three "limited changes" from the original proposed definition. *Id.*

First, the revised class definition "omit[s] the phrase 'and/or a chasing arrows symbol' from the originally proposed Class definition to clarify that every Product in the Class has the phrase 'Recyclable Tube' on the exterior label or carton of the Product." *Id.* Thus, Plaintiffs emphasize, the proposed class "is not intended to include, and does not include, any Product whose carton may have had a standard chasing arrows symbol but without any textual representation of 'Recyclable Tube' anywhere on the carton." *Id.* Second, the revised definition "clarif[ies] that the 'Recyclable Tube' language must appear on the outer package, consistent with the Court's discussion at the hearing regarding exposure and the parties' shared focus on external packaging rather than interior or tube-only markings where the tube was not visible at the point of sale—i.e., it was in a carton." *Id.* Third, the revised definition "expressly exclude[s] a few

64

United States District Court
Northern District of California

Products[,]" namely,  "certain versions of Colgate MaxFresh [that] had idiosyncratic production issues that caused Colgate to manufacture recyclable and non-recyclable version of the Products simultaneously[;]"  and "the Tom's Sensitive Rapid Relief product for some period of time [during which the label] used an unusual version of the claim where the phrase 'recyclable tube' appeared within a paragraph instead of as a separate call-out on the label." *Id.*

In its response, Colgate asserts that the proposed subclasses do not "cure the fundamental defects in the 'giant class' Plaintiffs originally sought to certify" because they do not account for " 'variations in the placement of the challenged claims,' 'variations in the . . . fonts and graphics used,' and 'variations in whether the check locally language is included[.]' " Dkt no. 98 (Colgate's Response to Plaintiffs' Supplemental Brief re Subclasses at 1.  First, it contends "Plaintiffs' 'back and/or side panel' subclasses (Subclasses 2 and 3) fail because the Court cannot infer that consumers viewed the Claims on the side or back of the packaging, precluding any classwide presumption of exposure and reliance." *Id.*  at 1, 2-4.  Second, it argues that "Plaintiffs' 'check locally' subclasses (Subclasses 3 and 4) fail because the named Plaintiffs did not purchase Products with the 'check locally' disclaimer, and there is no basis to find that Plaintiffs can adequately represent purchasers of Products with these materially different Claims." *Id.* at 1, 4-6.

Third, Colgate contends "Plaintiffs' proposed subclasses all fail to grapple with significant variations in Claim language and graphics, as well as Product features, within each class." *Id.* at 1. As an example, Colgate points out that "Subclasses 1 and 4 comprise Products reflecting a front-label 'chasing arrows' symbol with 'recyclable tube' language, as well as Products reflecting a front-label 'chasing arrows' symbol with no accompanying language[,]" asserting that  "Plaintiffs have not demonstrated how they will prove on a classwide basis that consumers interpret or value these Claims consistently and thus cannot establish that common questions predominate within this proposed class." *Id.*  at 6.  Colgate also asserts that Plaintiffs' exclusion from the class definition of Products that include only a chasing arrow symbol without a "Recyclable Tube" representation creates problems of manageability "because Plaintiffs have offered no principled way to identify consumers who purchased Products with the challenged labels." *Id.*  at 6-7. Colgate also contends Plaintiffs' proposed class and subclasses still do not meet the predominance

and commonality requirements because of significant variations within them as to Product "attributes and aesthetics[,]" "[v]ariation in market bleed-in and manufacturing" and "[v]ariations in injury." *Id.* at 7-10.

In their reply supplemental brief, Plaintiffs reject Colgate's argument that Subclasses 2 and 3 – the so-called "back and/or side panel" subclasses  --  give rise to individualized issues related to exposure and reliance that defeat predominance, arguing that the Ninth Circuit recently rejected that argument in *Falcone v. Nestle USA, Inc.*, in which the court held that "all the class members were exposed to the misrepresentation because it was on the products' packaging and, by definition, class members must have bought the products at issue to be part of the class; in labeling fraud cases, this is all that is required."  Dkt. no. 99, Reply in Support of Supplemental Brief re Subclasses at 1 (quoting *Falcone*, No. 24-7707, 2026 U.S. App. LEXIS 555, at *3 (9th Cir. Jan. 9, 2026), *aff'g Falcone v. Nestle USA, Inc.*, No. 3:19-cv-723-L-DEB, 2024 U.S. Dist. LEXIS 214648, at *28 (S.D. Cal. Sep. 25, 2024) ("rejecting Nestle's arguments that exposure and materiality were individualized issues where the sustainability representations at issue were mostly on the backs of packages").

Plaintiffs also reject Colgate's argument that the "check locally" subclasses fail because there is no evidence that the named Plaintiffs purchased Products with the "check locally" label and therefore, they lack standing to assert claims based on Products with those labels. *Id.* at 2. According to Plaintiffs, "[m]inor differences in the interests of the class representatives and the class are not enough to defeat class certification under the adequacy requirement." *Id.* (quoting *In re Equifax Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1275 (11th Cir. 2021); and citing *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 701 F. App'x 554, 555–56 (9th Cir. 2017)).

Furthermore, Plaintiffs assert, each of the proposed subclasses meets the requirements of Rule 23 as "there is no significant variability in the 'Recyclable Tube' representations within each proposed subclasses." *Id.*  at 3 (citing Exhibit 1). Plaintiffs further contend:

> The Colgate products in particular—representing approximately 85% of sales—used formats and language that were materially and visually consistent. As for adequate representation, Colgate does not dispute that Plaintiff Gershzon is a member of Subclass 1 or that Plaintiffs Della and Lienhard are members of Subclass 2. Colgate is, however,

United States District Court
Northern District of California

mistaken in arguing that none of the Plaintiffs purchased a product with a "check locally" statement and thus that they cannot adequately represent Subclass 3. Gershzon testified that he purchased Colgate Total regularly through October 2023. *See* Thairani Subclass Reply Decl., Ex. 11 (Gershzon Tr.) 92:11–25, 155:10–18. That was approximately nine months after Colgate began implementing the "Check locally" statement on Colgate Total products (ECF No. 75-3 at 114, 117, Thairani Subclass Reply Decl., ¶¶ 3–4, Exs. 12–13), and the "Check locally" version would have been on store shelves when Gershzon made those purchases, even under Defendant's most conservative assumptions (ECF No. 98-10 (Ex. I) 78:24–79:11 (admitting new versions would be in stores within six to eight months, at the latest)). Accordingly, Gershzon did make purchases within the scope of Subclass 3.

*Id.* at 3. Plaintiffs concede that none of the named Plaintiffs falls within Subclass 4 but request that the Court give them the opportunity to find a class representative for that subclass if the Court deems it necessary. *Id.* Finally, Plaintiffs challenge Colgate's assertion that variation within the subclasses defeats class certification, arguing that variations are "minimal." *Id.* at 3-5.

### F.   *Daubert* Motions

#### 1.   Motions to Exclude Dennis and Weir Expert Reports

##### a.   Dennis Motion

In its Motion to Exclude Expert Testimony of J. Michael Dennis, dkt. no. 76 ("Dennis *Daubert* Motion"), Colgate argues that Dr. Dennis's perception, materiality and (proposed) conjoint surveys are all unreliable and should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

First, Colgate argues that the "referendum question" used in Dr. Dennis's materiality survey question did not "follow accepted standards for testing the materiality of challenged packaging claims in consumer purchase decisions." Dennis *Daubert* Motion at 7. Instead, Colgate contends, the survey "presented respondents with a leading question with a clearly 'correct' answer: all else being equal, would you prefer a product that contains a 'Recyclable' claim, or one that does not?" *Id.* (citing Kivetz Decl. ¶¶ 91, 104, 116). According to Colgate, this problem is exacerbated by "Dennis's failure to present the Claims in the context of the actual product and marketplace[,]" namely, by placing a green box around the Claims, directing respondents to "choose between Toothpaste A and Toothpaste B based on the 'content inside the green rectangle[,]' " and "explicitly instruct[ing] respondents 'to assume that the two displayed products

United States District Court
Northern District of California

were their "only options." ' " *Id.* at 8-9 (citing Kivetz Report ¶¶ 34, 37, 105-106).

Colgate also asserts that the materiality survey is unreliable because the survey's "heavy-handed emphasis on the presence or absence of the Claims creates severe demand effect and focalism biases, which artificially inflate the importance consumers place on that attribute and renders the survey unreliable." *Id.* at 10-11 (citing Kivetz Report ¶¶ 35, 112-115). Furthermore, it asserts, the materiality survey is deficient because it does not include a proper control group or question. *Id.* at 11 (citing Kivetz Report ¶¶ 122, 125). Therefore, Colgate asserts, Dr. Dennis's materiality survey does not measure the materiality of the Challenged Claims and should be excluded under Rule 702 and *Daubert*.

Next, Colgate argues that Dennis's perception study is flawed and therefore unreliable. *Id.* at 11-15. First, Colgate argues that Dr. Dennis's survey was designed to validate Plaintiffs' theory, " 'present[ing] stimuli (which consisted of a distorted representation of the Colgate package, with a green rectangle that consumers would never encounter in reality),' 'instead of 'allowing participants to provide their own spontaneous impressions from Dr. Dennis's presented stimuli.' " *Id.* at 13 (quoting Kivetz Report ¶ 75). According to Colgate, the problem with this approach is illustrated by *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269 (S.D.N.Y. 2022), in which the court excluded as unreliable a "survey that 'purport[ed] to determine how a reasonable consumer . . . understands KIND's 'All Natural' claim.' " *Id.* at 14 (quoting *KIND*, 627 F. Supp. 3d at 285). According to Colgate, the court in *KIND* found that Dr. Dennis's survey "was deficient because it 'asks only about one potential definition of "All Natural"—the definition that plaintiffs selected for this case—and only allows survey participants to select from finite choices agreeing, disagreeing, or not having an expectation about this definition.' " *Id.* (quoting *KIND*, 627 F.Supp. 3d at 288). " 'This limited inquiry,' the [*KIND*] court said, was 'insufficient to determine in any meaningful sense how reasonable consumers understand the "All Natural" claim, or to test plaintiffs' theory.' " *Id.* The same rationale applies here, according to Colgate.

Second, Colgate argues that the perception survey is flawed because it does not "'approximate what a potential customer would encounter' in the marketplace." *Id.* at 15 (quoting *WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002)). In

68

United States District Court
Northern District of California

particular, Colgate contends, "the 'net deception rate' Dr. Dennis calculated from his survey findings is an artifact of his flawed survey design[,]" namely, his failure " 'to represent toothpaste purchasers who would simply not have any perception of the challenged claims, because they would not have even noticed them.' " *Id.* (quoting Kivetz Report ¶ 36).

Similarly, Colgate argues that the conjoint analysis Dr. Dennis proposes is not reliable because he ignores "real-world data" showing that the price of the Products did not increase when the recyclability claims were added to their packaging. *Id.* at 17-18. Colgate points to the findings of its own expert, Dr. Wilcox, who "analyzed retail sales data for the top-selling Colgate toothpaste SKU and the top-selling Tom's of Maine toothpaste SKU before and after introduction of the recyclable tube claims as compared to the average price for all other products in the US toothpaste category to account for inflation and other general factors that may impact pricing" and "concluded that the introduction of the Claims had no impact on the market price" or Colgate's market share. *Id.* (citing Wilcox Report ¶¶ 18-32). According to Colgate, Dr. Dennis's simulation of a "hypothetical marketplace" is "nonsensical in the face of real-world data reflecting no price increase related to the Claims on two top selling Products." *Id.* Colgate contends the court in *Briseno v. Henderson,* reached a similar conclusion, "reject[ing] Mr. Weir's 'conclusion that the [100% Natural] label [at issue] led to a price premium' where the company 'dropped the "100% Natural" label years ago, so he could have studied whether that led to the removal of the price premium.' " *Id.* (quoting *Briseno*, 998 F.3d 1014, 1029 (9th Cir. 2021)). Colgate also points to *Klein v. Meta Platforms, Inc*., in which Judge Donato observed in an antitrust case that " 'an expert does not have license to simply disregard reality.' " *Id.* at 18 (quoting *Klein*, 766 F. Supp. 3d 956, 963 (N.D. Cal. 2025)). Colgate contends Dr. Dennis's proposed conjoint survey does just that. *Id.*

Colgate also argues that the proposed conjoint survey is flawed because it fails to mimic real-world purchasing conditions in three respects. *Id.* at 18-20. First, Colgate asserts, "Dr. Dennis's proposed survey design presents claims from the front of the toothpaste carton (in his 'Front-of-Package Label Claims' attribute) and claims from the side and back of the carton (in his 'Other Label Claims on Product Package' attribute) in the same manner—*i.e*., via a list of

United States District Court
Northern District of California

product features—even though such attributes would not be equivalently visible to, or equally considered by, consumers in the real world." *Id.* at 19 (citing Dennis Report ¶ 144; Wilcox Report ¶ 49).

"Second, by including the Claims in both the 'Front-of-Package Label Claims' attribute and the 'Other Label Claims on Product Package' attribute, Dr. Dennis's proposed conjoint design will expose respondents to hypothetical toothpaste products with two concurrently visible 'recyclable tubes' claims, supposedly representing cartons with both front label and back/side label claims[,]" even though " '[i]n the real world, a consumer would not see two recyclable tube claims at the same time . . . when they were looking at a product carton unlike what would be presented to them in the conjoint survey.' " *Id.* (quoting Spelman Decl., Ex. DD (Dennis Dep.) at 213-214). Colgate contends this flaw will "infect the reliability of Dr. Dennis's survey results and his proposed survey's ability to effectively isolate the impact of the Claims." *Id.* (citing Wilcox Report ¶¶ 48, 55).

"Third, Dr. Dennis attempts to capture the price premium for the Claims with the 'check locally' language by requiring respondents to hover over an asterisk to reveal the language" whereas "in the real world . . . a consumer would need to take no further action (besides viewing the back label claim) to see" that language. Colgate argues that while Dr. Dennis chose this approach to "avoid other focalism bias that could occur if the 'check locally' language was 'there all the time[,]' " this feature of the survey "highlights the proposed conjoint survey's inability to reliably isolate the alleged price premium associated with the four Challenged Claim formats." *Id.* at 20 (citing Spelman Decl., Ex. DD (Dennis Dep.) at 214-215).

Colgate contends the conjoint survey is flawed for the additional reason that Dr. Dennis's "methodology does nothing to account for the distinctive behaviors of repeat Colgate or Tom's purchasers" even though courts have recognized that "the behavior of repeat buyers differs substantially from that of first-time buyers." *Id.* at 20 (citing Wilcox Report ¶¶ 42-43) & n. 4 (citing cases)).

Finally, Colgate contends the proposed conjoint survey methodology is flawed because it will only measure consumers' willingness to pay and does not factor in supply-side factors. *Id.* at

70

21-23. Because the amount a consumer is willing to pay is "not probative of the actual price premium that a seller can charge for that attribute, which also hinges on supply-side and competitive factors[,]" Colgate asserts, the conjoint survey cannot be used to calculate price premiums. *Id.* (citing Wilcox Report ¶¶ 33-35).

For these reasons, Colgate argues that the Court should exclude Dr. Dennis's consumer perception and materiality surveys, his proposed conjoint survey, and his related expert opinions. *Id.* at 23.

### b. Weir Motion

In its Motion to Exclude Expert Testimony of Colin Weir, dkt. no. 77 ("Weir *Daubert* Motion"), Colgate argues that because Mr. "Weir's calculation of price premium damages is entirely dependent on Dr. Dennis's price premium estimates," it is unreliable for the same reasons Dr. Dennis's conjoint survey methodology is defective, discussed above. Weir *Daubert* Motion at 1, 8. Furthermore, Colgate contends, "Rule 702 does not permit [Mr. Weir] to take Dr. Dennis's survey findings at face value" and "Mr. Weir does not propose conducting any independent analysis to ascertain the price premium attributable to the Claims." *Id.* at 9 (citing *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556–57 (C.D. Cal. 2014)). Likewise, Colgate asserts, because "Mr. Weir's 'framework' for calculating damages consists of nothing more than multiplying Dr. Dennis's price premium estimate by dollar sales for the toothpaste sales[,]" no specialized expert testimony is required. *Id.* Rather, Colgate argues, "any lay person presented with the relevant sales data can perform the calculation that Mr. Weir intends to perform." *Id.*

Colgate argues that Mr. Weir's methodology also fails because he relies on Dr. Dennis's "hypothetical marketplace" to purportedly determine price premiums but real-world pricing data indicates that there were no price premiums as a result of the Claims, as discussed in the Dennis *Daubert* Motion. *Id.* at 5-6. Colgate contends Mr. Weir's methodology is also unreliable for the independent reason that "Plaintiffs' proposed damages model hinges on [Mr. Weir's] ability to identify sales associated with the Products bearing each of the four Claim formats" but "Mr. Weir has presented no reliable method to aggregate sales attributable to the different versions of the recyclable tube cartons." *Id.* at 6 (citing Spelman Decl., Ex. EE (Weir Dep.) at 53).

71

Furthermore, Colgate asserts, "there *is* no reliable way to know which sales are associated with Products bearing the Claims, let alone which sales are associated with each of the four claim formats[.]" *Id.* (emphasis in original).  According to Colgate, this is because: 1) "the recyclable tubes and subsequent label updates were introduced as 'bleed ins,' [and therefore] there were significant and variable time periods in which a single SKU was available in the market with different cartons (or, for products sold without cartons, both non-recyclable and recyclable versions of the tubes), and there is no way to identify which of the sales during these time periods are associated with which carton or tube[,]" *id.* (citing Wilcox Report  ¶¶ 64–67); and 2) "the Production Audit reflects that, in addition to the 'bleed in' time periods, there are significant time periods during which different versions of product labels were in production simultaneously." *Id.* at 6-7 (citing Spelman Decl., Ex. U).

Colgate rejects Mr. Weir's opinion that "the necessary data exists and supports the feasibility of conducting a detailed, products specific analysis[,]" *id.*  at 7 (citing Weir Report ¶ 63), asserting that "at his deposition, Mr. Weir could not recall what specific fields were contained in the data or indeed whether he had looked at the data at all." *Id.*  (citing Spelman Decl., Ex. EE (Weir Dep.) at 58-59). It also challenges Mr. Weir's testimony in his deposition "that he would set 'goalposts' that would allow him to estimate the sales at issue." *Id.* (quoting Spelman Decl., Ex. EE (Weir Dep.) at 61).[11]  Colgate argues that Mr. Weir "fails to describe how this 'goalpost'

---

[11] Mr. Weir's testimony relating to setting "goalposts" is as follows:

**Weir**:  . . . Based on my discussions with counsel, I believe that there is sufficient information that would allow me to make a conservative estimate of the sales of the challenged products to the class against which price premium statistics calculated by Dr. Dennis could be applied.

**Counsel**:  What do you mean by conservative estimate?

**Weir**:  So this same issue came up in the Dean Canale, Willis matters, and I gave consideration to the concept of -- for example, if you know  when a label was approved -- label change was approved, that may not be the exact moment that a label claim makes it to the shelf; or also that, for example, there could be a brief period where two versions of a product are for sale at the same time. But that pursuant to the methodology I had specified in the Willis case, and the concept of setting two goalposts that are based on the same parameter -- for example, approval date or whatnot -- I've conducted a number of analyses as it relates to Colgate toothpaste and other products that indicates that the use of those two goalposts, so long as they're based on the same triggering event -- and, again, subject to the nuance of controlling for other date elements such as statute of limitations or court-approved class  certification periods -- that turn to move the

methodology would account for the undisputed evidence that products with and without the 'recyclable tube' claim that had identical UPC codes were simultaneously in retail stores during numerous points in time over the putative class period, making it impossible to 'evaluate the validity' of Mr. Weir's purported methodology." *Id.* (citing Wilcox Report ¶ 66). Furthermore, Colgate contends, Mr. Weir does not explain how he will account for variations in the Claims over time, " 'provid[ing] no methodology . . . that can account for these individual differences in when the At-Issue Products would have been available for sale to Putative Class Members.'" *Id.* at 8 (quoting Wilcox Report ¶ 67).

For these reasons, Colgate argues that Mr. Weir's expert report should be excluded under Rule 702 and *Daubert*. *Id.*

### 2. Opposition to Motions to Exclude

In their Opposition brief, dkt. no. 81 ("*Daubert* Opposition"), Plaintiffs argue that the methodology that Dr. Dennis has used (or proposes to use as to the conjoint survey) for his surveys satisfies the requirements of Rule 702 and *Daubert*, as does Mr. Weir's damages model.

As a preliminary matter, Plaintiffs argue that "[a]t class certification, a full-blown *Daubert* analysis would be premature; instead, 'the court considers only if expert evidence is useful in evaluating whether class certification requirements have been met.' " *Daubert* Opposition at 5 (quoting *Noohi v. Johnson & Johnson Consumer Inc.,* 2025 U.S. App. LEXIS 18547, at *11-12

---

goalposts both forward or both backwards in time, there would be a de minimis impact on the estimate of total sales.

**Counsel**: Can you give me some more explanation about how you would be setting these goalposts?

**Weir**: Yes. So, for example, if I'm given a date range that says, 'Here was when the label was first approved, and then here is a later period when it was approved to be removed,' we can apply those date ranges to the sales data. And even though we know the actual sales occur in a window that would be shifted ahead in time from those approval periods, . . . that typically wouldn't cause the use of that specific date range to provide an unreliable estimate of the sales to the class. And by using a data source such as Nielsen or Circana where it's known that those are reliable but not 100 percent comprehensive, that leads to a conservative understatement of sales to the class.

Spelman Decl., Ex. EE (Weir Dep.) at 59-61.

73

United States District Court
Northern District of California

(9th Cir. 2025) (internal quotations and citation omitted)).  According to Plaintiffs, "survey evidence is admissible under *Daubert* provided it is: (1) 'conducted according to accepted principles;' and (2) 'relevant' to the issues in the case."  *Id.* (citing *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1036 (9th Cir. 2010)).   Plaintiffs further note that "the Ninth Circuit has repeatedly held [that] '[c]hallenges to survey methodology [typically] go to the weight given the survey, not its admissibility.' " *Id.*  (quoting *Wendt v. Host Int'l, Inc*., 125 F.3d 806, 814 (9th Cir. 1997); *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc*., 648 F. App'x 609, 613 (9th Cir. 2016)). According to Plaintiffs, their experts "easily pass these tests." *Id.*

First, Plaintiffs argue that Dr. Dennis's perception survey is scientifically valid and useful to the trier of fact, satisfying Rule 702 and *Daubert. Id.* at 7-10.  Plaintiffs argue that Colgate's criticisms of the survey based on Dr. Dennis's use of close-ended questions and a green box around certain claims on the packaging go to the weight of the survey rather than its admissibility. *Id.*  at 7-8.  Furthermore, Plaintiffs assert, Colgate is incorrect with respect to its criticism relating to Dr. Dennis's use of close-ended questions as that is actually the "preferred method in quantitative consumer perception surveys such as the one conducted here."  *Id.* at 8 (citing Dennis Decl. ¶¶ 66–67; Dennis Reply Decl. ¶¶ 19–29).

Plaintiffs also contend numerous courts have "rejected arguments that closed-ended or supposedly leading questions render a survey inadmissible or unreliable for purposes of class certification issues."  *Id.* (citing *Sinatro v. Barilla Am., Inc*., No. 22-cv-03460-DMR, 2024 U.S. Dist. LEXIS 94628, at *17-19 (N.D. Cal. May 28, 2024*);  Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 713 F. Supp. 3d 660, 675 (N.D. Cal. 2024); *Corbett v. PharmaCare U.S., Inc*., No. 21cv137-JES (AHG), 2024 U.S. Dist. LEXIS 58336, at *59-60, 64-66 (S.D. Cal. Mar. 29, 2024); *Montera v. Premier Nutrition Corp*., No. 16-cv-06980-RS, 2022 U.S. Dist. LEXIS 75843, at *11-12 (N.D. Cal. Apr. 26, 2022)).

Plaintiffs further assert that Colgate's reliance on *In re KIND LLC "Healthy & All Nat." Litig*., 627 F. Supp. 3d 269, 288 (S.D.N.Y. 2022), aff'd, *Bustamante v. Kind LLC*, 100 F.4th 419 (2d Cir. 2024), is misplaced because it is inconsistent with established law in the Ninth

Circuit and in any event, the facts are distinguishable. *Id.* at 9. In particular, Plaintiffs contend the claim at issue in that case had "no established definition and there was a diversity of views among the plaintiffs as to what the term meant." *Id.* (citing 627 F. Supp. 3d at 284-85). In contrast, Plaintiffs contend, "there is an objective, legal definition of the term "recyclable," (see Cal. Bus. & Prof. Code § 17580.5; 16 C.F.R. § 260.12(b)), and the response choices presented in the consumer perception survey are readily understandable and correspond to that objective definition; they do not subject Colgate to a host of potentially varying liability standards." *Id.*

Plaintiffs reject Colgate's assertion that the use of the green box in Dr. Dennis's perception survey biased the results for the reasons set forth in Dr. Dennis's reply declaration, set forth above. *Id.* at 9-10.

Likewise, Plaintiffs assert that Dr. Dennis's materiality survey is scientifically valid and useful to the trier of fact. *Id.* at 10-12. According to Plaintiffs, Dr. Dennis's use of a referendum design posing just two choices "is a well-accepted method to establish consumer preferences and such materiality surveys do not require a separate control group or test." *Id.* ¶ 11 (citing Dennis Reply Decl., ¶¶ 38-39, 44). Plaintiffs further assert that the use of the green box in the materiality study did not improperly highlight the Challenged Claims, that the referendum question was neutral and non-leading and that the "Don't know / not sure" response also ensured the results would not be biased. *Id.* (citing Dennis Reply Decl. ¶¶ 39-41, 43, 84-85). Furthermore, Plaintiffs contend, these disputes regarding Dr. Dennis's methodology go to the weight of the evidence and not its admissibility. *Id.* at 12 (citing *Vizcarra v. Unilever United States Inc*., No. 4:20-CV-02777 YGR, 2023 U.S. Dist. LEXIS 38208, at *33-37 (N.D. Cal. Feb. 24, 2023); *Broomfield v. Craft Brew All., Inc*., No. 17-cv-01027-BLF, 2018 U.S. Dist. LEXIS 177812, at *30-36 (N.D. Cal. Sep. 25, 2018); *In re Folgers Coffee, Mktg. Litig*., 2024 U.S. Dist. LEXIS 163079, at *19-20; *In re Scotts EZ Seed Litig*., No. 12 CV 4727 (VB), 2017 U.S. Dist. LEXIS 125621, at *26-28 (S.D.N.Y. Aug. 7, 2017)).

Finally, Plaintiffs assert that the conjoint survey proposed by Dr. Dennis and the calculation of classwide damages proposed by Mr. Weir are scientifically valid and will be useful to a trier of fact. *Id.* at 13-21. First, Plaintiffs reject Colgate's assertion, in reliance on Dr.

Wilcox's before and after study, that there is no price premium. *Id.* at 13-14. They contend this evidence does not preclude Plaintiffs from presenting conflicting evidence and also assert that it amounts to a concession that Plaintiffs' claims are amenable to classwide proof. *Id.* Plaintiffs further assert that Dr. Wilcox's before and after methodology is unsound for the reasons set forth in the reply declarations of Dr. Dennis and Mr. Weir. *Id.* at 14-15.

Plaintiffs contend Colgate's reliance on *Briseno v. Henderson*, 998 F.3d 1014 (9th Cir. 2021) is misplaced as that case "did not reject conjoint analysis or elevate a before-and-after pricing study like Dr. Wilcox's as the superior—or even a valid—method for determining whether a price premium exists." *Id.* at 15. Instead, according to Plaintiffs, the Ninth Circuit was "reviewing the fairness of a settlement that offered only injunctive relief, and it questioned the value of that relief because the defendant could reinstate the challenged '100% Natural' label at will." *Id.* (citing 998 F.3d at 1028). That case has no applicability to the facts here, Plaintiffs contend, where they are seeking monetary relief and there is no need to value any injunctive relief. *Id.*

Plaintiffs assert that Colgate's technical criticisms of the conjoint survey – that "(a) it presents various label claims in a simple table format, even though some of the claims would appear on different sides of the packaging in the real world; (b) some survey respondents will see a recyclability claim both in the front-of-package attribute section and in the section for other label claims, although those claims would be spaced and oriented differently in the real world on actual packaging; (c) using an asterisk to reveal the 'check locally' language (when a cursor hovers over the asterisk in the survey environment) is different from how consumers encounter the 'check locally' language in the real world; and (d) the conjoint design does not account for the behavior of repeat or habitual purchasers" – have no merit. *Id.* at 16. They contend, "(a) there are always some differences between the presentation of a product in the real world and the presentation of some of its content or features in a conjoint survey; and (b) there is always some variation in a class with respect to what consumers notice or focus on when purchasing product, but that does not mean evidence of common issues must be excluded (or that those common issues do not predominate over individualized issues)." *Id.* Furthermore, Plaintiffs argue, "Colgate's

76

criticisms ignore all the design elements and instructions used to simulate an actual purchasing situation." *Id.* (citing Dennis Reply Decl. ¶ 83).

Plaintiffs also reject Colgate's criticisms of Mr. Weir's methodology. *Id.* at 17-21. First, Plaintiffs assert that Mr. Weir's testimony will not simply amount to a simple exercise in multiplication that the jury can perform without the assistance of an expert but instead, will assist the trier of fact by explaining "how conjoint outputs can be reliably translated into damages under accepted principles of economics[,]" and "how Plaintiffs' model accounts for supply-side factors[.]" *Id.* at 17.

Next, Plaintiffs argue that Colgate's criticism "that Mr. Weir cannot identify 'which sales' correspond to cartons with or without the challenged claims" has no merit. *Id.* at 18.   According to Plaintiffs, "because a court 'may make such orders or judgments . . . as may be necessary to prevent . . . unfair competition . . . or as may be necessary to restore . . .money or property,' Cal. Bus. & Prof. Code § 17203, 'the "courts' discretion is very broad" as to the remedy it awards.' " *Id.* (quoting *Colgan v. Leatherman Tool Group, Inc*.,135 Cal. App. 4th 663, 695 (2006)). Furthermore, Plaintiffs assert, "[c]lass wide damages calculations under the UCL, FAL, and CLRA are particularly forgiving." *Id.* (quoting *Lambert v. Nutraceutical Corp.,* 870 F.3d 1170, 1183 (9th Cir. 2017)).  As to Colgate's assertion that Mr. Weir's calculations will be unreliable due to the "bleed in" introduction of the claims, Plaintiffs contend "this is the case in nearly every case consumer fraud case" and that "Colgate is attempting to make hay out of the commonplace fact that when a new package is implemented, retailers have to sell their existing stock." *Id.*  In fact, Plaintiff's assert, Mr. Weir has sales data from Nielsen and his approach is "straightforward and conservative." *Id.* at 18-19.   As to Colgate's reliance on *Jensen v. Natrol, LLC*, No. 17-cv-03193-VC, 2020 U.S. Dist. LEXIS 13214 (N.D. Cal. Jan. 27, 2020), Plaintiffs contend the facts in that case "are nothing like those here." *Id.*  at 19.

Finally, Plaintiffs reject Colgate's assertion that Mr. Weir's opinion "must be excluded because it is 'tied inextricably to the reliability of Dr. Dennis's opinion[,]'" arguing that Dr. Dennis's opinions are reliable. *Id.*  at 20.  According to Plaintiffs, "[t]he overwhelming majority of courts in this District have found that conjoint analysis can adequately account for supply-side

United States District Court
Northern District of California

factors—and can therefore be utilized to estimate price premiums consistent with *Daubert* and *Comcast*—when '(1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period.' " *Id.* (quoting *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105 (2018); and citing *Krommenhock*, 334 F.R.D. at 576; *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969 (N.D. Cal. 2018); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. at 606; *Davidson v. Apple, Inc.*, 2018 U.S. Dist. LEXIS 137707, 2018 WL 2325426, at \*22 (N.D. Cal. May 8, 2018); *Maldonado v. Apple, Inc.*, No. 3:16-cv-04067-WHO, 2021 U.S. Dist. LEXIS 92483, at \*69 (N.D. Cal. May 14, 2021); *Bailey*, 338 F.R.D. at 410; *Williams v. Apple, Inc.*, No. 19-CV-04700-LHK, 2021 U.S. Dist. LEXIS 101771, at \*64 (N.D. Cal. May 28, 2021); *Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027- BLF, 2018 U.S. Dist. LEXIS 177812, at \*57–60 (N.D. Cal. Sep. 25, 2018); *Allen v. ConAgra Foods, Inc.*, 331 F.R.D. 641, 673 (N.D. Cal. 2019); and *Milan v. Clif Bar & Co.*, No. 18-cv-02354-JD, 2021 U.S. Dist. LEXIS 184924, at \*19 (N.D. Cal. Sep. 27, 2021)). According to Plaintiffs, their proposed conjoint survey will meet both requirements. *Id.* at 21.

### 3. Reply in Support of Motion to Exclude

In its reply brief, dkt. no. 82 (*Daubert* Reply), Colgate reiterates the arguments in its motions to exclude, arguing that "both experts' opinions are biased, unreliable, and disconnected from the real world." *Daubert* Reply at 1.

Colgate rejects Plaintiffs' assertion that only a "limited" *Daubert* analysis is required at class certification, arguing that *Daubert* applies with "full force" at this stage of the case. *Id.* at 1, 2-4. Colgate contends the two cases Plaintiffs cite in support of this "watered-down approach" -- *Lytle v. Nutramax Laboratories, Inc.*, 114 F.4th 1011 (9th Cir. 2024) and *Noohi v. Johnson & Johnson*, 146 F.4th 854 (9th Cir. 2025) – do not support their position. *Id.* at 3. In particular, in both cases, according to Colgate, the courts "reasoned that 'there is no categorical prohibition on a district court relying on an unexecuted damages model to certify a class,' and explained that, in some circumstances 'where an expert's model has yet to be fully developed,' a 'more full-

78

blown *Daubert* assessment of the results of the application of the model would be premature.'" *Id.* (citations omitted). But this reasoning does not apply here, Colgate contends, because both the perception survey and the materiality survey have already been executed, and the conjoint survey has been described in detail. *Id.*

Colgate rejects Dr. Dennis's assertion in his reply declaration that the referendum format used in his materiality survey is a well-accepted method to establish consumer preferences, arguing that the only support Dr. Dennis offered was "a single report from the 1993 National Oceanic and Atmospheric Administration Panel." *Id.* at 4 (citing Dennis Reply Decl. ¶ 44). Colgate asserts that in his expert report, Dr. Kivetz "explained, nothing in this report—which addressed the use of contingent valuation surveys to evaluate damages in situations involving lost 'use values'' 'relates to, or even remotely justifies, a "referendum" question of the type' Dr. Dennis posed to purportedly measure materiality here." *Id.* at 4-5 (citing Kivetz Decl. ¶ 111 n. 198) (stating, "I reserve the right to explain, inter alia: (i) how nothing in Professor Arrow's NOAA Panel Report to which Dr. Dennis cites (*id.*, ¶ 78) mentions anything that relates to, or even remotely justifies, a 'referendum' question of the type asked in the Dennis 'Materiality' Survey[.]").

Colgate also rejects Plaintiffs' assertion that the green boxes in the images shown to materiality survey respondents were neutral, asserting that Plaintiffs ignore the "context in which consumers were asked about the claims[:]

> Dr. Dennis's referendum design did not neutrally measure purchasing decisions of consumers in the marketplace. Rather, respondents were expressly advised that the two versions of the product stimuli reflected in Dr. Dennis's referendum survey were exactly the same (including with respect to price) except for the area in the superimposed green border, where the only difference was the presence or absence of the Claims. Unsurprisingly, respondents indicated that, as between these two options, they would choose the one with an additional, complimentary product feature: i.e., the "recyclable tube." That proves nothing about real-world materiality.

*Id.* Colgate contends this is a fundamental flaw that requires exclusion of the materiality survey. *Id.* at 6.  Similarly, Colgate asserts, "the deficiencies in Dr. Dennis's consumer perception survey are flaws that strike at the core of his survey's reliability." *Id.* at 7.  According to Colgate, "[a]

United States District Court
Northern District of California

79

survey that leads consumers to a response consistent with Plaintiffs' theory of liability is not just 'weak' evidence—it is inadmissible junk science." *Id.* (citing *Casey v. Home Depot*, 2016 WL 7479347, at *16, 20–22 (C.D. Cal. Sept. 15, 2016)).

Colgate reiterates its assertion that the conjoint survey proposed by Dr. Dennis was improperly designed, failing to take into account real-world evidence that there was no price premium associated with the Challenged Claims. *Id.* at 11-13. It also contends the flaws Plaintiffs characterize as "technical" are "major deviations from accepted practice" that render the proposed survey unreliable. *Id.* at 13-14

Finally, Colgate argues again that Mr. Weir's damages model cannot reliably determine classwide damages and that his methodology does not require expert testimony to explain. *Id.* at 14-15. Rather, it asserts, Mr. Weir's testimony is being offered improperly to "bolster" Dr. Dennis's opinions. *Id.* at 15 (citing *Huawei Techs., Co., Ltd. v. Samsum Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 994 (N.D. Cal. 2018)), Colgate also rejects Plaintiffs' assertion that Mr. Weir's testimony will be helpful to identify "at-issue sales," arguing that Mr. Weir "still does not address the fact that, during much of the class period, versions of the same product with and without the Claims were in the marketplace at the same time[,]" which "directly undermines his assumption that all sales of a given SKU are attributable to a single Claim." *Id.* Further, Colgate asserts, Mr. Weir's "goal post" approach remains vague and is not sufficient to address this shortcoming. *Id.*

### G.    Legal Standards Under Rule 23

A class action may be maintained under Rule 23 of the Federal Rules of Civil Procedure if all of the requirements of Rule 23(a) are satisfied and the plaintiff demonstrates that one of the requirements of Rule 23(b) is met as well. Rule 23(a) requires that a plaintiff seeking to assert claims on behalf of a class demonstrate: 1) numerosity; 2) commonality; 3) typicality; and 4) fair and adequate representation of the interests of the class. Fed. R. Civ. P. 23(a).

Plaintiffs seek class certification under Rule 23(b)(3), which allows a class action to be maintained where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R.

Civ. P. 23(b)(3). In the alternative, they ask the Court to certify the class under Rule 23(b)(2), which provides for class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2).

"[D]istrict courts have broad discretion to modify class definitions." S*chneider v. Chipotle Mexican Grill, Inc*., No. 16-CV-02200-HSG, 2019 WL 570751, at \*1 (N.D. Cal. Feb. 12, 2019) (quoting *Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 575 (N.D. Cal. 2018) (quoting *Powers v. Hamilton County Public Defender Com'n*, 501 F.3d 592, 619 (6th Cir. 2007), and collecting cases)); *see also* 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1759 (4th ed.) ("if plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of Rule 23 or it may allow plaintiff to amend in order to limit the class. . . . It also may order the formation of subclasses and test each of them against the Rule 23(a) requirements.").

At the class certification stage, Plaintiffs "bear[ ] the burden of affirmatively demonstrating through evidentiary proof that the class meets the prerequisites of Rule 23(a)," *Sali v. Corona Reg'l Med. Ctr*., 909 F.3d 996, 1003–04 (9th Cir. 2018), and the "facts necessary for certifying a class under Rule 23(b)(3)." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). "In determining whether the Rule 23 requirements for class certification are satisfied, the court may consider the merits of the underlying claims 'to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.' " *Sinatro v. Barilla Am., Inc*., No. 22-CV-03460-DMR, 2024 WL 2750018, at \*3 (N.D. Cal. May 28, 2024), reconsideration denied, No. 22-CV-03460-DMR, 2024 WL 4008715 (N.D. Cal. Aug. 29, 2024) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

### H. Legal Standards under Rule 702 and *Daubert*

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it

is more likely than not that:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Under Federal Rule of Evidence 702, expert testimony must be both relevant and reliable to be admissible." *BillFloat Inc. v. Collins Cash Inc*., 105 F.4th 1269, 1275 (9th Cir. 2024) (citing *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589 (1993)). The Ninth Circuit has "long held that survey evidence should be admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.' " *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt*., *Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (quoting *Wendt v. Host Int'l, Inc*., 125 F.3d 806, 814 (9th Cir. 1997); and citing *Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1263 (9th Cir. 2001); *Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134, 1143 (9th Cir. 1997); *E & J Gallo Winery*, 967 F.2d at 1292; *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988)).

    " '[T]echnical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.' " *BillFloat Inc*., 105 F.4th at 1275 (quoting *Fortune Dynamic, Inc.* 618 F3d at 1036) (internal quotations and citations omitted). Likewise, " 'follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility.' " *Id.* (quoting *Clicks Billiards, Inc*., 251 F.3d at 1263). "On the other hand, substantial deficiencies in the design or execution of a survey of individuals is grounds for its complete exclusion." *In re: Autozone, Inc*., No. 3:10-MD-02159-CRB, 2016 WL 4208200, at *16 (N.D. Cal. Aug. 10, 2016) (internal citation and quotation marks omitted).

    "[C]lass action plaintiffs may rely on a reliable though not-yet-executed damages model to demonstrate that damages are susceptible to common proof so long as the district court finds that

82

the model is reliable and, if applied to the proposed class, will be able to calculate damages in a manner common to the class at trial." *Lytle v. Nutramax Lab'ys, Inc*., 114 F.4th 1011, 1019 (9th Cir. 2024), cert. denied, 145 S. Ct. 1308 (2025)

## III.    ANALYSIS

### A.    MOTIONS TO EXCLUDE

#### 1.  Dennis *Daubert* Motion

As discussed above, Dr. Dennis has conducted a perception survey and a materiality survey and has proposed a method for conducting a conjoint survey to determine damages on a classwide basis.  While Colgate argues that Dr. Dennis's surveys amount to "junk science" that must be excluded, *Daubert* Reply at 7, the Court concludes that the criticisms offered by its experts amount to challenges to the technical adequacy of Dr. Dennis's survey design that go to the weight of Dr. Dennis's opinions rather than their admissibility.

With respect to the perception survey, Dr. Dennis designed and conducted a survey to measure on a classwide basis whether the Challenged Claims are deceptive using a test and control group to isolate their impact on consumers.  The Court finds that the methodology Dr. Dennis used applies accepted principles for measuring consumer deception and that Dr. Kivetz's criticisms relate only to the design of the survey.  *See, e.g.,* Dennis Report ¶¶ 60, 61 (citing S.S. Diamond, 2011, "Reference Guide on Survey Research," describing survey methods using test and control groups to isolate the impact of an allegedly deceptive claim);  *see also Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 713 F. Supp. 3d 660, 669 (N.D. Cal. 2024) (finding Dr. Dennis perception survey in consumer deception case admissible); *Corbett v. PharmaCare U.S., Inc*., No. 21CV137-JES (AHG), 2024 WL 1356220, at *22 (S.D. Cal. Mar. 29, 2024) (same); *Maeda v. Kennedy Endeavors, Inc*., No. CV 18-00459 JAO-WRP, 2021 WL 2582574, at *6 (D. Haw. June 23, 2021) (same).

Dr. Kivetz's main challenges to the perception survey are to the addition of a green box to the product image to focus survey respondents on the presence (or absence) of the Challenged Claims (which Dr. Kivetz opines results in focalism) and the use of close-ended questions (which Dr. Kivetz says are leading and result in bias).  As to the former, Colgate cites the rule that " 'the

United States District Court
Northern District of California

closer the survey context comes to marketplace conditions, the greater the evidentiary weight it has.' " Motion at 8 (quoting 6 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 32:163 (5th ed. 2023)).  It has not cited any case authority, however, that suggests that merely adding a graphic to the image shown to survey respondents to focus their attention on a *general area* of the product package that contains both the challenged claim and many other claims that are *not* challenged is such a severe flaw in the survey design that it renders the survey results inadmissible.   The Court finds that it does not.

Similarly, while the experts here clearly have a disagreement about when it is appropriate to use close-ended versus open-ended questions, Dr. Dennis justifies his approach based on his own experience and points to evidence that his use of close-ended questions is in line with accepted principles. *See, e.g.,* Dennis Reply Decl. ¶ 21 ("Dr. Kivetz's use of the open-ended survey format . . . as well as his proposal that I should have used open-ended survey questions, is contradicted by nearly all professional survey research experts who recognize that closed-ended questions are more appropriate for scientifically rigorous, quantitative survey research, while open-ended survey questions have more utility for qualitative research."). That is all that is required to survive a *Daubert*  challenge.  *See, e.g., Sinatro v. Barilla Am., Inc.*, No. 22-CV-03460-DMR, 2024 WL 2750018, at *7 (N.D. Cal. May 28, 2024), reconsideration denied, No. 22-CV-03460-DMR, 2024 WL 4008715 (N.D. Cal. Aug. 29, 2024) (rejecting defendant's *Daubert* challenge based on argument that "Dr. Dennis's survey provided only a single interpretation of the Challenged Representation that was consistent with Plaintiffs' theory of liability"); *Moore*, 713 F. Supp. 3d at 669 (rejecting *Daubert*  challenge to Dr. Dennis perception survey based, in part, on Dr. Dennis's use of close-ended questions); *Corbett*,  2024 WL 1356220, at *22 (same); *Montera v. Premier Nutrition Corp.*, No. 16-CV-06980-RS, 2022 WL 1225031, at *4 (N.D. Cal. Apr. 26, 2022), aff'd in part, 111 F.4th 1018 (9th Cir. 2024) (same).

The Court also does not find persuasive Colgate's reliance on *In re KIND LLC "Healthy & All Nat." Litig.*, 627 F. Supp. 3d 269, 288 (S.D.N.Y. 2022), aff'd, *Bustamante v. Kind LLC*, 100 F.4th 419 (2d Cir. 2024).  In that case, the court found a perception survey by Dr. Dennis purporting to establish a reasonable consumer's understanding of the term "all natural" was

84

United States District Court
Northern District of California

subject to exclusion because Dr. Dennis "ask[ed] only about one potential definition of 'All Natural' – the definition that plaintiffs selected for this case – and only allow[ed] survey participants to select from finite choices agreeing, disagreeing, or not having an expectation about this definition." 627 F. Supp. 3d at 288.  The court found that Dr. Dennis's "limited inquiry [was] insufficient to determine in any meaningful sense how reasonable consumers [understood] the 'All Natural' claim, or to test plaintiffs' theory" and therefore, was inadmissible under *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984), holding that "[a] survey cannot assist the trier of fact where it poses a 'leading question in that it suggest[s] its own answer.' " *Id.* at 287.  The court did not address, however, why this flaw went to admissibility rather the weight of the evidence and the Court finds that the *KIND* court's holding is incompatible with the standards on this issue established in the Ninth Circuit, including in *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025 (9th Cir. 2010).

Furthermore, the Court finds that the *KIND* case is factually distinguishable because there, the court held that the plaintiffs had not "articulated . . .  a viable theory for why the challenged KIND products are not within a reasonable consumer's understanding of 'All Natural[,]'" with "each of the plaintiffs in [the] case . . . advancing a different theory about how to understand [that] term[.]"  627 F. Supp. 3d at 285. In contrast, Plaintiffs' theory of liability in this case is based on an objective, legal definition of the term "recyclable" set forth in the Green Guides and California law, see Cal. Bus. & Prof. Code § 17580.5; 16 C.F.R. § 260.12(b), and the response choices presented in Dr. Dennis's consumer perception survey are tailored to that theory.  The Court therefore rejects Colgate's reliance on *In re KIND* in support of its assertion that the perception study should be excluded.

As to the materiality study, the Court rejects Colgate's argument that the use of a green box to focus the respondents' attention renders the survey inadmissible for the reasons discussed above. Furthermore, the Court rejects Colgate's assertion that the use of a referendum approach, rather than a test-control survey, is a fundamental flaw in the materiality survey that requires exclusion.  Dr. Dennis has justified his use of this survey approach based on his experience, noting that he has "frequently used the referendum survey question format in consumer surveys in

the litigation context[,]" and has pointed to at least one study that he opines supports his application of this methodology here. *See* Dennis Reply Decl. ¶¶ 42-48. While Dr. Kivetz disagrees with this approach (and has reached a different conclusion about materiality using his own survey), the Court concludes that this dispute between the experts as to the proper survey design is one that should be decided by the jury and does not warrant exclusion of Dr. Dennis's survey results.

The Court reaches the same conclusion with respect to the conjoint survey that Dr. Dennis has proposed. Colgate's primary challenge to the reliability of the proposed conjoint survey is that it fails to take into account supply-side factors and can only measure willingness to pay, not the price consumers would actually pay in a but-for world. Almost exactly the same argument was rejected by Judge Cousins in *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592 (N.D. Cal. 2018). There, Dr. Dennis's conjoint survey used "the fixed historical supply and past market prices (which reflect supply factors)," just as Dr. Dennis proposes to use here. 326 F.R.D. at 605. Thus, the plaintiff in that case (like Plaintiff here) argued that the willingness to pay of the marginal consumer could be determined by offering a "no/buy" option to survey takers, allowing for calculation of the price premium associated with the infringing claims. *Id.* The court agreed, concluding that the plaintiffs "calculated the price premium consumers paid for the [challenged claim], and not just a theoretical willingness to pay" because the conjoint survey "was performed in a market that is long-established and efficient, where retailers' pricing is responsive to market forces, and . . . took into account the fixed quantity of supply of [the product][,]" having used known past sales. *Id.* at 606. Consequently, the court found that the plaintiff's "price premium study" using a conjoint survey "passe[d] muster under *Daubert* and Federal Rule of Evidence 702." *Id.*

Judge Koh reached the same conclusion in *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018), rejecting the defendant's argument that the plaintiff's conjoint damages model was inadmissible because it did not account for supply side factors. She explained:

> Kellogg is correct that, in cases where price premia are the relevant measure of damages, courts have repeatedly rejected conjoint analyses that only measure demand-side willingness-to-pay.

United States District Court
Northern District of California

> However, courts have also found that conjoint analyses can adequately account for supply-side factors—and can therefore be utilized to estimate price premia without running afoul of *Comcast*—when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period.

324 F. Supp. 3d at 1105. Because Dr. Dennis's proposed conjoint survey will use both the actual market prices that prevailed during the class period and the actual quantities sold during the class period, the Court rejects Colgate's supply-side argument.

Nor does Colgate's assertion that it is "nonsensical" to model a hypothetical world when in the *actual* world, prices did not increase as a result of the claims, hold water. Colgate points to *Briseno v. Henderson*, 998 F.3d 1014 (9th Cir. 2021) in support of this argument, but that case is not on point. In *Briseno*, the Court of Appeals found that the district court had erred in approving a class action settlement in part because the only relief afforded the class was injunctive relief, namely, removal of the allegedly deceptive "all natural" claim from the label of the product. 998 F.3d at 1028. Although the plaintiff's expert, Colin Weir, opined that this injunctive relief was worth $11.54 million a year to the class, the court found that estimate to be speculative because the expert had not analyzed the effect on sales of the removal of the claim from the product label, which had occurred two years before; nor had he conducted a study to determine the price premium such as a conjoint survey. *Id.* at 1029. On top of that, the defendant had sold the company and the new owner was free to add the "all natural" claim back to the product label at any time. *Id.* Under these circumstances, the court found the injunction to be "virtually worthless." *Id.* at 1028. *Briseno* does not address when a damages model based on conjoint analysis meets the requirements of *Daubert*; nor does it hold that a study of historical prices is more reliable for evaluating price premia than a conjoint survey.

Colgate also plucks language from *Klein v. Meta Platforms, Inc*., to support its position, pointing to Judge Donato's statement that "an expert does not have license to simply disregard reality and base a 'necessary link' in his theory on guesswork or speculation." Dennis *Daubert* Motion at 18 (quoting *Klein*, 766 F. Supp. 3d 956, 961 (N.D. Cal. 2025)). That case, however, did not involve conjoint analysis or even any price premium charged as a result of a deceptive claim;

87

United States District Court
Northern District of California

rather, the plaintiffs alleged that "Meta illegally acquired and maintained a monopoly in the 'personal social network services' . . . market 'through repeated misrepresentations over its data collection and use practices' that 'deprive[d] its competitors of the ability to compete.' " *Id.* at 959. The plaintiffs' expert opined that but for this conduct, competition would have led Meta to pay users for access to their personal data." *Id.*    The court, however, found the expert's opinion to be speculative.  *Klein* therefore does not help Colgate.

Furthermore, while Dr. Wilcox has performed his own survey that he contends establishes that there was no price premium due to the Challenged Claims, that conflicting evidence goes to the merits. It does not establish that the conjoint survey Dr. Dennis proposes is unreliable.

Colgate also challenges the proposed conjoint survey on the ground that it does not sufficiently approximate real-world conditions for a number of reasons.  This includes the fact that: 1) the front label claims and side label claims are presented in the same way on the list of attributes even though in real life the side label claims are less likely to be noticed; 2) by including the front label claims and side label claims as separate attributes on the list of attributes, the respondent will see both claims at the same time (in contrast to real life, where a consumer would not see both claims at the same time; and 3) the respondent must hover over an asterisk to see the "check locally" disclaimer.  The Court finds that all of these are technical issues relating to the design of the survey and go to the weight of the survey and not its admissibility.  Likewise, Dr. Wilcox's criticism that the survey does not account for habitual purchasers of the Products does not render the proposed survey unreliable under *Daubert*, though Colgate will be free to challenge the results of the survey on this basis at trial.

Accordingly, the Court DENIES the Dennis *Daubert* Motion.

### 2. Weir *Daubert* Motion

To the extent that Colgate challenges Mr. Weir's damages model based on his reliance on Dr. Dennis's conjoint survey, the Court rejects Colgate's challenge for the reasons discussed above.  It also rejects Colgate's assertion that Mr. Weir's testimony will not be helpful to the trier of fact because his damages model amounts to a simple multiplication operation.  The application of conjoint analysis to determine the damages of the class will involve more than a simple

mathematical calculation as Mr. Weir's damages calculation will require him to generalize survey results for a sample of the class to the entire class and to explain how the phasing in of the Challenged Claims over the class period is addressed by his model.  Furthermore, the economic principles governing conjoint analysis and its application to this case are not an area the jury is likely to be well-versed in.  Therefore, the Court declines to exclude Mr. Weir's testimony on this ground.

Colgate also argues that Mr. Weir's opinions should be excluded as unreliable because he cannot identify "at-issue sales" in light of the bleed-in approach used to introduce the claims to the Products.   Colgate's concerns are exaggerated.  While Colgate contends Mr. Weir's "goalpost" approach to this issue is "vague[,]" the Court finds that his description of how he will handle this issue is relatively straightforward. He will "identify production dates as goal posts, add buffer periods to omit any early sales that may not include the claims, and then conduct sensitivity analyses by shifting those periods forward to ensure estimates are not biased against Colgate." *Daubert* Opposition at 19 (citing Weir Reply Decl. ¶¶ 107–115).[12]  While Mr. Weir's ability (or inability) to match sales to particular product labels "may provide a basis for [Colgate] to argue to the trier of fact that damages or restitution should be reduced or rejected, . . . it does not undermine the fit or admissibility of [his] damages model." *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 576 (N.D. Cal. 2020).[13]

Therefore, the Court DENIES the Weir *Daubert* Motion.

[12] In *Willis v. Colgate Palmolive Co*., the court rejected a similar argument in which Colgate argued against class treatment of false advertising claims on the basis that the toothpaste at issue in that case "was sold in multiple sizes with differing claims, the class does not specify a time period, and it [was] highly unlikely that class members saved their receipts, and consumers [would] unlikely recall which products they purchased." No. 19-cv-8542, 2023 U.S. Dist. LEXIS 241714, *69 (C.D. Ca'. Jan. 5, 2023). The court reasoned that "there would be no such thing as a consumer class action if defendants could simply argue that class members do not have proof that they belong in a class." *Id.* (internal quotation and citation omitted).

[13] Plaintiffs acknowledge that there is evidence in the record that as to the 6 ounce and 6.3 ounce versions of one of the Products, Max Fresh, there was a period when both versions of the product (one with the Recyclability Claim and one without it) were being manufactured simultaneously. *See Daubert* Opposition at 19-20 (citing Thairani Decl., Ex. AI (Rein Dep.) at 144-145.  Because Plaintiffs have now revised the class definition to exclude these particular Max Fresh products, the Court need not address whether this evidence raises questions about the reliability of Mr. Weir's "goalpost" approach with respect to those products.

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.    CLASS CERTIFICATION MOTION**

**1.    Rule 23(b)(3)**

Colgate does not dispute that the numerosity and commonality requirements are met by Plaintiffs' revised proposed class and subclasses.  It argues that class certification is improper, however, because individualized issues related to materiality and classwide exposure predominate; that the class is overbroad because it contains members who could not have been injured; that the proposed damages model does not satisfy *Comcast*; and that the named plaintiffs are not typical or adequate class representatives.  Below, the Court addresses these arguments as they relate to the revised class definition offered by Plaintiffs in their supplemental briefing.

a.    Predominance

i.    Nature of Plaintiffs' Claims

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 809 (2011).  Here, Plaintiffs assert false advertising claims under California's CLRA, UCL and FAL and also assert a common law fraud claim based on one core alleged misrepresentation, namely, the claim "Recyclable Tube" on the outer packaging of the Products.

California's CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770.  "To bring a CLRA claim, a plaintiff must show (1) the defendant engaged in deceptive conduct and (2) the deception caused plaintiff harm." *Lytle v. Nutramax Lab'ys, Inc*., 114 F.4th 1011, 1034 (9th Cir. 2024), cert. denied, 145 S. Ct. 1308 (2025) (citing *Stearns v. Ticketmaster Corp*., 655 F.3d 1013, 1022 (9th Cir. 2011)). "However, under the CLRA, '[c]ausation, on a classwide basis, may be established by materiality. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class.'"  *Id.* (quoting *Stearns*, 655 F.3d at 1022) (internal quotations and citation omitted). "A misrepresentation is material 'if a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question[.]' " *Id.* (quoting *Stearns*, 655 F.3d at 1022)).

90

United States District Court
Northern District of California

The UCL "prohibits any 'unlawful, unfair or fraudulent business act or practice.'" *Moore v. Mars Petcare US, Inc*., 966 F.3d 1007, 1016 (9th Cir. 2020) (quoting Cal. Bus. & Prof. Code § 17200). "California's FAL prohibits any 'unfair, deceptive, untrue or misleading advertising.'" *Id.* (quoting *Williams v. Gerber Prods. Co*., 552 F.3d 934, 938 (9th Cir. 2008) (quoting Cal. Bus. & Prof. Code § 17500)). "Any violation of the [FAL] . . . necessarily violates' the [UCL]." *Kasky v. Nike, Inc*., 27 Cal.4th 939, 950 (2002) (quoting *Committee on Children's Television, Inc. v. General Foods Corp*., 35 Cal.3d 197, 210 (1983)). UCL and FAL claims, like CLRA claims, are governed by the "reasonable consumer" test. *Williams v. Gerber Prods. Co*., 552 F.3d 934, 938 (9th Cir. 2008).

A claim under the UCL may be brought by a person who has "suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. The California Supreme Court has "interpreted this statute to mean that named plaintiffs, but not absent ones, must show proof of 'actual reliance' at the certification stage." *Smith v. Keurig Green Mountain, Inc*., No. 18-CV-06690-HSG, 2020 WL 5630051, at *5 (N.D. Cal. Sept. 21, 2020) (quoting *Walker v. Life Ins. Co. of the Sw*., 953 F.3d 624, 630 (9th Cir. 2020) (quoting *In re Tobacco II Cases*, 328, 207 P.3d 20, 40 (Cal. 2009))). As to the absent class members, a presumption of reliance may arise where "misrepresentations and false statements were part of an extensive and long-term advertising campaign." *In re Tobacco II Cases*, 46 Cal. 4th at 328. For example, in *Smith*, the court held that a presumption of reliance applied to the class where the recycling representations that were claimed to be deceptive were on the product website and also "always included on the Products' packaging." 2020 WL 5630051, at *5.

Finally, a common law fraud claim requires that plaintiffs prove that the defendant "made false representations with knowledge of their falsity, that these representations were made with intent to and did induce reasonable reliance by plaintiffs, and that plaintiffs suffered damages as a result." *Vasquez v. Superior Ct*., 4 Cal. 3d 800, 811 (1971). With respect to the reliance element, California courts have held that "if the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class." *Id.* at 814; *see also Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355, 363 (1976) (for common-law

fraud class, reliance can be proven on common basis by showing that misrepresentations were material).   Materiality on a common law fraud claim is governed by the same reasonable person standard that applies to the statutory claims discussed above.  *Vasquez*, 4 Cal. 3d at 814 n. 9.

Taking these standards and the theory of Plaintiffs' claims into consideration, the Court finds that common issues predominate, as discussed below.

### ii.  Classwide Proof of Materiality and Exposure

Under California consumer protection law, "[t]he relevant analysis . . . does not consider whether each class member saw and  relied on each of the Challenged Statements and in what combination, but instead whether the Challenged Statements were used consistently through the Class Period, supporting an inference of classwide exposure, and whether the Challenged Statements would be material to a reasonable consumer." *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 563–64 (N.D. Cal. 2020).  The Court finds that the facts here give rise to a presumption of classwide exposure and that materiality can be proven on a classwide basis, thus supporting the conclusion that the predominance requirement is met.

On the question of exposure, Colgate takes the position that individualized issues predominate because on some Product, the Challenged Claims were on the front of the package while on others, the claims were on the side or back only and thus were less likely to have been noticed or to have misled consumers.  Opposition at 13-14 (citing *Hadley v. Kellog Sales Co*., 324 F. Supp. 3d 1084, 1099–1100 (N.D. Cal. 2018) (*"Hadley I"*).  It further asserts that individualized issues will predominate with respect to exposure because a significant percentage of the Products carried no recyclability claims on their packaging during the class period due to the phased transition.  The Court is not persuaded by either argument.

First, with respect to Colgate's assertion that individualized issues predominate because of the placement or prominence of the challenged claims on the product packaging, the Court respectfully disagrees with the reasoning and conclusion reached by the court in *Hadley I*, upon which Colgate relies.  In that case, Judge Koh found that "an inference of class-wide exposure to an alleged misrepresentation affixed to a product's packaging might not be warranted if the alleged misrepresentation is not sufficiently prominently displayed on the packaging." 324 F.

United States District Court
Northern District of California

Supp. 3d at 1099. Judge Koh then held "as a matter of law that one statement ('wholesome goodness') was not prominent enough to be certified because it 'only appeared (1) on the back panel of the Nutri-Grain packaging; (2) "in small font"; and (3) in the middle of a block of text.' " *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 564 (N.D. Cal. 2020) (quoting *Hadley I*, 324 F. Supp. 3d at 1100).

In *Krommenhock,* Judge Orrick examined the reasoning in *Hadley I* and declined to follow that case:

> In reaching this issue on class certification, Judge Koh relied on *Zakaria v. Gerber Products Co*., LACV1500200JAKEX, 2016 WL 6662723 (C.D. Cal. Mar. 23, 2016). There, the challenged representations on the products were "accompanied by other information, in small font, and sometimes located on the back or inside cover" of the product. *Id*. at *8. Based on that record, the court concluded as a matter of law that the "alleged misrepresentations were not prominently displayed. For this reason, it cannot be inferred that there is a 'high likelihood that in the process of buying the product, the consumer would have seen the misleading statement on the product and thus been exposed to it.' " *Id*. at *8 (quoting *Ehret v. Uber Techs., Inc*., 148 F. Supp. 3d 884, 895 (N.D. Cal. 2015)). The issue in *Ehret*, which was also relied on by Judge Koh and is not a labelling case, was "whether class-wide exposure can be inferred where Uber's alleged misrepresentations regarding the 20% gratuity were primarily on its website, blog, and e-mail messages, rather than on the Uber app itself." *Id*. at 895–96. In that case, the court denied class certification where "although there may have been a consistent misrepresentation, there is insufficient evidence that all customers during the class period were likely exposed to the misrepresentation" given that many customers only interacted with the app. *Id*. at 900.
>
> . . .
>
> Here, there is no dispute that the majority of Challenged Statements were made consistently (or consistently enough) throughout the relevant timeframes on the Products' packages. As to the prominence of statements on the Products' packages, plaintiffs argue that Judge Koh's approach – deciding the issue as a matter of law on class certification – was unnecessary because under California law prominence goes only to the inapposite question of whether significant numbers of prospective class members saw or interacted with the statement. According to plaintiffs, California law does not ask whether class members actually saw or relied on representations, but simply whether the representations were consistently made and were material to a reasonable consumer.
>
> I agree with plaintiffs. Where, as here, there is evidence that the representation was consistently made on a product's label, the only question is whether it was objectively material to a reasonable consumer. *Bradach v. Pharmavite, LLC*, 735 Fed. Appx. 251, 254 (9th Cir. 2018) (unpublished), cert. denied, ⸺ U.S. ⸺, 139 S. Ct.

491, 202 L.Ed.2d 379 (2018) ("Under California law, class members in CLRA and UCL actions are not required to prove their individual reliance on the allegedly misleading statements. Instead, the standard in actions under both the CLRA and UCL is whether 'members of the public are likely to be deceived.' "); *see also Kumar v. Salov N.A. Corp.*, 14-CV-2411-YGR, 2016 WL 3844334, at *4 (N.D. Cal. July 15, 2016) ("The statement appeared on the front of the bottle. Salov's arguments—that the font size and color were too small to make the statement stand out; that consumers would not misunderstand the language the way Kumar alleges; and the presence of a hang-tag on the bottle neck or a statement on the back of the bottle would have blocked consumers' view of the statement—all go to the proof of whether a reasonable consumer would have been misled, not to determining who meets the class definition."); see *id.* at *7 ("To state a claim based on false labeling, "it is necessary only to show that 'members of the public are likely to be deceived.' " [ ] Thus the answer to the reasonable consumer question based on common facts, that is, identical statements on the labels of the products at issue."); *Martin v. Monsanto Co.*, EDCV 162168-JFWSPX, 2017 WL 1115167, at *7 (C.D. Cal. Mar. 24, 2017) ("Monsanto has 'failed to present any evidence that class members were able to purchase [the] products without being exposed to the alleged misrepresentations,' so predominance is satisfied."). When relevant, prominence goes to the materiality and misleading questions to be resolved by the jury.

*Krommenhock*, 334 F.R.D. at 564–65.

This Court agrees with the reasoning in *Krommenhock* that for the purposes of class certification, so long as the Recyclable Tube claim appeared on a Product, a presumption of classwide exposure arises regardless of the prominence of the claim on the packaging. The Court rejects Colgate's assertion that Judge Orrick's analysis is inconsistent with the Ninth Circuit's holding in *Mazza v. Am. Honda Motor Co.* "that a lack of common 'exposure' negates an inference of reliance such that 'common questions of fact do not predominate.'" Opposition at 13 n. 7 (citing *Mazza*, 666 F.3d 581, 595 (9th Cir. 2012), overruled by *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022))). *Mazza* did not involve claims made on product labels but instead, involved advertisements about a particular feature of a car sold by the defendant where the advertising was described by the court as "very limited." 666 F.3d at 595. In that context, the court found that "the small scale of the advertising campaign [did] not support a presumption of reliance" and therefore, that individual issues predominated." *Id.* at 594.

Other cases cited by Colgate also do not support its position. In *In re Hyundai & Kia Fuel Econ. Litig.*, for example, the advertising at issue did not involve product labelling but instead,

94

advertising related to particular vehicles that appeared on television "during the NFL playoffs, the Super Bowl, and the Academy Awards, . . . on Amazon, Facebook, Yahoo, and other internet sites," in some "print advertising," and on billboards in Times Square and along California freeways. 881 F.3d 679, 696 n. 11 (9th Cir. 2018), on reh'g en banc, 926 F.3d 539 (9th Cir. 2019). Likewise, in *Castro Valley Union 76, Inc. v. Vapor Sys. Techs*., Inc., 2012 WL 5199458, at \*10 (N.D. Cal. Oct. 22, 2012), also cited by Colgate, *see* Opposition at 11, the false advertising claims were based on allegedly false statements to gas station owners who purchased the defendant's gas nozzle where there were *no* uniform written materials supplied to the proposed class of station owners and the evidence showed that the defendant had not communicated with some station owners at all. The holding in *Krommenhock* therefore does not run afoul of *Mazza*, *Hyundai* or *Castro Valley Union.*

With respect to Colgate's further argument that individualized issues predominate because the challenged claim was not made consistently on the Products during the class period, the Court finds that in this case, as in *Krommenhock*, the Challenged Claims were made "consistently enough" on the Product packaging throughout the challenged time period to support a presumption of classwide exposure. Moreover, Plaintiffs have ensured that all of the putative class members "were by definition exposed to a [recyclability claim], and [have] thereby eliminated all 'factual differences regarding ... exposure' to that statement that could give rise to predominance issues." *Hadley I,* 324 F. Supp. 3d at 1097 (citation omitted); *see also Falcone v. Nestle USA, Inc*., No. 24-7707, 2026 WL 74510, at \*1 (9th Cir. Jan. 9, 2026) ("Here, all the class members were exposed to the misrepresentation because it was on the products' packaging and, by definition, class members must have bought the products at issue to be part of the class; in labeling fraud cases, this is all that is required. Thus, exposure is a common question that predominates over individual inquiries."); *Sinatro v. Barilla Am., Inc*., No. 22-CV-03460-DMR, 2024 WL 2750018, at \*5 (N.D. Cal. May 28, 2024), reconsideration denied, No. 22-CV-03460-DMR, 2024 WL 4008715 (N.D. Cal. Aug. 29, 2024) (finding that the class definition was "not overbroad because it [was] limited to those persons who purchased the Products . . . containing the Challenged Representation.") (internal quotation and citation omitted).

95

The remaining question is whether materiality can be established on a classwide basis. The Court finds that it can. First, as to the UCL's "unlawful" prong, Plaintiffs' claims are based on the theory that the Product labels that are the subject of their claims violated the Green Guides and California law by including a Recyclability Claim when a substantial majority of California consumers do not have access to recycling facilities and when the products are not yet reused in end markets. These questions will be addressed by common proof and any disputes between the parties' experts about whether a substantial majority of California recycling facilities accept Colgate's products for recycling or whether the tubes are actually reused are merits questions that have no bearing on class certification. As to Plaintiffs' remaining claims, the reasonable consumer standard governs those claims and therefore, individualized inquiries are not required to establish materiality as to each class member.

### iii. Whether the Proposed Class is Overbroad

Colgate argues that the proposed class is overbroad because: 1) some putative class members got what they paid for because they live in areas where Colgate's tubes are, in fact, recycled; and 2) class members who purchased tubes with "check locally" on the packaging could not have been deceived. The Court finds these arguments unpersuasive.

The theory of Plaintiffs' claims is that under the FTC's Green Guides and California law, a product may be labeled recyclable only "[w]hen recycling facilities are available to a substantial majority [defined as, at least 60%] of consumers or communities where the item is sold." 16 C.F.R. § 260.12(b)(1). According to Plaintiffs, the Recyclability Claims on the Products are deceptive because recycling facilities that accept the products are *not* available to a substantial majority or consumers and further, that consumers paid a premium because of the recyclability claims. This Court agrees with Judge Gilliam's conclusion in *Smith v. Keurig* that in light of this theory, "[w]hether an individual class member's recycling facility happened to accept the Products is irrelevant." *Smith v. Keurig*, 2020 WL 5630051, at *7. "This common question can be addressed through classwide proof, and individualized inquiries into the collection capabilities at each class member's community recycling centers do not override the common issues." *Id*; *see also Swartz v. Coca-Cola,* C-21-4643 JD (N.D. Cal. July 27, 2023), dkt. no. 115 at 3 (holding that

where plaintiffs alleged that "each of the individual plaintiffs purchased bottles supplied by defendants, and that they paid a premium based on the 100% recyclable representation[,]" "[t]hese monetary injuries 'readily qualify as concrete injuries under Article III[ ]'" and that "[w]hether the bottles plaintiffs purchased were actually converted into reusable material after they were placed in the recycling bin is immaterial."). Because Plaintiffs contend they have suffered an economic injury and have demonstrated that that injury can be quantified on a classwide basis, Colgate's assertion that their claims assert "bare procedural violations" under *Spokeo* is not persuasive.[14]

Similarly, the Court rejects Colgate's argument that the proposed class is overbroad because it includes individuals who purchased Products that included "check locally" on the packaging.  The court in *Smith v. Keurig* rejected the same argument, explaining:

> Importantly, Plaintiff argues that both qualifiers were insufficient to adequately inform a reasonable consumer such that Keurig's recyclable claim was still misleading. Reply at 10. While a recyclable claim may be permitted if recycling facilities are available to less than a substantial majority, the claim must include the percentage of communities that have access to such facilities, and where "[t]he lower the level of access to an appropriate facility is, the more strongly the marketing should emphasize the limited availability of recycling for the product." 16 C.F.R. § 260.12(b)(2). Qualifiers such

_____

[14] Colgate cites to *Estrada v. Johnson & Johnson*, 2015 WL 1440466 (E.D. Cal. Mar. 27, 2015) for the proposition that a "plaintiff 'cannot claim that she paid a premium' for a product when 'she received all of the intended benefits of the bargain.' "  Opposition at 18.  In that case, the plaintiff had alleged that the defendant's baby powder product was unsafe because it increased the risk of women contracting ovarian cancer and further alleged that she purchased baby powder in reliance on the defendant's representations that the product was "safe." 2015 WL 1440466, at *1, 4. The court found that because there were no safety statements on the product itself and the plaintiff had only pointed to "general safety statements" on the defendant's websites, the plaintiff had failed to "substantiate an injury." *Id.* at *4.  The court went on to find as an additional reason to dismiss her claim that the plaintiff could not "claim that she paid a premium for the Baby Powder because she received all of the intended benefits of the bargain." *Id.* n. 9.  In support of that conclusion, the court cited a line of cases applying the rule that "[i]n product liability cases, . . . to establish standing based on a threat of future harm, plaintiffs must plead 'a credible or substantial threat to their health . . . .' " *In re Fruit Juice Prods. Mktg. & Sales Pracs. Litig.*, 831 F. Supp. 2d 507, 510 (D. Mass. 2011) (quoting *Herrington v. Johnson & Johnson Consumer Cos., Inc.*, No. C 09–1597 CW, 2010 WL 3448531, at *3 (N.D.Cal. Sept. 1, 2010)).  Because Plaintiffs' claims in this case are not based on a theory that Colgate's labelling of the Products resulted in any physical harm (or risk of physical harm) to Plaintiffs, the Court declines to expand this line of cases beyond that context as doing so appears to conflict with the many cases in which courts have found that economic injury, including payment of a price premium, is sufficient to establish standing in false advertising cases.

United States District Court
Northern District of California

as "Recyclable where facilities exist" or "Check to see if recycling facilities exist in your area" are still deceptive under Plaintiff's theory "because they do not adequately disclose the limited availability of recycling program." *Id*. at § 260.12(d). All of Keurig's qualifiers are subject to these same standards, and whether they are sufficient (or insufficient) can be established through common proof.

*Smith v. Keurig*, 2020 WL 5630051, at \*7.  The same reasoning applies here. Plaintiffs' theory is that the Products with the "check locally" language were still misleading because this language was not an adequate disclaimer under the Green Guides and California law.  That theory can be addressed on a classwide basis with common proof.

The Court further finds that *Howard v. Hain Celestial Grp., Inc*., 2024 WL 718180 (N.D. Cal. Feb. 22, 2024), appeal filed, No. 25-1919 (9th Cir. Mar. 24, 2025), does not support a contrary result. *See* Opposition at 17-18.  In that case, the plaintiffs asserted fraud and UCL unlawful claims based on the presence of nutrient content statements on certain foods marketed to children under age two, which allegedly violated FDA regulations incorporated into California's Sherman Law providing that "if a food product is specifically intended for children under two, the manufacturer cannot include certain statements on the label about the nutrient content of the product." 2024 WL 718180, at \*1 (citing 21 C.F.R. § 101.13(b)(3)).  The plaintiffs' proposed class was "comprised of all people who purchased the products, not just people who purchased the product for children under two." *Id.*  The court found that this class was overbroad because it included people who purchased the product for someone over two years old and therefore "could not have been defrauded." *Id.*  The court further concluded that the UCL unlawful claim was similar to the common law fraud claim and therefore, the plaintiffs were required to show that "they relied on the misleading statements." *Id.*  The court reasoned that "because the plaintiffs [were] bringing these claims on behalf of a proposed class, they must also show that it would at least be fair to infer that the rest of the class similarly relied on the alleged misrepresentation." *Id.* Because the class included individuals who could not have been misled, the court found, the "proposed class simply [did] not fit the plaintiffs' theory of liability" and therefore the court denied the plaintiff's request for class certification. *Id.*

The Court questions whether application of California law in *Howard v. Hain* is correct, given that it appears to be well-established that under California law, "reliance is not an element of

98

United States District Court
Northern District of California

a claim under the UCL unlawful or unfair prongs which are not based on fraud." *King v. Nat'l Gen. Ins. Co.*, No. 14-cv-0313 DMR, 2025 U.S. Dist. LEXIS 85677, at *74 (N.D. Cal. May 5, 2025) (citing *Medrazo v. Honda of N. Hollywood*, 205 Cal. App. 4th 1, 12 (2012), as modified on denial of reh'g 2012 Cal. App. LEXIS 547 (Apr. 16, 2012) (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 325 n.17)).   Even assuming that it was, that case is distinguishable from the facts here, where the theory of Plaintiffs' claims is that the Recyclability Claim on Colgate's products was deceptive under the Green Guides as to *all* class members, even as to the Products that included the "check locally" language. Whether or not that is true will depend on the facts of the case, including whether a substantial number of MRFs in California accept Colgate's tubes for recycling.  However, there is nothing in the Green Guides that would allow the Court to find, as a matter of law, that some class members fall outside of the ambit of those regulations.  Therefore, *Howard v. Hain* is not on point even if it was correctly decided.

Therefore, the Court finds that the proposed class is not overbroad.

### iv.  Classwide Proof of Damages

Colgate contends Plaintiffs have failed to establish, through "evidentiary proof," that their proposed damages model can accurately "measure only those damages attributable to [their] theory of liability."  Opposition at 18-19 (citing *Comcast*, 569 U.S. at 33, 35). This argument mirrors the arguments Colgate makes in its motions to exclude the opinions of Dr. Dennis and Mr. Weir.  As discussed above, the Court finds that Dr. Dennis and Mr. Weir incorporate historical pricing, sales data, and other supply-side factors into their analyses and further, that the proposed conjoint survey proposed by Dr. Dennis and damages calculation proposed by Mr. Weir offers a sufficiently reliable approach to calculating the price premium Plaintiffs allege the class paid as a result of the recyclability claims.  Therefore, the Court rejects this argument.

For all of the reasons discussed above, the Court finds that Plaintiffs have established that the revised proposed class satisfies the predominance requirement.

### b.  Typicality

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class

members have been injured by the same course of conduct." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (internal quotation marks and citation omitted). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). On the other hand, where "it is predictable that a major focus of the litigation will be on a defense unique to" the named plaintiff, the typicality requirement is not met. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992). "The typicality requirement ensures that 'the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Lee v. Pep Boys-Manny Moe & Jack of California*, No. 12-CV-05064-JSC, 2015 WL 9480475, at *8 (N.D. Cal. Dec. 23, 2015) (quoting *Gen Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982)).

Colgate contends all of the named plaintiffs were long-time purchasers of Colgate toothpaste who purchased the Products out of brand loyalty or for other reasons unrelated to the Recyclability Claim and therefore, that they are not typical of the class. The Court finds that under the permissive standards that govern typicality, the named plaintiffs satisfy the typicality requirement as all three testified that the Recyclability Claim affected their decision to purchase the Products and that they were misled by the Recyclability Claim. While a named plaintiff would *not* be typical if they conceded that they "did not read [the defendant's] statements on the product packaging of products purchased or explicitly testified that [they] did not rely on packaging statements[,] *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 662 (C.D. Cal. 2014), Colgate has pointed to no such testimony here. Furthermore, to the extent that the named plaintiffs' testimony may indicated that the Recyclability Claims were not the *only* reason they purchased the products, that does not mean that they will face unique defenses as "a plaintiff need not prove that the defendant's misrepresentation was the only cause, or even the predominant or decisive factor influencing his conduct[ ]" under California law. *Id.* (internal quotations and citation omitted).

Therefore, the Court concludes Plaintiffs have adequately demonstrated typicality.

### c.  Superiority

Under Rule 23(b)(3), courts must consider whether "a class action is superior to other

100

available methods for fairly and efficiently adjudicating the controversy." The factors courts should consider in making this determination include: "(A) the interest of members of the class in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by . . . members of the class; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." Fed.R.Civ.P. 23(b)(3). Here, Colgate asserts no separate challenges to superiority apart from its arguments that individualized inquiries will predominate. As discussed above, the Court finds that Plaintiffs have satisfied the predominance requirement. The Court further concludes that it is desirable to concentrate class members' claims in a single forum and that with the creation of appropriate subclasses, the litigation will be complex but manageable. Therefore, the superiority requirement is satisfied.

### d.   Subclasses

While the Court concludes that Plaintiffs' revised proposed class definition satisfies the requirements of Rule 23(b)(3), it also finds that in light of the many product labels at issue in this case, the creation of subclasses will facilitate case management. *See Am. Timber & Trading Co. v. First Nat. Bank of Oregon*, 690 F.2d 781, 786–87 (9th Cir. 1982) (holding that under Fed.R.Civ.P. 23(d), the district court has "broad power to adopt procedural innovations to facilitate management of the class action."). Therefore, the Court adopts the subclasses proposed by Plaintiffs in their supplemental brief. These subclasses are not required due to any conflicts of interest or inadequate representation but instead, may help to address the complexity of Plaintiffs' claims by segregating out the categories of packaging used by Plaintiffs' experts in addressing, *inter alia*, materiality and reliance.

### 2.   Rule 23(b)(2) Class

As discussed above, Rule 23(b)(2) allows a class action to be maintained where the requirements or Rule 23(a) are met and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).   "A

class seeking monetary damages may be certified pursuant to Rule 23(b)(2) where such relief is 'merely incidental to [the] primary claim for injunctive relief.' " *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir.), opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001) (quoting *Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776, 780 (9th Cir.1986)).  On the other hand, where the monetary relief sought by the class is the predominant relief sought in the case, class certification is not appropriate under Rule 23(b)(2) because adjudication of the class claims requires individualized determinations of money damages.  *See Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 541 (N.D. Cal. 2012).

In *Ries*, the putative class asserted false advertising claims based on allegedly false claims that the product was "natural" and requested certification under Rule 23(b)(2), seeking injunctive and declaratory relief as well as money damages (in the form of restitution and disgorgement of profits) based on the "artificially inflated prices" the plaintiffs alleged they paid as a result of the false claims.  287 F.R.D. at 52-528.  The Court denied class certification as to the putative class members' claims for money damages, certifying a class only as to the request for declaratory and injunctive relief, explaining as follows:

> Defendants' final contention, that plaintiffs' request for restitution is problematic in the context of certification under Rule 23(b)(2), has some merit. Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 131 S.Ct. at 2557. Although plaintiffs characterize restitution as a form of equitable relief, rather than for monetary damages, whether the monetary relief is understood as legal damages or an equitable remedy is irrelevant to this analysis. *See id*. Of course, monetary recovery is not entirely prohibited in the (b)(2) class context. For example, class claims for statutory or punitive damages that do not turn on the individual circumstances of class members may be sufficiently "incidental" to warrant certification under (b)(2).

> By contrast, here plaintiffs seek individualized awards of monetary restitution which would require individualized assessments of damages based on how many products the class member had bought. *See In re Flash Memory Antitrust Litig.*, No. 07–0086, 2011 WL 1301527, at *7 (N.D.Cal. Mar. 31, 2011) ("Because the restitution amount is dependent on the particular purchases made ... monetary relief will dictate the key procedures utilized in this case and require individualized inquiries and hearings."). Even though plaintiffs' claim for disgorgement could be subject to common proof because the amount of damages could be calculated based on overall beverage sales, rather than sales to individual consumers, it would still be

United States District Court
Northern District of California

United States District Court
Northern District of California

unmanageable under Rule 23(b)(2), which lacks Rule 23(b)(3)'s notice and opt-out requirements designed to facilitate the award of monetary damages to individual class members. *See Dukes*, 131 S.Ct. at 2559.

Furthermore, although the monetary amount sought may be small per class member, in the aggregate they can hardly be said to be incidental to the injunctive relief sought. Although plaintiffs describe their pursuit of monetary relief as secondary to their desire for corrective advertising and cessation of the allegedly deceptive labeling practices when arguing for class certification, based on the entire record in this case it is clear the monetary relief predominates. "Plaintiffs clearly state that the crux of their claims is that [they] paid artificially-inflated prices for [Arizona Iced Tea]" because it was labeled as all natural. *In re Flash Memory Antitrust Litig.*, 2011 WL 1301527, at \*7. Indeed, they begin their argument in opposition to defendants' summary judgment motion by arguing, "[d]efendants profit in this lucrative market for natural foods and drinks by dressing up its Arizona Beverage Products as 'Natural' and selling them to consumers who seek to purchase products made from ingredients that are found in nature and who are willing to pay more to buy these 'natural' products." Class certification is granted for the purposes of declaratory and injunctive relief and denied to the extent plaintiffs seek monetary damages, including restitution, refund, reimbursement and disgorgement.

*Id.* at 541–42.

The Court finds the reasoning in *Ries* persuasive. Furthermore, the predominant form of relief sought in this case is clearly the recovery of the price premia that Plaintiffs allege they paid as a result of Colgate's Recyclability Claim, which will necessitate individualized inquiries regarding how many Colgate products each class member bought. Indeed, Plaintiffs in their class certification reply brief did not address Colgate's argument under *Zinser* that a Rule 23(b)(2) class should not be certified because Plaintiffs' request for money damages is not incidental to their injunctive relief claims, implicitly conceding that it is not. Nor did Plaintiffs propose, as an alternative, that the Court certify a separate Rule 23(b)(2) class *only* as to their claims for declaratory and injunctive relief. Therefore, the Court denies Plaintiffs' request to grant class certification under Rule 23(b)(2).

## IV.    CONCLUSION

For the reasons stated above, the Motions to Exclude are DENIED. The Class Certification Motion is GRANTED. The Court certifies the following class and subclasses under Rule 23(b)(3):

103

United States District Court
Northern District of California

**Class**: All persons who purchased, in the State of California, a Colgate or Tom's of Maine brand toothpaste products with the language "Recyclable Tube" on the outer package ("Products") between August 29, 2019, and the date of notice of pendency, except the Excluded Products.

The Excluded Products are defined as MaxFresh 6 oz. (UPC No. 35000764522); MaxFresh 6.3 oz. (UPC No. 35000996671); and Tom's of Maine Sensitive Rapid Relief Toothpaste Fresh Mint Fluoride (UPC No. 77326835623).

**Subclass 1**: All Class Members who purchased Products with a "Recyclable Tube" claim or chasing arrows with an asterisk on the front panel of the outer package, and without "check locally" stated on the outer package.

**Subclass 2**: All Class Members who purchased Products with a "Recyclable Tube" claim on the back and/or side panel of the outer package, with no such claim appearing on the front panel, and without "check locally" stated on the outer package.

**Subclass 3**: All Class Members who purchased Products with a "Recyclable Tube" claim on the back and/or side panel of the outer package, with no such claim appearing on the front panel, and with "check locally" stated on the outer package.

**Subclass 4**: All Class Members who purchased Products with a "Recyclable Tube" claim or chasing arrows with an asterisk on the front panel of the outer package and with "check locally" stated on the outer package.

The Court appoints Mikhail Gershzon, Kristin Della, and Jill Lienhard as class representatives.

The Court appoints Gutride Safier LLP as Class Counsel.

The parties shall meet and confer and propose a schedule for class notice, including briefing of any disputes relating class notice, no later than **April 8, 2026**.

**IT IS SO ORDERED.**

Dated: April 1, 2026

_____
JOSEPH C. SPERO
United States Magistrate Judge

104